# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF NEW MEXICO

| | |
|---|---|
| LEADERSHIP INSTITUTE and | ) |
| | ) |
| TURNING POINT USA at the UNIVERSITY OF NEW MEXICO, | ) ) ) |
| | ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 1:24-cv-187 |
| | ) |
| GARNETT STOKES, in her official capacity as President of the University of New Mexico, | ) ) ) |
| | ) |
| JOSEPH SILVA, in his official capacity as Chief of Police of the University of New Mexico Police Department, | ) ) ) ) |
| | ) |
| TIMOTHY STUMP, in his official capacity as Lieutenant of the University of New Mexico Police Department, | ) ) ) ) |
| | ) |
| CHERYL WALLACE, in her official capacity as Director of the Student Union Building at the University of New Mexico, | ) ) ) ) |
| | ) |
| DENNIS ARMIJO, in his official capacity as Assistant Director of the Student Union Building at the University of New Mexico, and | ) ) ) ) |
| | ) |
| RYAN LINDQUIST, in his official capacity as Director of the Student Activities Center at the University of New Mexico, | ) ) ) ) |
| | ) |
| Defendants. | ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Leadership Institute (LI) and Turning Point USA at the University of New Mexico (TP-UNM), through their undersigned counsel, hereby file this Complaint for Declaratory and Injunctive Relief and sue the above-named Defendants in their respective official capacities, as follows:

## INTRODUCTION

1. "The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth[.]" *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

2. To that end, courts have long recognized that college campuses are "peculiarly the marketplace of ideas," where the constitutional right to speak is given "vigilant protection[.]" *Healy v. James*, 408 U.S. 169, 180 (1972) (internal quotation marks and citation omitted).

3. But the University of New Mexico (UNM) has abdicated its duty to vigilantly protect the free speech rights of its students.

4. Relying on a policy that allows university officials to impose security fees on student organizations based on a non-exhaustive list of factors, Defendants refused to allow TP-UNM to host a speaking event unless its members agreed to pay nearly $7,500 in security fees.

5. This security fee policy is facially unconstitutional, as "[t]he First Amendment prohibits the vesting of such unbridled discretion in a government official." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 133 (1992).

6. The TP-UNM event featured speaker Riley Gaines, a former Division I swimmer and employee of LI who speaks publicly about her experience competing against a transgender athlete and who advocates for the protection of women's opportunities in sports.

7. Defendant Stump, a UNM police lieutenant, stated to TP-UNM that the university would not have charged these fees to a hypothetical student organization screening the Barbie movie because it was not "worried about the Barbie movie."

8. But Defendant Stump and other UNM officials determined—because of the nature of the event and "consistent" with how the university had assessed conservative speaking events in the past—that thirty-three police officers, including arresting officers, would be necessary at or near the event that night.

9. UNM officials thus engaged in viewpoint and content discrimination when they required Plaintiffs to bear the cost of security based on the officials' subjective assessment of the crowd's potential reaction to Ms. Gaines' speech.

10. UNM also maintains a policy that only requires university policies regulating speech to be "reasonable" and "viewpoint-neutral."

11. The speech policy is unconstitutional on its face because it gives university officials authority to impose unconstitutional, content-based restrictions on speech.

12. UNM's policies and actions have denied Plaintiffs the right to engage freely and openly in the marketplace of ideas. Declaratory and injunctive relief are necessary to stop UNM's unconstitutional practice of forcing students and speakers to bear burdensome security fees to exercise their basic freedoms.

**PARTIES**

13. Plaintiff Leadership Institute is a 501(c)(3) organization that provides training, fundraising, and grassroots support to conservative student organizations.

14. Plaintiff Turning Point USA at the University of New Mexico is a chartered student organization at the University of New Mexico whose members engage in on-campus speech activities from a conservative point of view on topics including limited government, self-defense and the right to bear arms, feminism, socialism, capitalism, and gender ideology.

15. Defendant Garnett Stokes is the President of the University of New Mexico. At all times relevant to this complaint, Defendant Stokes exercised control over the other Defendants under color of state law and within the scope of her employment.

16. Defendant Joseph Silva is the UNM Police Department's Chief of Police. At all times relevant to this complaint, Defendant Silva acted under color of state law and within the scope of his employment.

17. Defendant Timothy Stump is a Lieutenant of the UNM Police Department. At all times relevant to this complaint, Defendant Stump acted under color of state law and within the scope of his employment.

18. Defendant Cheryl Wallace is the Director of the Student Union Building at UNM. At all times relevant to this complaint, Defendant Wallace acted under color of state law and within the scope of her employment.

19. Defendant Dennis Armijo is the Assistant Director of the Student Union Building at UNM. At all times relevant to this complaint, Defendant Armijo acted under color of state law and within the scope of his employment.

20. Defendant Ryan Lindquist is the Director of the Student Activities Center at UNM. At all times relevant to this complaint, Defendant Lindquist acted under color of state law and within the scope of his employment.

## JURISDICTION AND VENUE

21. This case arises directly under the First and Fourteenth Amendments to the United States Constitution, the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

22. This Court has jurisdiction over the complaint under 28 U.S.C. §§ 1331 (federal question) and 1343 (redress for deprivation of civil rights).

23. This Court has jurisdiction over the remaining claims in the complaint under 28 U.S.C. § 1367(a) (supplemental jurisdiction) because the claims are so related to Plaintiffs' federal claims that they are part of the same case or controversy.

24. This Court has authority to issue a declaratory judgment, to order preliminary and permanent injunctive relief, attorneys' fees, and other relief that is necessary and proper pursuant to 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. §§ 1983 and 1988, and Fed. R. Civ. P. 65.

25. Venue is appropriate in this district under 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to this claim occurred in this district. Alternatively, venue is appropriate under 28 U.S.C. § 1391(b)(1) as, on information and belief, all Defendants are residents of the state of New Mexico and at least one Defendant resides in this district.

26. This Court has personal jurisdiction over Defendants because they maintain their offices and are employed in this district.

## FACTS

### University of New Mexico Policies

27. UNM Regents' Policy 2.1: Free Expression and Advocacy (free speech policy) states that the Board of Regents "recognize[s] and approve[s] the right of free speech and honest

expression of opinion on any subject by any member of the University community, subject only to reasonable viewpoint-neutral rules."[1]

28. The free speech policy authorizes the president of UNM to serve as the primary spokesperson for the university and to develop viewpoint-neutral policies and procedures involving free expression on campus.

29. UNM Administrative Policy 2230: Police and Security Services (security fee policy) states that the UNM Police Department is responsible for providing security services, including "maintaining adequate security on campus and at special events[.]"[2]

30. The security fee policy states that "[s]pecial events may require security," and it defines a "special event" as "any non-routine event held in a University building or on University property."

31. According to the security fee policy, UNM "will evaluate the following factors to determine required security services for a special event:

      a. an accurate estimate of the number of attendees at the event

      b. the venue's size and location

      c. the number of entrances and exits, within the venue, and access to restrooms and other facilities near the venue

      d. whether the event will be open to the public

      e. whether there will be a ticketing process and what type

      f. length of time scheduled for the event

---

[1] https://perma.cc/LUT8-K4ZX

[2] https://perma.cc/34LH-6REL

      g. whether the event will occur during daylight or evening hours

      h. whether a fee will be charged for entry, goods, or services

      i. whether alcohol will be served at the event."

32. The security fee policy states that a "basic cost of security . . . will be charged to all groups" based on a schedule of charges that the UNM Police Department posts on its website.

33. Student organizations that want to host a special event must complete a "Special Events Notification Form" (event form) ten business days before the event.[3]

34. On the event form, UNM asks for details about the event, such as start time, end time, estimated attendance, and location.

35. UNM also asks whether the organization is requesting security for the event. It advises that the UNM Police Department may determine that police are required, and it lists the hourly rates for each position in the department.

36. According to the security fee policy, the sponsor of a special event is responsible for paying "basic security costs," and university departments "will be invoiced internally for security fees."

37. UNM Administrative Policy 5250: Use of University Facilities (facilities policy) also states, "[t]he basic cost of security will be charged to all groups."[4]

38. Neither the security fee policy, nor the event form, nor the facilities policy indicate the "basic cost of security" that will be charged to all groups.

---

[3] https://perma.cc/7XEK-DWTN

[4] https://perma.cc/M9KJ-7KX3

39. The facilities policy also provides that the "[f]ailure to pay . . . security fees . . . may result in the immediate loss of scheduling privileges, possible disciplinary action, or possible legal action."

**The Riley Gaines Event**

40. TP-UNM's student members believe they have an important role to play on UNM's campus as the only chartered student organization with conservative views.

41. TP-UNM's members enjoy engaging in open inquiry about current affairs, including the role of government, free market principles, socialism, modern day feminism, self-defense and the Second Amendment, and biological sex, gender, and gender ideology.

42. Before the fall 2023 semester began, TP-UNM submitted a request to host an event featuring speaker Riley Gaines. The event was scheduled to last for 3.5 hours.

43. Ms. Gaines is a former Division I college athlete who speaks publicly about her experience competing against a transgender-identifying athlete. She advocates for the protection of women in sports and the preservation of competitive eligibility based on biological sex.

44. Ms. Gaines serves as Director of the Riley Gaines Center at the Leadership Institute.

45. In early September 2023, approximately one month after initiating the request process, TP-UNM's leadership learned that there was a scheduling conflict with the space they originally requested.

46. In a meeting with Defendants Stump, Armijo, and Wallace on September 5, 2023, TP-UNM's student representatives learned that UNM planned to move the event to a different space and would require the presence of UNM police officers, a service which would cost TP-UNM's members $10,202.50 according to an invoice provided to the students at the meeting.

47. TP-UNM met with Defendants Stump and Wallace a second time on September 7, 2023, to discuss ways to lower the security costs.

48. Defendant Stump informed TP-UNM that the quote of over $10,000 reflected his intent to station all thirty-three police officers UNM employed at or near the event for its entire duration, as well as for one hour before and after, for a total of 5.5 hours per officer.

49. When TP-UNM asked why Defendant Stump intended to assign every officer to the Gaines event, and whether it depended on the location or the speaker, he responded that "it's all based on individual assessments," that he was looking at the "individual," and that "there is not a criteria."

50. He also told the TP-UNM student representatives that if they were to screen the Barbie movie in a venue on campus, not even a single security officer would likely be required because he was "not worried about the Barbie movie."

51. Defendant Stump also said that the UNM Police Department was "consistent" in how it assessed fees "to Turning Point" in the past, and he described past TP-UNM events featuring other conservative speakers that generated protests at UNM.

52. A few times during the meeting, he reiterated that UNM assesses security fees on a "case-by-case basis."

53. In a third meeting on September 18, 2023, between TP-UNM's student representatives and Defendants Lindquist and Stump, Defendant Stump agreed to lower the cost of security by cutting the officers' scheduled time from 5.5 to 4.5 hours. He provided TP-UNM with a new quote of $7,420.00.

54. He also agreed to dismiss officers during the event where possible to keep costs down.

55. He informed TP-UNM's student representatives that they needed to agree in writing to pay the security fee invoice or else the event would not be allowed to proceed.

56. UNM presented TP-UNM with a Space Reservation Agreement for KIVA lecture hall (reservation agreement).

57. The reservation agreement reiterates, "UNM reserves the right to determine, in conjunction with Campus Police, the number of security staff for each event and will determine whether internal or external security will be used."

58. TP-UNM and LI did not believe that the security fee was constitutional. But because they had already made a commitment to Ms. Gaines and because Ms. Gaines was not available to speak on another day that semester, Plaintiffs believed they had no choice but to pay the fee to proceed with the event.

59. LI agreed in writing to pay "reasonable security costs" on behalf of TP-UNM.

60. Ms. Gaines came to campus on Wednesday, October 4, and spoke from 7:00-9:00 p.m. to a crowd of approximately 200 people.

61. The event was open to members of the public; they needed tickets to enter, but the tickets were free.

62. Approximately ten protestors showed up that evening after the event started.

63. Upon information and belief, no violence broke out, no property was damaged, and no arrests were made related to the event.

64. The day after the event, Defendant Stump sent an invoice to TP-UNM totaling $5,384.75.

65. According to the invoice, UNM hired twenty-seven officers for the event. Six officers were dismissed after two hours and fifteen minutes. Three officers were dismissed after three hours and fifteen minutes. Eighteen officers remained at their posts for the entire event, which lasted four hours.

66. Some officers were stationed inside KIVA lecture hall and at its exits, but most were stationed at surrounding buildings, on rooftops, or roaming campus.

67. Three officers were specifically designated as an "Arrest Team."

68. Plaintiffs have not paid the invoice yet because they believe the fees are unreasonable and unconstitutional.

**Related Events**

69. Upon information and belief, in the spring of 2023, members of the UNM chapter of Students for Life America (SFLA) received a quote for $8,140 in security fees when they requested to host pro-life speaker Kristan Hawkins.

70. Upon information and belief, SFLA is no longer a chartered student organization at UNM after the students did not renew their charter.

71. One month after the Gaines event, the UNM student government hosted "Drag Bingo with Roxxxy Andrews" featuring a former contestant of *RuPaul's Drag Race*, a reality television series in which drag performers compete for fame and fortune.

72. Roxxxy Andrews has a following of more than 500,000 users on Instagram.

73. Roxxxy Andrews is also known for political advocacy.

74. The event took place on a Thursday evening, at 7:00 p.m., in the UNM Student Union.

75. Members of TP-UNM observed that not a single police officer was visible near any of the entrances or exits, nor inside the event space.

## INJURY TO PLAINTIFFS

76. Plaintiffs should not be forced to pay excessive and unreasonable security fees, either from the Gaines event or in the future.

77. If LI does not pay the security fee invoice from the Gaines event, it faces a loss of its ability to send speakers to UNM campus and the threat of legal action by UNM; TP-UNM and its members face a loss of scheduling privileges, disciplinary action like the revocation of chartered student organization status, and the threat of legal action by UNM.

78. If TP-UNM's members must pay security fees any time UNM deems invited speakers controversial, they will have less money available for other activities, including tabling on campus, distributing flyers and printed materials, and hosting events.

79. TP-UNM plans to bring speakers to campus in the future. Plaintiffs cannot predict whether UNM will again require excessive security fees for those events but based on statements leading up to the Gaines event about TP-UNM's history, they anticipate that UNM will again assess high security fees when TP-UNM requests to host another speaker, including those LI supports or employs.

80. If TP-UNM's members are assessed high security fees again in the future, they will likely not proceed with the event.

81. The acts and policies complained of herein will chill Plaintiffs' speech because they will refrain from hosting similar speaking events rather than being forced to pay $5,000 to $10,000 in security fees each time.

82. Plaintiffs cannot schedule future speakers until this problem is resolved. Without knowing whether their charter and scheduling privileges will remain intact or whether they will be forced to pay security fees in the future, TP-UNM's leadership cannot in good conscience make a commitment to the speakers they want to book.

83. Without a declaration that the acts and policies complained of herein are unconstitutional, Plaintiffs have a reasonable fear that Defendants will take legal action against them, that TP-UNM will suffer disciplinary actions including the loss of chartered student organization status and scheduling privileges for future events, that LI will be prevented from sending speakers to UNM campus, and that individual members of TP-UNM will face disciplinary action, reputational injury, and the loss of scholarship opportunities.

84. If the Court declares that the acts and policies complained of herein are unconstitutional, the declaration would clarify Plaintiffs' rights and conclusively determine whether they must pay the security fees charged by Defendants.

85. If the Court enjoins Defendants from enforcing the acts and policies complained of herein, Plaintiffs will be free to resume scheduling speakers who will articulate a viewpoint that TP-UNM wishes to see expressed on UNM campus.

## CLAIMS FOR RELIEF

### COUNT 1

**Violation of the First and Fourteenth Amendments
Vagueness and Overbreadth (Security Fee Policy)**

86. Plaintiffs incorporate the allegations above as if fully set forth herein.

87. The First Amendment demands that policies and ordinances "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited[.]" *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

88. Vague policies raise due process concerns because they force individuals to guess at their meaning. *Id*. at 108–09. As a result of this vagueness, individuals "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Id*. at 109 (internal quotation marks and citations omitted).

89. And when policies by their reach "prohibit[] constitutionally protected conduct" and chill speech as a result, they are unconstitutionally overbroad on their face. *Id*. at 114; *accord Forsyth Cnty.*, 505 U.S. at 129–30.

90. Vague and overbroad policies are also unconstitutional because they give officials unfettered discretion to approve or censor speech based on its viewpoint or content. *Forsyth Cnty.*, 505 U.S. at 130–33.

91. The security fee policy is unconstitutionally vague and overbroad on its face because it provides a non-exhaustive list of factors to consider when determining security services for an event. The policy does not explain how each factor impacts the amount of security required. And the policy does not include precise guidelines for administrators to follow when weighing the

14

factors, but instead leaves it to an individual administrator's discretion whether an event "*may require security.*"

92. Defendants' enforcement of the policy vests unbridled discretion in a government official to decide what speech is "controversial" enough to demand the security fee.

93. As a result of the policy, TP-UNM is deterred from hosting future speaking events on campus because the students cannot predict how much security will cost for other events. They also fear sanctions for failing to pay security fees imposed because of this policy.

94. In these ways, the policy gives university officials unbridled discretion to determine how much security is required per event, opening the door to unconstitutional content and viewpoint discrimination.

## COUNT 2

### Violation of the First and Fourteenth Amendments
### Viewpoint Discrimination (Security Fees)

95. Plaintiffs incorporate the allegations above as if fully set forth herein.

96. "[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984).

97. "Viewpoint discrimination is . . . an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995); *see also Flanagan v. Munger*, 890 F.2d 1557, 1566 (10th Cir. 1989) ("The Supreme Court has squarely rejected what it refers to as the

15

'heckler's veto' as a justification for curtailing 'offensive' speech in order to prevent public disorder.").

98. Defendants engaged in unconstitutional viewpoint discrimination when they made "individual assessments" and determined that, based on the nature of the Gaines event and past events held by TP-UNM, more security fees were required to prevent a potential hostile reaction from other students.

99. Defendants engaged in unconstitutional viewpoint discrimination when they forced TP-UNM's member to pay for twenty-seven officers, including arresting and roaming officers that were on duty for two hours longer than the Gaines event, in anticipation of a hostile reaction to her speech.

100. Defendants engaged in unconstitutional viewpoint discrimination when they compared the Gaines event to the Barbie movie and indicated that they were "not worried" about the Barbie movie and would not require any officers for the Barbie movie.

101. Defendants engaged in unconstitutional viewpoint discrimination when they determined that twenty-seven officers were needed at a conservative event discussing gender ideology and sexual identity but did not make a similar determination for an event featuring a drag queen and activist.

102. Defendants' viewpoint discrimination is per se unconstitutional, and, alternatively, in the event strict scrutiny applies, Defendants do not have a compelling or sufficiently important justification for infringing on Plaintiffs' First Amendment rights to speak on matters of public concern on a public college campus.

103. In the event strict scrutiny applies, the security fees were not narrowly tailored to serve a compelling interest.

### COUNT 3

**Violation of the First and Fourteenth Amendments**
**Content Discrimination (Security Fees)**

104. Plaintiffs incorporate the allegations above as if fully set forth herein.

105. "Speech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob. . . . Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Forsyth Cnty.*, 505 U.S. at 134–35 (internal quotation marks and citations omitted).

106. Defendants engaged in unconstitutional content-based discrimination when they determined that TP-UNM's event required more security, and thus higher security fees, based on what they perceived to be the controversial nature of Ms. Gaines' message and the reaction to her speech they anticipated.

107. Defendants do not have a compelling or sufficiently important justification for infringing on Plaintiffs' right to speak their minds on a matter of public concern on a public college campus.

108. The security fees were not narrowly tailored to serve a compelling interest.

### COUNT 4

**Violation of the First and Fourteenth Amendments**
**Content Discrimination (Free Expression Policy)**

109. Plaintiffs incorporate the allegations above as if fully set forth herein.

110. Regulations that "target speech based on its communicative content" are presumptively unconstitutional content-based restrictions. *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018).

111. UNM's free expression policy violates the First Amendment on its face because it only requires that policies be "reasonable" and "viewpoint-neutral," thus allowing university officials to impose content-based restrictions on speech.

112. Through the policy, the university ignores settled precedent that government must treat both a speaker's viewpoint *and* the content of her message neutrally.

113. Defendants do not have a compelling or sufficiently important justification for empowering Defendant Stokes to censor speech based on its communicative content.

114. The restriction is not narrowly tailored to serve a compelling interest.

### COUNT 5

### Violation of Article II, Section 17 of the New Mexico Constitution
### (Facial and As-Applied Challenge)

115. Article II, Section 17 of the Bill of Rights of the New Mexico Constitution provides: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press."

116. The New Mexico Civil Rights Act provides, "A public body or person acting on behalf of, under color of or within the course and scope of the authority of a public body shall not be subject or cause to be subjected any resident of New Mexico or person within the state to deprivation of any rights, privileges or immunities secured pursuant to the bill of rights of the constitution of New Mexico." NMSA 1978, § 41-4A-3(A).

117. Defendants are public persons who acted under color of state law and within the scope of authority at all times relevant to this complaint, and thus may be sued under the New Mexico Civil Rights Act. *See* NMSA 1978, § 41-4A-2.

118. Defendants violated Article II, Section 17 of the New Mexico Constitution for all of the reasons described herein, including: enforcing a vague and overbroad security fee policy; discriminating against Plaintiffs based on the content of their speech; discriminating against Plaintiffs based on their viewpoints; and enacting the free speech policy which allows for content-discriminatory rules.

119. Even if strict scrutiny applies, Defendants cannot satisfy it because the security fees complained of herein were not narrowly tailored to serve a compelling government interest.

## RELIEF REQUESTED

Plaintiffs respectfully request that this Court:

A.  Enter a declaratory judgment that the actions and policies complained of herein violated Plaintiffs' rights as secured by the First and Fourteenth Amendments of the United States Constitution and Article II, Section 17 of the New Mexico Constitution;

B.  Enter an order permanently ordering Defendants to take all affirmative steps necessary to remedy the effects of the unconstitutional conduct described herein and to prevent similar occurrences in the future;

C.  Enter an order preliminarily and permanently enjoining Defendants from demanding the payment of security fees complained of herein;

D.  Enter Plaintiffs an award for nominal damages of $1.00;

  E. Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988, NMSA 1978, § 41-4A-5, and any other applicable legal authority; and

  F. Grant Plaintiffs such other and further relief as the Court deems appropriate.

Dated: <u>February 27, 2024</u>.

                  Respectfully submitted,

           By: <u>/s/ Braden H. Boucek</u>
              Braden H. Boucek
              Georgia Bar No. 396831
              Tennessee Bar No. 021399
              Benjamin I. B. Isgur
              Virginia Bar No. 98812
              Southeastern Legal Foundation
              560 W. Crossville Road, Suite 104
              Roswell, Georgia 30075
              (770) 977-2131
              (770) 977-2134 (Fax)

              Carter B. Harrison IV
              924 Park Avenue SW, Suite E
              Albuquerque, NM 87102
              (505) 295-3261
              (505) 341-9340 (Fax)
              carter@harrisonhartlaw.com

              *Attorneys for Plaintiffs*