## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

LEADERSHIP INSTITUTE and )
)
TURNING POINT USA at the UNIVERSITY )
OF NEW MEXICO, )
)
     Plaintiffs, )
)
v. )  Case No. 1:24-cv-187-DHU-JMR
)
GARNETT STOKES, in her official capacity )
as President of the University of New Mexico, )
)
JOSEPH SILVA, in his official capacity as )
Chief of Police of the University of New )
Mexico Police Department, )
)
TIMOTHY STUMP, in his official capacity as )
Lieutenant of the University of New Mexico )
Police Department, )
)
CHERYL WALLACE, in her official capacity )
as Director of the Student Union Building at )
the University of New Mexico, )
)
DENNIS ARMIJO, in his official capacity as )
Assistant Director of the Student Union )
Building at the University of New Mexico, and )
)
RYAN LINDQUIST, in his official capacity as )
Director of the Student Activities Center at the )
University of New Mexico, )
)
     Defendants. )

---

## MOTION FOR PRELIMINARY INJUNCTION

---

Under Fed. R. Civ. P. 65(a), Plaintiffs respectfully request this Court issue a preliminary injunction.

## INTRODUCTION

"[T]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American [universities]." *Healy v. James*, 408 U.S. 169, 180 (1972). The freedom to speak about current affairs—"the essence of self-government"—on our nation's campuses is critical to both a functioning democracy and a well-rounded college experience. *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964). Colleges should harbor lively discussion about any topic and from any viewpoint. Indeed, the constitutional guarantees of free speech require that they do.

Unfortunately, not all of our nation's colleges and universities allow true diversity of speech. Instead, they silence students because of their viewpoints and the content of their speech. That is exactly what happened at the University of New Mexico (UNM). The members of Turning Point USA at UNM (TP-UNM) believe in free speech and feel a responsibility to represent conservative voices on a campus that otherwise has none. But when they requested to have Riley Gaines—a former college athlete who advocates for preserving competitive eligibility in sports based on biological sex—come and speak on campus, UNM initially informed the students that they could not hold the event unless they agreed to pay more than $10,000 in security fees to cover the cost of having all thirty-three of UNM's police officers on staff for the event. These fees were required not just for the four officers in the event room, but for officers in nearby buildings, on neighboring rooftops, and roaming the campus on bikes. After extensive negotiation between TP-

UNM's student leadership and UNM, the university invoiced TP-UNM and Leadership Institute (LI) for over $5,000 in security fees for a single speech.[1]

UNM's policies provide unbridled discretion to administrators when determining whether to permit speech. UNM's Policy 2.1: Free Expression and Advocacy (free speech policy) gives Defendant Stokes, UNM's president, the authority to enact and impose content-based restrictions, a violation of the First Amendment on its face. UNM Administrative Policy 2230: Police and Security Services (security fee policy) provides a list of general factors for determining if security fees should be charged to an event and how much they should be without providing any rules for applying the factors. The security fee policy's lack of guidance renders it both vague and overbroad; it gives university officials unbridled discretion to assess fees in a content- and viewpoint-discriminatory manner.

UNM officials exercised that unbridled discretion to discriminate against Plaintiffs' speech based on both its content and its viewpoint. Lieutenant Stump of the UNM police department repeatedly described the policy as requiring a "case-by-case" analysis. Defendant Stump's case-by-case analysis focused on the audience's reaction to the Plaintiffs' planned event and Ms. Gaines' speech—a constitutionally impermissible elevation of the heckler's veto. Through the security fee policy, Defendants imposed excessive security fees based on the content and viewpoint of Plaintiffs' planned event in violation of their constitutional free speech rights.

A preliminary injunction is urgently needed to stop this unconstitutional suppression of protected speech. Plaintiffs will likely prevail on the merits of these constitutional claims. Plaintiffs

---

[1] Since the college students could not afford the fee, they enlisted the help of LI, a grassroots nonprofit organization that assists conservative student organizations with planning and hosting speaking events.

suffered and continue to suffer irreparable harm through the loss of their constitutional freedoms of speech. An injunction will prevent further harm by restoring Plaintiffs' constitutional freedoms and ending any chill to their speech. Further, an injunction to remedy such deprivation is always in the public interest. Plaintiffs thus respectfully ask this Court to grant their motion for a preliminary injunction.

## STATEMENT OF THE FACTS AND CASE

TP-UNM is the only chartered conservative organization on campus. Jonathan Gonzales Decl. ¶ 11. Its members are students who believe in freedom of speech and limited government. They enjoy learning about and debating current affairs, including the right to self-defense, capitalism and free markets, modern-day feminism, and gender ideology. *Id.* ¶ 8. As conservatives, the members of TP-UNM feel that they are in a minority on campus and feel a responsibility to represent a voice that is not normally heard by their peers. *Id.* ¶ 9.

In the summer of 2023, TP-UNM decided to host an event featuring Riley Gaines, a former Division I college athlete who competed against transgender-identifying swimmer Lia Thomas and now speaks about the importance of protecting and preserving women's sports and the valuable opportunities they offer to young women. *Id.* ¶¶ 12–13. Ms. Gaines is employed by LI, where she serves as Director of the Riley Gaines Center. Sarah Clark Decl. ¶ 6.

TP-UNM began the request process on August 15, 2023, before the fall semester even began. Gonzales Decl. ¶ 16. Kenna Fleig, one of TP-UNM's co-presidents, timely submitted an event request form indicating that TP-UNM expected around 100 attendees for an event that would last 3.5 hours. *Id.* ¶¶ 17–18. The form noted that Ms. Gaines travels with her own security and that the students did not want to request additional security. *Id.* ¶ 19. A week later, on August 23, TP-

UNM received an email from UNM informing them that they were required to request and accept university security. *Id.* ¶ 20. TP-UNM promptly filled out the security request form. *Id.* ¶ 21. But a week later, UNM reached out again, this time to schedule a meeting for September 5. *Id.* ¶¶ 22–23. At that meeting, Defendant Stump of the UNM police department told the students that there was a problem with the space they originally requested. *Id.* ¶ 24. For "security reasons," Defendant Stump told TP-UNM that they needed to move to a different room. *Id.* In addition, he told the students that Ms. Gaines' security "does not have authority" on the UNM campus and so the students would be required to pay for police security. *Id.* ¶ 25. Defendant Stump provided the students an invoice and stated that the quote "has to be agreed upon before we can agree to let her speak." *Id.* ¶¶ 26–27.

The invoice listed the cost of security for the event as $10,202.50. *Id.* ¶ 28. That total included over *thirty* police officers, each working for 5.5 hours to cover a 3.5 hour, hundred-person event. *Id.* ¶¶ 18, 19, 28. Defendants maintain UNM Administrative Policy 2230: Police and Security Services (security fee policy). *See* Compl. ¶ 29; *see also* https://perma.cc/34LH-6REL. The security fee policy lists factors the university will consider when determining an event's security needs, including the number of expected attendees, the size and location of the venue, the number of entrances and exits, and the time of day and length of the event. *See id.* ¶ 31. The security fee policy also states that the police department "regularly" updates a "schedule of charges based on the factors" and that "[t]he basic cost of security according to this schedule will be charged to all groups[.]" *See* Compl. ¶ 32. When TP-UNM asked for clarification about where to find the published schedule of charges, Defendant Stump stated that the individualized, invoiced quote for $10,202.50 in security services *was* the schedule of charges. Gonzales Decl. ¶ 33.

Nothing on the police department's website or in any other UNM policy indicates what "the basic cost of security" is.

TP-UNM, Defendant Stump, and Defendant Wallace, Director of the Student Union Building on UNM campus, met on September 7 to discuss the possibility of a different space to keep security costs down. *Id.* ¶ 29. During the meeting, Defendant Stump stated that the quote of over $10,000 was for every officer UNM employed—thirty-three officers; nearly one for every three attendees the students expected. *Id.* ¶ 30. When TP-UNM asked why Defendant Stump intended to assign every officer to the Gaines event, and whether it was because of the speaker or the inviting organization, he responded that "it's all based on individual assessments," that they were looking at the "individual," and that "there is not a criteria [sic]." *Id.* ¶ 31. He also told the students that if an organization were to screen the Barbie movie in a venue on campus, he likely would not require even a single officer because the UNM police were "not worried about the Barbie movie." *Id.* ¶ 32. He then said that security was "consistent" in how it assessed fees "to Turning Point" in the past. *Id.* ¶ 31. He described past TP-UNM events featuring other conservative speakers that generated protests at UNM. *Id.* A few times during the meeting, he reiterated that UNM assesses security fees on a "case-by-case basis." *Id.*

In a third meeting with TP-UNM on September 18, Defendant Stump agreed to lower the security fees by cutting the officers' scheduled time from 5.5 hours to 4.5 hours. *Id.* ¶ 37. This resulted in a new quote for $7,420.00 in security fees. *Id.* ¶ 38. Defendant Stump also agreed to dismiss officers during the event when possible, again to keep costs down. *Id.* ¶ 37. He had previously informed TP-UNM's representatives that they needed to agree—in writing and in advance—to pay the security fee invoice or else the event would be cancelled. *Id.* ¶ 26.

Ms. Gaines was not available on another date that semester and the students wanted to have a timely discussion about the effect of allowing biological men to compete in women's sports. They only had two options: agree to pay the fee or cancel the event. Because the student organization could not afford to pay nearly $7,500 for one event, they needed the help of LI to pay the fee. LI issued a written statement via email agreeing to pay "reasonable security costs" for the event on behalf of the chapter. *See* Clark Decl. Ex. 1.

Ms. Gaines visited campus on Wednesday, October 4, at 7:00 p.m. and spoke to a crowd of around 200 people until 9:00 p.m. Gonzales Decl. ¶ 41. The event was open to members of the public; the tickets were free. Fewer than ten protestors showed up after the event started and demonstrated outside the event room. *Id.* ¶ 42. The demonstration was peaceful and non-disruptive. *Id.* ¶ 43. No police action was taken or needed. *Id.*

Five days later, on October 9, Defendant Stump issued a final invoice to TP-UNM for the event totaling $5,384.75. *Id.* ¶ 44. According to the invoice, the university staffed twenty-seven officers at the event who charged for a total of 95.25 hours. *Id.* ¶ 45. Only four of the twenty-seven officers were stationed inside the event venue (KIVA Lecture Hall, or KIVA). *Id.* ¶ 46. Fifteen officers were stationed in other areas of the building or in nearby buildings; two officers roamed outdoor areas of campus on bike; three were stationed on a nearby rooftop; three were specifically designated as an "Arrest Team." *Id.* ¶¶ 47–48.

UNM Administrative Policy 5250: Use of University Facilities (facilities policy) states that the "[f]ailure to pay . . . security fees . . . may result in the immediate loss of scheduling privileges, possible disciplinary action, or possible legal action." Compl. ¶ 39; *see also* https://perma.cc/M9KJ-7KX3. The members of TP-UNM fear that if the invoice is not paid, they

will lose their scheduling privileges and charter, which will impact their right to host events and conduct other student organization business. Gonzales Decl. ¶¶ 51–52. They fear that, as individuals, they could face disciplinary action, difficulties in finding a job after college, and a loss of scholarship opportunities. *Id.* ¶¶ 52–53. LI likewise fears that it will be subject to legal action or otherwise lose privileges as a guest on campus. Clark Decl. ¶ 20. And this is on top of Plaintiffs' shared concern that these fees will be required in the future and will prevent them from speaking or hosting speakers on UNM's campus. *See id.* ¶ 19; Gonzales Decl. ¶ 51.

This is not the first time UNM has issued a high security fee invoice to a conservative student organization. Just last spring, UNM imposed security fees to the tune of $8,140 on the UNM chapter of Students for Life America (SFLA) when they requested to host Kristan Hawkins, a conservative, pro-life speaker. Gonzales Decl. ¶ 58. SFLA is no longer a recognized student organization on campus after not renewing its charter. *Id.* ¶ 59.

Just one month after TP-UNM's event with Ms. Gaines, UNM's Student Government hosted "Drag Bingo with Roxxxy Andrews," a bingo event hosted by a drag performer who rose to fame as a contestant on the television show *RuPaul's Drag Race*. *Id.* ¶ 54. The event took place on a Thursday evening, at 7:00 p.m., in the UNM Student Union Building. *Id.* During the event, members of TP-UNM observed not a single security officer near any of the entrances or exits, nor inside the event space. *Id.* ¶ 57.

Plaintiffs sued UNM for violating their freedom of speech under state and federal law. In Count One of their Complaint, they alleged that the UNM security fee policy is facially vague and overbroad under the First Amendment because it provides a non-exhaustive list of factors to consider when determining security services for an event, giving university officials unbridled

8

discretion to determine whether and how much security each event's organizers must pay for. Compl. ¶¶ 86–94. In Count Two, they alleged that UNM discriminated against their viewpoints in violation of the First Amendment when, based on the nature of the Gaines event and past TP-UNM events, it determined that TP-UNM must pay for an excessive amount of security to prevent an anticipated hostile reaction from others. *Id.* ¶¶ 95–103. In Count Three, they alleged that UNM unconstitutionally discriminated against the content of their speech when it assessed high security fees to Plaintiffs based on Ms. Gaines' topic. *Id.* ¶¶ 104–08. In Count Four, they alleged that the university's free speech policy is unconstitutional on its face because it only requires that university policies be "viewpoint-neutral," thus allowing university officials to impose content-based restrictions on speech as Defendants did here. *Id.* ¶¶ 109–14. And in Count Five, they alleged that the university violated Article II, Section 17 of the New Mexico Constitution for the same reasons described above. *Id.* ¶¶ 115–19. Plaintiffs requested nominal damages in the amount of $1.00 and declaratory and injunctive relief against the policies and actions taken by UNM.

## ANALYSIS

"In determining whether to grant a preliminary injunction, a court must weigh (1) the likelihood that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the relative weight of the harm alleged by the movant and the harm to the nonmoving party; and (4) the public interest." *Citizens United v. Gessler*, 773 F.3d 200, 209 (10th Cir. 2014). Given "the seminal importance of the interests at stake" in a First Amendment challenge, the first factor is often "determinative." *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016). If a speaker can show that a First Amendment violation likely occurred, the other factors should weigh in the speaker's favor because "the public interest is better served by . . . protecting the core First

Amendment right of political expression." *Homans v. City of Albuquerque*, 264 F.3d 1240, 1244 (10th Cir. 2001) (per curiam).

I.   **Plaintiffs are likely to succeed on the merits.**

A.   **The security fee policy is unconstitutionally vague and overbroad on its face.**

Policies must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited[.]" *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). When policies contain vague language that sweeps constitutional activities into their purview, speakers are faced with the impossible choice of risking unknown consequences for violating the policies or self-censoring altogether. Worse still, vague and overbroad policies provide government officials with a blank check to censor speech based on viewpoint or content. If a policy allows "appraisal of facts, the exercise of judgment, and the formation of an opinion by the licensing authority, the danger of censorship and of abridgment of our precious First Amendment freedoms is too great to be permitted[.]" *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (internal quotation marks and citations omitted) (holding that a lack of clear guidelines in a permit ordinance gave county officials unbridled discretion to unconstitutionally assess fees on a case-by-case basis). Policies must contain limiting language that includes "narrowly drawn, reasonable and definite standards[.]" *Id*. at 133.

The UNM security fee policy is facially vague and overbroad. Although it lists criteria for officials to consider when assessing event security—such as venue size and location—the list is amorphous. *See* Compl. ¶ 31 (listing all nine factors). For instance, the policy fails to explain how much more security is required for a large venue compared to a small venue, or for an evening event compared to a daytime event. The security policy also states that the "basic cost of

security . . . will be charged to all groups" based on a schedule of charges that the UNM Police Department posts on its website. *Id.* ¶ 32. But the department only shows how much each officer is paid by the hour. Nothing indicates the "basic cost of security" that will be charged to all groups. Likewise, the reservation agreement given to TP-UNM prior to the event states that the university will determine when security is "necessary" for an event without offering any additional guidelines. This falls far short of the "narrowly drawn, reasonable and definite standards" required by the First Amendment. *See Forsyth Cnty.*, 505 U.S. at 133.

The security fee policy leaves ample room for abuse by giving university officials unbridled discretion to increase or decrease fees based on those hazy factors. As in *Forsyth County*, "[n]othing in the [policy] or its application prevents the official from encouraging some views and discouraging others through the arbitrary application of fees." *Id.* The vague factors allow administrators to impose arbitrary security fees on a case-by-case basis—a fact so obvious Defendant Stump felt no need obscure it. *See* Gonzales Decl. ¶ 31. This opens the door to abuse based on the viewpoint of speakers and the content of their speech. *See Forsyth Cnty.*, 505 U.S. at 134–35; *id.* at 133 n.10 ("[T]he success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance *preventing* him from doing so.") (emphasis added); *Sonnier v. Crain*, 613 F.3d 436, 448 (5th Cir. 2010) (holding that a university's security fee policy that left the amount of security in the "sole discretion" of officials and provided "no objective factors" had "the same shortcomings as the ordinance struck down in *Forsyth County*"); *Young America's Found. v. Napolitano*, No. 17-cv-02255, 2018 U.S. Dist. LEXIS 70108, at *11–12 (N.D. Cal. 2018) (holding that allegations that a

policy "includes no standards, either through the policy's terms or its history of enforcement, to limit any implementing officials' discretion . . . for example, no standard for determining what events fall under the policy, at what locations events may be held, and what, if any, security fee may be imposed" are sufficient to state a facial challenge).

Variations in fees often demonstrate unbridled discretion. *Forsyth Cnty.*, 505 U.S. at 132– 33 (holding that because a county official imposed various fees to different groups using county property without explaining the fluctuations, there were no objective factors in place to curb the arbitrary application of fees). UNM presented Plaintiffs with three different quotes for security fees related to just this event: $10,202.50, then $7,420.00, and finally $5,384.75. Gonzales Decl. ¶¶ 28, 38, 44. And, as described more fully below, Plaintiffs believe that UNM has charged anywhere from $0 to $8,140 for events that are comparable in size, venue, and nature to this one. *See id.* ¶¶ 54–59. For these reasons, the policy is unconstitutionally vague and overbroad.

**B. The security fees applied to Plaintiffs were unconstitutional.**

**1. Defendants engaged in unconstitutional viewpoint discrimination.**

Defendants imposed the security fees in a manner that discriminated against both the content and the viewpoint of Plaintiffs' speech.

"[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984); *accord Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos.*, 515 U.S. 557, 579 (1995) (explaining that the government "is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government"). When government places a higher

12

burden—such as excessive security or permit fees—on a speaker based on anticipated public reaction, it engages in viewpoint discrimination because it makes a value judgment about how tolerable the speech will be. *See Matal v. Tam*, 582 U.S. 218, 243 (2017) ("Giving offense is a viewpoint."); *id.* at 244 (collecting 80 years of cases); *id.* at 250 (Kennedy, J., concurring) ("Indeed, a speech burden based on audience reactions is simply government hostility and intervention in a different guise. The speech is targeted, after all, based on the government's disapproval of the speaker's choice of message."); *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2317 (2023) ("Nor, in any event, do the First Amendment's protections belong only to speakers whose motives the government finds worthy; its protections belong to all, including to speakers whose motives others may find misinformed or offensive."); *New Century Found. v. Robertson*, 400 F. Supp. 3d 684, 699 (M.D. Tenn. 2019) (finding that the evidence showed a park only applied security fees to groups that it thought might attract protest and holding that the security fee was a viewpoint-based heckler's veto); *Cent. Fla. Nuclear Freeze Campaign v. Walsh*, 774 F.2d 1515, 1525 (11th Cir. 1985) (enjoining enforcement of permit ordinance that gave officials discretion to set fees based on potential counterprotests and hostile reactions because the effect of the ordinance "is to charge more for First Amendment activity which may require more police protection than less controversial speech"); *Coll. Republicans of the Univ. of Wash. v. Cauce*, No. C18-189, 2018 U.S. Dist. LEXIS 22234, at *4–9 (W.D. Wash. 2018) (enjoining enforcement of security fee policy that did not require administrators to rely on objective factors and instead allowed administrators to consider the public reaction to speech).[2]

---

[2] The courts of appeals are not perfectly aligned in whether the heckler's veto is best described as a form of content-based discrimination or viewpoint-based discrimination. *Compare, e.g.*, *Rosenbaum v. City & Cnty. of San Francisco*, 484 F.3d 1142, 1158 (9th Cir. 2007) ("A 'heckler's

Defendant Stump explained that UNM would require TP-UNM to pay for security because of the nature of TP-UNM and the event. Gonzales Decl. ¶¶ 31–32. Defendants hired security officers to roam campus, including at locations far away from the actual event. *Id.* ¶ 47. They even hired arresting officers, clearly anticipating a reaction that could warrant arrests. *Id.* Defendant Stump stated that UNM consistently applied these high fees to TP-UNM events. *Id.* ¶ 31. He even admitted that they would not charge such high fees for an event with different content and a different viewpoint, like a screening of the Barbie movie. *Id.* ¶ 32. He also stated that they assess security fees based on the individual, on a case-by-case basis. *Id.* ¶ 31. Defendants thus engaged in viewpoint discrimination when they made a value judgment that TP-UNM's event was controversial and assessed security fees based on the anticipated reaction to the event.

Worse, this discrimination appears to be part of a larger pattern of discrimination against conservative organizations. UNM has now attempted to charge two conservative groups nearly $10,000 in security fees in the last year and only lowered the charges for the Gaines event to under $6,000 after members of TP-UNM engaged in extensive conversations and negotiations with the university. *Id.* ¶¶ 28, 38, 44, 58. These charges may have been related to the celebrity status of

---

veto' is an impermissible content-based speech restriction where the speaker is silenced due to an anticipated disorderly or violent reaction of the audience."), *with Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 248 (6th Cir. 2015) (en banc) ("The heckler's veto is precisely that type of odious viewpoint discrimination."). The Tenth Circuit has found that the heckler's veto is always impermissible and that the Supreme Court has said as much: "The Supreme Court has squarely rejected what it refers to as the 'heckler's veto' as a justification for curtailing 'offensive' speech in order to prevent public disorder." *Flanagan v. Munger*, 890 F.2d 1557, 1566 (10th Cir. 1989). Because the focus of the heckler's veto inquiry is the offensive nature of the speech, and "[g]iving offense is a viewpoint," *Tam*, 582 U.S. at 243, it is most naturally understood as viewpoint-based discrimination. However, the difference is immaterial—a heckler's veto is unconstitutional.

Riley Gaines and Kristan Hawkins. But when the more famous Roxxxy Andrews[3] of *RuPaul's Drag Race* hosted a bingo night—at a similar time as the Gaines event, in a venue *more* centrally located on campus, featuring a host characterized as having a history of political activism, and involving an activity that has been protested on other campuses[4]—security was nowhere to be found. *Id.* ¶¶ 54–56. This points to viewpoint-based discrimination that warrants a preliminary injunction.

Viewpoint-based restrictions are per se unconstitutional. *See Rosenberger v. Rector & Visitors*, 515 U.S. 819, 829–30 (1995) (holding viewpoint discrimination unconstitutional without conducting strict scrutiny); *Taxpayers for Vincent*, 466 U.S. at 804 ("[T]he First Amendment *forbids* the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." (emphasis added)); *Wigg v. Sioux Falls Sch. Dist. 49-5*, 382 F.3d 807, 814 (8th Cir. 2004). Thus, the security fees were per se unconstitutional because they were applied based on Plaintiffs' conservative views and the reaction UNM anticipated.

## 2. Defendants engaged in unconstitutional content discrimination.

The fees also point to unconstitutional content-based discrimination because, in comparing Plaintiffs' event to a hypothetical showing of the Barbie movie, the university determined that

---

[3] As of this filing, Roxxxy Andrews has more than 500,000 followers on Instagram under the handle @roxxxyandrews; Riley Gaines has roughly 325,000 under the handle @rileygbarker. Like Ms. Gaines, Roxxxy engages in what has been characterized as political activism. *See, e.g.*, Selene San Felice, *"The Shows Must Go On": Florida Drag Artists Protest in Tallahassee* (April 25, 2023), Axios, https://perma.cc/L4BC-RAJF (protesting a law described in the article as banning children's attendance at "adult live performances," which include a show that "depicts or simulates nudity and sexual conduct").

[4] *See, e.g.*, Timothy Nerozzi, *Students Protest Drag Show Planned for Catholic University Notre Dame* (Oct. 28, 2023), Fox News, https://perma.cc/2PN7-BGLC.

higher security fees were necessary for Plaintiffs' event based on content. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."); *see also Forsyth Cnty.*, 505 U.S. at 137 (holding that county permit fee ordinance, as applied, was unconstitutional and that "the provision of the Forsyth County ordinance relating to fees is invalid because it unconstitutionally ties the amount of the fee to the content of the speech and lacks adequate procedural safeguards").

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. There can be no compelling interest in penalizing and censoring speakers based on the anticipated reaction of a crowd unless their speech involves incitement to imminent lawless action. *Cf. Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). Defendants' actions were not narrowly tailored to achieve a compelling government interest. *See Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (*NIFLA*) (applying strict scrutiny to a content-based restriction). A narrower approach would have been to rely on clear and definite standards when assessing security, including a full schedule of basic security costs, and to never increase security fees based on anticipated audience reactions. The burden should not be on college students to pay over $5,000 every time they want to host speakers. Although campus safety is an important interest, and the government may consider a crowd's reaction when assessing "what level of police protection is needed for a public demonstration," it is settled that those costs cannot be placed on "those asking to exercise their First Amendment rights." *Walsh*, 774 F.2d at 1525. To do otherwise, as

Defendants did here, flips the First Amendment on its head and grants hecklers an undemocratic and undeserved victory by forcing speakers to bear arbitrary, deterrent costs.

### C.  The free expression policy is an unconstitutional content-based restriction.

UNM's free speech policy "approve[s] the right of free speech and honest expression of opinion on any subject by any member of the University community, subject only to reasonable viewpoint-neutral rules," imposed by Defendant Stokes, UNM's President. *See* Compl. ¶ 27. But this ignores settled precedent that the government also may not regulate the *content* of speech, for the reasons described above. *NIFLA*, 138 S. Ct. at 2371. The policy allows university officials to impose unconstitutional content-based restraints on speech. There is no compelling interest served by giving university officials blanket permission to censor the communicative content of speech. *See Thomas v. Collins*, 323 U.S. 516, 530 (1945) ("Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation."). And even if there were, the requirement is not narrowly tailored to achieve that interest because the university could still regulate speech in a content-neutral manner that would be substantially less burdensome. *See McCullen v. Coakley*, 573 U.S. 464, 495 (2014) ("To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier.").

### D.  Defendants violated the New Mexico Constitution.

Defendants also violated the New Mexico Constitution for the reasons described herein, including:  enforcing a vague and overbroad security fee policy; discriminating against Plaintiffs based on the content of their speech; discriminating against Plaintiffs based on their viewpoints; and authorizing the provision of impermissible content-based speech restrictions. *See* N.M. Const.

Art. II, § 17; *see also* 28 U.S.C. § 1367(a). Because their state constitutional claims involve a federally-guaranteed right, the same standards as the federal claims above initially apply; the heightened protections of the New Mexico constitution only apply in the absence of federal protection of the speech at issue. *See State v. Gomez*, 122 N.M. 777, 783–84 (1997).

## II. Plaintiffs face irreparable harm.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Thus, once a First Amendment violation is established, the other preliminary injunction factors typically follow. When Defendants threatened Plaintiffs with security fees and advised them that they needed to agree to pay them or the event would be canceled, Plaintiffs found themselves facing an unconstitutional "choice": either agree to pay nearly $7,500 to exercise their First Amendment rights or cancel the event and forfeit their First Amendment rights. Seeing no other option but to pay the fee, Plaintiffs agreed to pay reasonable security costs with the hope that Defendants would lower the initial quote to a nominal sum. Now, despite warnings from Plaintiffs' counsel prior to the event, Defendants have come knocking with a $5,384.75 invoice for a security detail of nearly thirty officers. Gonzales Decl. ¶¶ 44–45.

Being forced to pay the unconstitutional security fee would be an irreparable financial harm owing to sovereign immunity. *See, e.g.*, *Wages & White Lion Invs., L.L.C. v. U.S. Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021). And the alternative—refusing to pay—will likely result in other irreparable harms. UNM's facilities policy states that failure to pay the security invoice could result "in the immediate loss of scheduling privileges, possible disciplinary action, or possible legal action." Compl. ¶ 39. At the very least, TP-UNM faces a loss of the ability to

18

schedule and host future speaking events and even chapter meetings, effectively eliminating the entire purpose of the organization. *Id.* TP-UNM's members also face disciplinary action; this harm compounds with their potential reputational injuries and lost scholarship opportunities. *Id.*; Gonzales Decl. ¶¶ 52–53. And as the party responsible for paying the invoice, LI also faces a loss of scheduling privileges as a campus visitor. Both parties also face the threat of legal action, all because college students dared to participate in the marketplace of ideas.

Even if UNM declined to pursue the invoice, the Plaintiffs are still suffering imminent and irreparable harm in the form of uncertainty surrounding future speaking events at UNM with speakers from LI's bureau. *See* Gonzales Decl. ¶ 51; Clark Decl. ¶ 19. Plaintiffs' speech is chilled by the fear that the security fee policy will be applied again to their future events, with fees of unknown amounts given the vague nature of the policy. *See* Gonzales Decl. ¶ 51; Clark Decl. ¶ 19. This chilled speech harm is currently impacting TP-UNM's members by preventing them from scheduling speakers for the spring 2024 semester and will continue to irreparably harm them until enjoined.

### III. An injunction would prevent, not cause, further harm.

"The third factor—balance of equities—also tips in Plaintiffs' favor." *Verlo*, 820 F.3d at 1127 (finding plaintiffs had shown that a speech restriction would prevent them from conveying their message to their intended audience). That is because an unconstitutional act by the government, even if done on behalf of the people it represents, can never outweigh a plaintiff's interest in having his constitutional rights protected. *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

Defendants will continue to punish students and their invited guests for exercising their rights unless and until an injunction is issued. Even if this only occurred one time, the loss of such freedom for even a moment is a harm that must be remedied. But Defendants have openly admitted that they consistently apply higher security fees to TP-UNM based on the nature of their events. Gonzales Decl. ¶ 31. And TP-UNM is not alone, as the SFLA event of spring 2023 demonstrated. *Id.* ¶ 58. The security fee policy and its enforcement create a chilling effect on speech at UNM by deterring TP-UNM and other students from hosting speakers in the future due to the threat of high fees. An injunction against the security fee policy and against the fees applied to Plaintiffs will prevent Defendants from engaging in further constitutional violations.

**IV. An injunction is in the public interest.**

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby*, 723 F.3d at 1145. It is a settled principle that more speech will *always* be in the public interest. *See Whitney v. Cal.*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring) ("If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence."). This is especially true on college campuses, which are "peculiarly the marketplace of ideas." *Healy*, 408 U.S. at 180 (internal quotation marks omitted). An injunction is imperative to curb censorship, promote diversity of thought, and protect the voice of every student during their college years.

## CONCLUSION

For the foregoing reasons, Plaintiffs request a preliminary injunction halting the enforcement of the security fee policy and the collection of payment for security fees related to the Gaines event.

Dated: <u>February 29, 2024</u>.

Respectfully submitted,

By:   <u>/s/ Braden H. Boucek</u>
Braden H. Boucek
Georgia Bar No. 396831
Tennessee Bar No. 021399
Benjamin I. B. Isgur
Virginia Bar No. 98812
Southeastern Legal Foundation
560 W. Crossville Road, Suite 104
Roswell, Georgia 30075
(770) 977-2131
(770) 977-2134 (Fax)

Carter B. Harrison IV
924 Park Avenue SW, Suite E
Albuquerque, NM 87102
(505) 295-3261
(505) 341-9340 (Fax)
carter@harrisonhartlaw.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned emailed the Defendants and the University of New Mexico's general counsel, Loretta P. Martinez, at 10:17 a.m. EST on February 29, 2024, a good-faith request for concurrence to this motion per Local Rule 7.1(a). The email was sent to Ryan Lindquist (depar@unm.edu); Joseph Silva (jsilva23@unm.edu); Timothy Stump (tstump@unm.edu); Cheryl Wallace (cwallace@unm.edu); Dennis Armijo (drayarmijo@unm.edu); Garnett Stokes (presidentstokes@unm.edu); and Loretta P. Martinez (lpmartinez@salud.unm.edu). As of this filing, Plaintiffs have not received a response. Plaintiffs presume that the motion is opposed. This document was filed electronically using the Court's CM/ECF system, pursuant to Local Rule 5.1(b). I additionally certify that I will serve, pursuant to Rule 4, a copy of this Motion to all Defendants by U.S. Mail at the following address: MSC05 3440, 1 University of New Mexico, Albuquerque, NM 87131-0001.

Dated: February 29, 2024.

/s/ Braden H. Boucek
BRADEN H. BOUCEK