```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                      FOR THE DISTRICT OF NEW MEXICO

 3   _____
                                     )
 4   LEADERSHIP INSTITUTE and        )
     TURNING POINT USA at the        )
 5   UNIVERSITY OF NEW MEXICO,       )    No. 24-CV-00187-DHU-JMR
            Plaintiffs,              )
 6                                   )
        vs.                          )    Mimbres Courtroom
 7                                   )    Albuquerque, New Mexico
     GARNETT STOKES, in her official )
 8   capacity as President of the    )
     University of New Mexico, et al.,)
 9          Defendants.              )    July 11, 2024
     _____)    1:37 p.m.

10

11                     TRANSCRIPT OF PROCEEDINGS
                    MOTION FOR PRELIMINARY INJUNCTION
12              BEFORE THE HONORABLE DAVID HERRERA URIAS
                    UNITED STATES DISTRICT COURT JUDGE
13
     APPEARANCES:
14
     For the Plaintiff:   BRADEN BOUCEK, ESQ.
15                        BENJAMIN ISGUR, ESQ.
                          Southeastern Legal Foundation
16                        560 W. Crossville Rd., Suite 104
                          Roswell, Georgia 30075
17
     For the Defendant:   PATRICIA WILLIAMS, ESQ.
18                        Wiggins, Williams & Wiggins
                          1803 Rio Grande Blvd, NW
19                        Albuquerque, New Mexico  87104

20

     REPORTED BY:         CARMELA V. MCALISTER, CRR, RPR, NM CCR 308
21                        United States Court Reporter
                          333 Lomas Blvd., NW
22                        Albuquerque, New Mexico  87102
                          Phone:  505-248-2094
23                        Email:  Carmela_McAlister@nmd.uscourts.gov

24        Proceedings recorded by mechanical stenography; transcript
     produced by computer.
25
```

1                    TABLE OF CONTENTS

2    Court in Session                                      3

3    JONATHAN GONZALES

4        Direct Examination by Mr. Isgur                   8

5        Cross-Examination by Ms. Williams                40

6    SARAH CLARK

7        Direct Examination by Mr. Isgur                  65

8        Cross-Examination by Ms. Williams                80

9    RYAN LINDQUIST

10       Direct Examination by Ms. Williams              108

11       Cross-Examination by Mr. Boucek                 111

12       Redirect Examination by Ms. Williams            136

13   Closing Argument by Mr. Isgur                       138

14   Closing Argument by Ms. Williams                    151

15   Rebuttal Argument by Mr. Isgur                      163

16   Certificate of Official Court Reporter              166

17                      EXHIBITS

18   Plaintiffs' Exhibits:

19   1.   9/5 Audio Recording                             12

20   2.   9/5 Transcript                                  14

21   3.   9/5 Invoice                                     17

22   4.   9/7 Transcript                                  20

23   5.   9/18 Transcript                                 25

24   6.   9/18 Invoice                                    26

25   7.   Space Reservation Agreement                     28

EXHIBITS (cont.)

8.   10/5 Invoice                                    30

9.   Roxxxy Andrews Announcement                     36

10.  Email Chain re:  LI Agreement                   38

11.  LI Agreement                                    73

12.  Ken Starr Invoice                              104

13.  Will Witt Invoice                              104

14.  Tomi Lahren Invoice                            104

15.  Ian Haworth Invoice                            104

16.  Ibram X. Kendi Invoice                         104

17.  Charlie Kirk Invoice                           104

18.  Kamala Harris Invoice                          104

19.  Email Chain re:  Ian Haworth                   104

20.  Email Chain re:  Charlie Kirk                   104

21.  Email Chain re:  Ian Haworth                   104

22.  Email Chain re:  Ian Haworth                   104

23.  Email Chain re:  Riley Gaines                  104

24.  Email Chain re:  Riley Gaines                  104

25.  Email Chain re:  Unpaid Invoices               104

26.  Email Chain re:  Hawkins                       104

27.  Email Chain re:  Haworth                       104

28.  Email Chain re:  Campus Disruption             104

1    THE COURT:  Good afternoon, everyone.  We're going to go

2  on the record in the case of Leadership Institute and Turning

3  Point USA at the University of New Mexico v. Garnett Stokes, et

4  al.  This is No. 1:24-CV-187.

5    Let's have counsel state their appearances.

6    MR. BOUCEK:  Your Honor, Braden Boucek appearing on

7  behalf of Plaintiffs.

8    THE COURT:  Good afternoon.

9    MR. ISGUR:  Your Honor, Ben Isgur appearing on behalf of

10  the Plaintiffs.

11    THE COURT:  Good afternoon to you as well.

12    MS. WILLIAMS:  Good afternoon, Judge.  Patty Williams

13  for the Defendants in this case, and with me at counsel table are

14  Christine Landavazo, who is from the Office of University Counsel;

15  my paralegal associate intern, Ally Dabney; and with us are three

16  of the Defendants, which are Cheryl Wallace, Commander Stump and

17  Ryan Lindquist.

18    THE COURT:  Thank you.  Good afternoon to all of you.

19    We're here on the Defendants' -- or, I'm sorry, the

20  Plaintiffs' motion for preliminary injunction.  I've received and

21  reviewed the briefings submitted by the parties, as well as the

22  accompanying affidavits and some of the other materials, including

23  policies and things of that sort.  I've also reviewed the

24  audiotapes that were provided by Plaintiff.  So I think I

25  understand the arguments and the positions taken by the parties,

1    and I've also had the opportunity to look at some of the

2    applicable law here.

3         Before we get started, we are going to -- we are going to

4    hear argument on the motion for preliminary injunction.  Before we

5    get started, I did want to say that I understand that there's a

6    pending motion to dismiss.  I think that was something that was

7    filed on the 3rd.  Is that correct, Ms. Williams?

8              MS. WILLIAMS:  Yes, sir.

9              THE COURT:  I don't believe the Plaintiffs have

10   responded to that yet.  Have you responded to that?

11             MR. ISGUR:  That is correct, Your Honor, we have not

12   responded.

13             THE COURT:  And you intend to submit a written response,

14   correct?

15             MR. ISGUR:  Yes, Your Honor.

16             THE COURT:  So I know that's pending and I know the

17   issue is going forward and making a determination before I've even

18   decided the standing issue, so it's unlikely I'm going to make a

19   decision today on the motion for preliminary injunction, because I

20   want to give the Plaintiff an opportunity to respond to some of

21   the arguments that were made in the motion to dismiss, which are

22   somewhat different, I think, than what we saw in the response to

23   the motion for preliminary injunction.  There's additional

24   arguments on standing that I want you to respond to.  So I do

25   understand that that's going on.

1        I think that we should go forward today and have the hearing.

2   I understand there might be some witnesses that are prepared to

3   testify today; is that right?

4              MR. ISGUR:  Yes, Your Honor, we have two witnesses to

5   call.

6              THE COURT:  You have two witnesses?

7              COURT REPORTER:  Can you use your microphone, please?

8              MR. ISGUR:  Certainly.  Yes, Your Honor, we have two

9   witnesses to call.

10              THE COURT:  Who are the witnesses?

11              MR. ISGUR:  Sarah Clark, an employee of Leadership --

12   the declarant, Sarah Clark, and Jonathan Gonzales.

13              THE COURT:  All right.  And how long do you anticipate

14   their testimony to go?  I know you can't guess on

15   cross-examination, but as far as the direct, how much time do you

16   think you need?

17              MR. ISGUR:  About maybe 45 minutes in total, Your Honor,

18   30 minutes for Mr. Gonzales, and 15 for Ms. Clark.

19              THE COURT:  Ms. Williams, will UNM be presenting

20   witnesses today?

21              MS. WILLIAMS:  Well, Your Honor, it depends on if

22   Plaintiffs meet their burden in their case in chief on whether we

23   have to call witnesses or not.  They had asked us to make our

24   clients who had made declarations available today, which we have.

25   I thought they were going to call them, but it sounds like they've

1   had a change.  So I'm not sure, depends on how the evidence comes

2   in.

3                   THE COURT:  All right.  I guess we can play it by ear

4   and go forward with the arguments.

5       I guess before we get to the witnesses, I'm not sure how the

6   parties want to proceed, if you want to make a preliminary sort of

7   legal argument.  I've read the briefs, so I kind of understand

8   where you're going to be going with this.  Or we could just wait

9   until after the witnesses testify, and then we can kind of sum it

10  up with a little legal argument at the end before I recess.

11                  MS. WILLIAMS:  Your Honor, I think that would be most

12  efficient, especially since you've recently read the pleadings and

13  know the parties' positions without the evidence that Plaintiffs'

14  intend to --

15                  THE COURT:  I didn't say I recently reviewed it.  I

16  reviewed.

17                  MS. WILLIAMS:  I apologize.

18                  THE COURT:  No, I did.  I have been looking at those.

19  So let's go forward with some of the witnesses that we're going to

20  have.

21      I guess, Plaintiff, this is your motion, so why don't you

22  call your first witness.

23                  MR. ISGUR:  Okay.  Thank you, Your Honor.  We call

24  Jonathan Gonzales to the stand.

25                  THE COURT:  Mr. Gonzales, if you'd come right up here to

```
 1  the witness stand and stand to the side of it there, so that the
 2  clerk can swear you in.
 3          LAW CLERK:  Do you solemnly swear or affirm that your
 4  testimony in this matter will be the truth?
 5          THE WITNESS:  I do.
 6          LAW CLERK:  You may be seated.
 7          THE COURT:  You may proceed.
 8          MR. ISGUR:  Thank you, Your Honor.
 9                        JONATHAN GONZALES
10              (being duly sworn, testified as follows:)
11              DIRECT EXAMINATION BY MR. ISGUR
12  Q.   Would you please state and spell your name for the record?
13  A.   My name is Jonathan Gonzales, J-O-N-A-T-H-A-N,
14  G-O-N-Z-A-L-E-S.
15  Q.   And where do you reside?
16  A.   I reside in Albuquerque, New Mexico.
17  Q.   And what do you do?
18  A.   Currently, I am a full-time student.
19  Q.   What are you studying?
20  A.   I currently study nursing and psychology.
21  Q.   And when do you expect to graduate from the -- you attend the
22  University of New Mexico, correct?
23  A.   Correct.
24  Q.   And when do you expect to graduate?
25  A.   I intend to graduate in August of 2025.
```

1    Q.    And how long have you been involved with the Turning Point

2    chapter at UNM?

3    A.    Two years.

4    Q.    And when did that start -- or why did that start, rather?

5    A.    I wanted to go and have conversations with those who are

6    like-minded and those who had different opinions than me, and I

7    felt like it was a good position where I could go and speak with

8    anyone across the board politically or non-politically.

9    Q.    Are you aware of any other organizations on UNM's campus that

10   promote a conservative viewpoint?

11   A.    Currently, I do not.

12   Q.    I want to move you forward to the members.  About how many

13   members does your group have on campus?

14   A.    We have just about 22 members.

15   Q.    Okay.  And do you think most of them share your goals of the

16   organization?  Do you think they're members for the same reasons

17   as you?

18   A.    Yes.

19   Q.    I want to move you forward to the Gaines event.  Why did you

20   want to invite Ms. Gaines to campus?

21   A.    So, originally, my co-president and I had found out about

22   Riley Gaines and her work with gender inequality work, and we

23   found out that she had a great message that aligned with our

24   views.  Alongside that, whenever we were going to look into

25   inviting her, we found out that we could go invite her and she

1  could go and speak at our events and speak about her situation

2  whenever she went against Lia Thomas in the NCAA Division I

3  swimming.  And speaking about her experience in that, going

4  against a biological male who was now transgender and competing

5  against her.

6      And so we thought that it was a great chance for us to go and

7  see a different viewpoint or see a viewpoint that aligned with

8  ours.  And we felt as if, overall, she met the criteria, really

9  would allow for those who agreed with us and disagreed to go and

10  just hear her out because she spoke on female gender issues.

11  Q.    Okay.  And when you first started planning the event, what

12  did you do first?

13  A.    So we first were reached out by LI for the event and Turning

14  Point USA, and we called the University of New Mexico's event

15  offices to go and schedule an event, and we were trying to go and

16  book a room.  And, originally, we were told that we could probably

17  go and get a room, and we were met by Ariel Archuleta on August

18  23rd when we called.

19  Q.    Okay.  And did she tell you anything about security?

20  A.    When we asked about security, she said that we -- she didn't

21  believe that we would have to go and request any security other

22  than our own, because we reassured her that we would be having

23  Ms. Gaines with her own security.

24  Q.    Okay.  And after that, what was the next thing you heard from

25  UNM?

1  A.   The next thing that we heard from UNM was Ariel reaching back

2  out, stating that she was told by her higher ups that we would

3  have to submit a security request form.

4  Q.   Okay.  And did you do that?

5  A.   We did.

6  Q.   And did you hear anything back?

7  A.   So we did hear back from UNM, and they stated that we would,

8  first off, need a meeting with them, and, also, we would truly

9  need to go and talk about this further since the whole dire

10 situation was that it wasn't in her security's jurisdiction to go

11 and have the event, and that we would have to talk more about

12 getting their security.

13 Q.   Okay.  And did they tell you that you needed to schedule a

14 meeting with them?

15 A.   Yes, they did.

16 Q.   Okay.  And did you have a meeting on September 5th?

17 A.   Yes, we did.

18 Q.   Do you recall who you met with?

19 A.   So we met with Cheryl Wallace, Timothy Stump and Dennis

20 Armijo.

21      MR. ISGUR:  Your Honor, permission to approach the

22 witness with a --

23      THE COURT:  You may.

24      MR. ISGUR:  Your Honor, I've just handed the witness

25 what is marked as Plaintiffs' Exhibit 1.

1  Q.    (By Mr. Isgur)  Mr. Gonzales, do you recognize that?

2  A.    Yes, I do.

3  Q.    What is it?

4  A.    It is the recordings from our meetings that I initialed off

5  on that they're legitimate and untampered.

6  Q.    And how do you know that they're legitimate and untampered

7  with?

8  A.    I listened to them earlier today and put my signature on it.

9          MR. ISGUR:  Okay.  Your Honor, I'd like to move to admit

10 Plaintiffs' Exhibit 1.

11         THE COURT:  Any objections?

12         MS. WILLIAMS:  No objection, Your Honor.

13         THE COURT:  Plaintiffs' Exhibit 1 will be admitted into

14 evidence.

15 (Plaintiffs' Exhibit No. 1 admitted into evidence.)

16         MR. ISGUR:  Your Honor, permission to approach the

17 witness with another document?

18         THE COURT:  You may.

19         MR. ISGUR:  Your Honor, I've just handed the witness

20 what is marked as Plaintiffs' Exhibit 2, which is a transcript.

21 Q.    (By Mr. Isgur)  Jonathan, do you recognize --

22 A.    Yes, I do recognize this transcript.

23 Q.    And have you reviewed that transcript?

24 A.    I have reviewed this transcript.

25         MR. ISGUR:  Your Honor, I'd like to move to admit the

1  transcript as Plaintiffs' Exhibit 2.

2            THE COURT:  What is the transcript exactly?  A

3  transcript of what?

4            MR. ISGUR:  It is a transcript of the meeting held on

5  September 5th between the Defendants Stump, Armijo and Wallace and

6  the members of Turning Point USA at the University.

7            THE COURT:  That's only the September 5th meeting?

8            MR. ISGUR:  It is the September 5th meeting, yes, Your

9  Honor.

10            THE COURT:  Has the defense had a chance to look at

11  that?

12            MS. WILLIAMS:  Yes, Your Honor.

13            THE COURT:  Any objections?

14            MS. WILLIAMS:  Yes, Your Honor.  There's three

15  transcripts that Plaintiff appears to want to admit today.  We

16  have objections to all three.  Number one, they're not recorded by

17  a certified court reporter, and, number two, the speakers are not

18  identified by name but by number and it's very confusing.  You

19  have the actual audios and I think that they're the best evidence

20  of what was said at those meetings.

21            THE COURT:  Well, I can't tell from the audio either

22  who's speaking.  I mean, I can kind of guess based on the way

23  they're addressing each other.  But what's the difference between

24  what I see -- or what I hear on the audio recording and not having

25  the names on the transcript?

1          MS. WILLIAMS:  Well, Your Honor, the fact that there's

2    no foundation for who's saying what.  Mr. Gonzales may be able to

3    provide and make them more admissible for you.  But at this point,

4    there's not a proper foundation for who's saying what to whom at

5    those meetings.

6          THE COURT:  I understand the objection, but given that

7    this is a motion for preliminary injunction and the Rules of

8    Evidence are a little relaxed in hearings like this, I'm going to

9    go ahead and allow it.  But to the extent possible, if you could

10   make clear, if he's answering questions about who's saying what,

11   that you identify who -- or ask him if he can identify who's

12   speaking at the time.

13         MR. ISGUR:  Yes, Your Honor.

14         THE COURT:  All right.  And I'll go ahead and allow for

15   the admission of Plaintiffs' -- this is Exhibit 2?

16         MR. ISGUR:  It's marked as Plaintiffs' Exhibit 2, yes,

17   Your Honor.

18         THE COURT:  Plaintiffs' Exhibit 2 will be admitted.

19   (Plaintiffs' Exhibit No. 2 admitted into evidence.)

20         MR. ISGUR:  Should I -- I'm sorry, Your Honor, should I

21   provide a copy up to the Bench?

22         THE COURT:  Yes, if you have a copy, please.

23       And, Ms. Williams, you said you do have a copy of it?

24         MS. WILLIAMS:  Yes, sir.

25         THE COURT:  All right.  Thank you.

1  Q.    (By Mr. Isgur)  So, Mr. Gonzales, at that meeting, were you

2  told anything about the rooms that you'd requested?

3  A.    So, originally, at that meeting, we were told.

4          COURT REPORTER:  You were told?

5          THE WITNESS:  Yes.

6  Q.    (By Mr. Isgur)  I'm sorry, what were you told about the rooms

7  you requested?

8  A.    So we were told that we were not going to be able to go and

9  get Lobo A and B.

10  Q.    Was a reason given for why you couldn't?

11  A.    Due to a security risk.

12  Q.    Okay.  And so Speaker 2 identified on this first page, who is

13  that?

14  A.    Speaker 2 on this first page is Timothy Stump.

15  Q.    Okay.  So would you mind reading the first, you know, two

16  sentences of -- the first thing said by Speaker 2 on the first

17  page of the transcript?

18  A.    Yeah.

19      Yeah.  Just for safety and security reasons, we can't have it

20  in Lobo A and B.  We can't secure the building.  So, and there are

21  just logistics of trying to make everybody safe and everything

22  good for that event that we couldn't do it for that evening.

23  Q.    So Commander Stump told you, at that time, that you couldn't

24  have it in the room you wanted to have it in?

25  A.    Correct.

1   Q.   And then you were also told about fees at this meeting; is
2   that correct?
3   A.   Correct.
4   Q.   What were you told?
5   A.   We were told at this meeting that we would have a list of
6   fees presented to us for what it would look like for the event of
7   a maximum total of $10,000.  And that could change, but that would
8   be our top total to host the event.
9            MR. ISGUR:  Your Honor, may I approach the witness?
10           THE COURT:  You may.
11           MS. WILLIAMS:  Your Honor, we're going to object to
12   truncating and interpreting the transcript if that is not
13   completely what the Speaker 2 said.  So either he can use the
14   transcript or not, but we would object to not completely
15   describing in response to the questions what the answers were.
16           THE COURT:  Well, I have both the full transcripts here
17   and I have the audio recording as well.  To the extent that
18   there's truncating going on and they're not filling in the
19   context, you're welcome to follow up on cross-examination.  But I
20   do understand that -- your position, and I actually noticed that
21   as well, that there's a little truncating going on.  But I think
22   it's because the Plaintiff is trying to make a particular point.
23   But I'll allow you to follow up on cross-examination on all that.
24        You may proceed.
25           MR. ISGUR:  Thank you, Your Honor.  I've handed the

1    Plaintiff what's been marked as Plaintiffs' Exhibit 3.

2    Q.   (By Mr. Isgur)  Do you recognize the document I've handed

3    you?

4    A.   Yes, I do recognize.

5    Q.   What is it?

6    A.   It is a list of security fees that we were originally

7    presented with on September 5th.

8    Q.   Okay.  And it's a photo you took, correct?

9    A.   That's correct.

10   Q.   And what does it list the total for the invoice as?

11   A.   $10,202.50.

12   Q.   And who provided you that invoice?

13   A.   Timothy Stump.

14   Q.   Thank you.

15          MR. ISGUR:  Your Honor, I'd like to move to admit

16   Plaintiffs' Exhibit 3.

17          THE COURT:  Any objection, Ms. Williams?

18          MS. WILLIAMS:  No objection, Your Honor.

19          THE COURT:  Plaintiffs' Exhibit 3 will be admitted.

20   (Plaintiffs' Exhibit No. 3 admitted into evidence.)

21          THE COURT:  Do you have a copy of that?

22          MR. ISGUR:  Yes, Your Honor.

23          THE COURT:  Thank you.

24   Q.   (By Mr. Isgur)  Mr. Gonzales, I'd like to move you forward to

25   the second meeting that you had on September 7th.  Do you remember

1  who you met with on that day?

2  A.   Yes, I do.

3  Q.   Who did you meet with?

4  A.   Cheryl Wallace and Timothy Stump.

5          MR. ISGUR:  Your Honor, I'd like to approach the

6  witness, if I may.

7          THE COURT:  You may.

8          MR. ISGUR:  Your Honor, I've handed the Plaintiff --

9  sorry, the witness a copy of Plaintiffs' Exhibit 4, which is a

10 transcript of the 9/7, the September 7th meeting.

11 Q.   (By Mr. Isgur)  Do you recognize the document and have you

12 reviewed it?

13 A.   Yes, I do, and I have reviewed it.

14         MR. ISGUR:  Your Honor, I'd like to move to admit the

15 transcript.

16         MS. WILLIAMS:  Your Honor, we understand your previous

17 ruling regarding the transcripts.  We'd want to preserve the same

18 objections to this exhibit.

19         THE COURT:  Did you have a foundational exhibit for the

20 first one, an objection to foundation?  Did you have one with the

21 first one?

22         MS. WILLIAMS:  I believe so.  I believe we talked about

23 a foundation, the fact that it wasn't transcribed by a certified

24 court reporter, and that it was -- the speakers are not

25 identified.

1          THE COURT:  All right.  Well, with regard to foundation,
2    I think there is -- although I will stand by my previous ruling,
3    there is some issues with foundation as far as what you've been
4    able to establish so far, so you might want to ask a couple more
5    questions and then you can move to admit it again.
6          MR. ISGUR:  Certainly, Your Honor.
7    Q.   (By Mr. Isgur)  To the best of your knowledge, is that an
8    accurate transcription of the meeting?
9    A.   To the best of my knowledge, yes.
10   Q.   Can you identify the individual speakers in -- present in the
11   transcript?
12   A.   Currently, yes.
13   Q.   And --
14         MR. ISGUR:  Your Honor, I'm uncertain of what the
15   objection Plaintiffs' counsel -- or Defendants' counsel is --
16         THE COURT:  Well, to the foundation, I think he's
17   covered what I was concerned about, because he didn't say that he
18   had reviewed the transcript or that it was an accurate transcript.
19   He's done that now, so are you going to be moving to admit that?
20         MR. ISGUR:  Yes, Your Honor.  I'd like to move to admit
21   the exhibit.
22         THE COURT:  Ms. Williams, you're standing by your
23   previous objections?
24         MS. WILLIAMS:  Yes, sir.
25         THE COURT:  Plaintiffs' Exhibit 4 will be admitted.

1    (Plaintiffs' Exhibit No. 4 admitted into evidence.)

2    Q.   (By Mr. Isgur)  Mr. Gonzales, I'd like you to turn to page 3

3    of that document.  Would you identify who Speaker 4 is, to the

4    Court, in this transcript?

5    A.   So in this transcript, Speaker 4, I believe, is Timothy

6    Stump.

7    Q.   And on the middle of the page, Speaker 4 -- Speaker 4 tells

8    you about the officers and what officers he's interested providing

9    as security for your event; is that correct?

10   A.   That is correct.

11   Q.   Mr. Gonzales, would you mind reading the section where he

12   tells you that?  I believe it starts with the word "or" in the

13   middle of the page.

14   A.   All right.

15        Or even if it was less or more, in that range if we're able

16   to block off seats, that might be a consideration.  And then the

17   other one is Kiva, which was construction problems or something

18   that may interfere with that.  So, but I like Kiva for the

19   location.  I didn't before, but I think looking at it more be

20   suited, you know, it's more open perimeter, so it takes more, it's

21   not, we don't, so your quote is for every officer that we have

22   available.

23   Q.   And do you recall about how many officers that was?

24   A.   That was 55 officers, I believe.

25   Q.   And when Lieutenant Stump or Commander Stump was telling you

1  about how he generated it, what did he tell you about how he'd
2  come up with that decision?
3  A.   So how he came up with that decision, it's -- he stated that
4  was based off of individual assessment and there wasn't a criteria
5  behind it.
6              COURT REPORTER:  Wasn't?
7              THE WITNESS:  Wasn't a criteria behind it.
8              MS. WILLIAMS:  Objection, Your Honor.  Misstates the
9  transcript.
10             MR. ISGUR:  I wasn't asking the witness to read the
11 transcript, Your Honor.  I was asking the witness what Lieutenant
12 Stump told him at the meeting.
13             THE COURT:  And, Ms. Williams, what's your objection
14 with regard to that?
15             MS. WILLIAMS:  It misstates the transcript.
16             THE COURT:  You're saying that's never stated in the
17 transcript?
18             MS. WILLIAMS:  Correct.
19             THE COURT:  You might want to rephrase the question, if
20 you want to direct him to the transcript.
21             MR. ISGUR:  Sure.
22 Q.   (By Mr. Isgur)  Mr. Gonzales, would you please turn to the
23 next page.  Could you identify Speaker 1 in this transcript,
24 please?
25 A.   Sorry.

1  Q.   We're on page 4 of the transcript.

2  A.   Sorry.  Based off the wording, I believe that it is Kenna

3  Fleig, F-L-E-I-G.

4          MR. ISGUR:  Your Honor, would you mind if we played a

5  portion of Exhibit 1, the admitted recordings, to the Court?

6          THE COURT:  You may go ahead and play it.

7          MR. ISGUR:  Mr. Boucek, would you please play the 9/7

8  meetings starting at the 2:00 mark.

9  (Exhibit 1 played.)

10         MR. ISGUR:  And then, Mr. Boucek, would you please move

11 to 7:03?

12         THE COURT:  Counsel, do you have a question for the

13 witness based on the audio recording?  It sounds like we're just

14 listening to the audio recordings in total here.  I just want to

15 know if there's a question that you have for him?

16         MR. ISGUR:  Certainly, Your Honor.  Yeah, I can reorder.

17         THE COURT:  I don't know who's speaking on the audio

18 recording, so it's not very helpful.  I don't know if he can

19 identify the speakers based on that.  That's where we were at

20 before, is trying to identify who was Speaker 1, I believe.

21 Q.   (By Mr. Isgur)  So, Mr. Gonzales, could you please identify

22 Speaker 1 on the transcript from that audio?

23 A.   Speaker 1 is myself.

24 Q.   And Speaker 4 is?

25 A.   Speaker 4 is Timothy Stump.

1  Q.    And I believe there's Speaker 3.  Yes, speaker 3 is?

2  A.    Cheryl Wallace.

3          THE COURT:  And just to sort of complete the circle

4  here, can you ask Mr. Gonzales -- can you ask the witness if he

5  can identify Speaker 2.

6  Q.    (By Mr. Isgur)  Can you identify Speaker 2, Mr. Gonzales?  I

7  don't know if Speaker 2 was present on that section of audio we

8  listened to.

9  A.    I didn't hear Speaker 3 or Speaker 2 present on that part of

10 the audio that we listened to.

11 Q.    Mr. Gonzales, could we refresh your recollection as to

12 Speaker 3's identity?

13         THE COURT:  Well, let me take a look here.  It doesn't

14 seem like Speaker 2 says much after the first couple of things, so

15 it's not as crucial for me to know who that is.  But he's

16 identified who he believes are the speakers.  Speaker 1 is

17 himself, Speaker 3 is Wallace, and Speaker 4 is Stump.  That's

18 what I have here.  So you can go ahead and proceed.

19         MR. ISGUR:  Right, and really only Speakers 1 and 4 are

20 important to the point.  So I'll move on, Your Honor.  I'm sorry.

21         THE COURT:  All right.

22 Q.    (By Mr. Isgur)  During the meeting, did you ask Lieutenant

23 Stump for a schedule of charges?

24 A.    Yes.  In this meeting, we did.

25 Q.    And did he provide you a schedule of charges?

1    A.    In this meeting, he provided us with a schedule of charges.

2    Q.    Did he provide you an invoice or a schedule of charges that

3    would be charged, sort of, universally to all student groups?

4    A.    It would be an invoice.

5    Q.    Okay.  So it was specific to your event?

6    A.    Specific to our event, yes.

7    Q.    Not a general one for all?

8    A.    Not general.

9    Q.    Okay.  Mr. Gonzales, I'd like to move you on to September

10   18th.  Did you have another meeting with University staff on that

11   day?

12   A.    Yes, we did.

13   Q.    Do you recall with whom you met?

14   A.    We met with Ryan Lindquist and Timothy Stump.

15            MR. ISGUR:  Okay.  Your Honor, I'd like to approach the

16   witness.

17            THE COURT:  You may.

18            MR. ISGUR:  Your Honor, I've handed the witness what is

19   marked as Plaintiffs' Exhibit 5.

20   Q.    (By Mr. Isgur)  Mr. Gonzales, do you recognize that document?

21   A.    Yes, I do.

22   Q.    Could you tell me what it is?

23   A.    It is our transcript from 9/18.

24   Q.    Okay.  And have you reviewed the transcript?

25   A.    Yes, I have.

1   Q.   And is it accurate, to the best of your knowledge?

2   A.   Yes, it is.

3   Q.   And you reviewed it while listening to the audio recording,

4   correct?

5   A.   Yes, I did, correct.

6        MR. ISGUR:  Your Honor, I'd like to move to admit

7   Exhibit 5.

8        THE COURT:  Ms. Williams?

9        MS. WILLIAMS:  No objection, Your Honor.  This one has

10   the speakers identified on it.

11        THE COURT:  We'll go ahead and admit Plaintiffs' Exhibit

12   5 with no objection.

13   (Plaintiffs' Exhibit No. 5 admitted into evidence.)

14        MR. ISGUR:  Your Honor, permission to approach the

15   witness.

16        THE COURT:  You may.

17        MR. ISGUR:  Your Honor, I've handed the witness what's

18   marked as Plaintiffs' Exhibit 6.

19   Q.   (By Mr. Isgur)  Mr. Gonzales, do you recognize that document?

20   A.   Yes, I do.

21   Q.   And could you tell the Court what it is?

22   A.   It is a revised version of our security charges, provided to

23   us on -- during this meeting.

24        MR. ISGUR:  Your Honor, I'd like to move to admit

25   Plaintiffs' Exhibit 6.

1      THE COURT:  Ms. Williams?

2      MS. WILLIAMS:  Your Honor, we don't object to the

3 exhibit.  We object to the Plaintiffs' description of the exhibit,

4 and I can fix that on cross.

5      THE COURT:  All right.  Thank you, Ms. Williams.

6    Plaintiffs' Exhibit 6 will be admitted.

7 (Plaintiffs' Exhibit No. 6 admitted into evidence.)

8 Q.   (By Mr. Isgur)  So, Mr. Gonzales, were you provided a new

9 invoice at the 9/18 meeting?

10 A.   Yes, we were.

11 Q.   And how much was that invoice for?

12 A.   In total, that invoice was for $7,420.

13 Q.   Why were you provided a new invoice?

14 A.   We brought up that the hours of the event did not align with

15 what we planned and were asking for a revised set of charges.

16 Q.   So if I understand you correctly, you asked to see if the

17 University could reduce the amount you would owe?

18 A.   Correct.

19 Q.   And the University succeeded at doing that?

20 A.   Correct.

21 Q.   Did the University make any other concessions to try and keep

22 costs down?

23 A.   By the reduction of hours and the reduction of police

24 officers, they also stated that, during the event, dependent on

25 how many officers were needed, they might reduce it, too.

1  Q.   And Lieutenant Stump had told you -- had Lieutenant Stump

2  told you prior to this that unless you -- unless Turning Point

3  agreed to pay the invoices, that the event wouldn't be able to

4  proceed?

5  A.   That is correct.

6  Q.   Did he repeat that instruction at this meeting?

7  A.   Yes, that's correct.

8          MR. ISGUR:  Your Honor, I'd like to approach the

9  witness.

10         THE COURT:  You may.

11         MR. ISGUR:  Your Honor, I've handed the witness what is

12 marked as Plaintiffs' Exhibit 7.

13 Q.   (By Mr. Isgur)  Mr. Gonzales, do you know what that document

14 is?

15 A.   Yes, I do.

16 Q.   Would you tell the Court what it is, please?

17 A.   It is a space reservation agreement.

18 Q.   What is the agreement for?

19 A.   The agreement is for the reservation of the building we were

20 going to be hosting our event in.

21 Q.   Okay.

22         MR. ISGUR:  Your Honor, I'd like to move to admit

23 Plaintiffs' Exhibit 7.

24         MS. WILLIAMS:  Your Honor, this document is unexecuted.

25 We don't know if it's the final document or not, and we object.

1          THE COURT:  Counsel?

2          MR. ISGUR:  I'm sorry, Your Honor?

3          THE COURT:  Your response to the objection.

4          MR. ISGUR:  We're moving to admit the agreement that

5    Mr. Gonzales was provided by UNM at the meeting.  We don't have an

6    executed copy of it and we weren't provided one in discovery.

7          THE COURT:  Okay.  He did testify that it is the

8    document that he was provided, so I'll go ahead and admit the

9    exhibit with the understanding that it's not -- there's no

10   signature, I suppose, or execution of it.

11         MR. ISGUR:  No, we don't -- we just don't have a signed

12   copy.  I'm not actually sure why.

13         THE COURT:  I'll admit it for the purposes that you're

14   stating.

15         MR. ISGUR:  Thank you, Your Honor.

16         THE COURT:  This is Plaintiffs' Exhibit 7 that's now

17   admitted into evidence.

18   (Plaintiffs' Exhibit No. 7 admitted into evidence.)

19         MR. ISGUR:  Thank you, Your Honor.

20   Q.   (By Mr. Isgur)  Mr. Gonzales, I'd like to move you forward to

21   the night of October 4th, 2023.  Where were you on October 4th,

22   2023?

23   A.   On October 4th, 2023, I was at the Riley Gaines event.

24   Q.   Could you tell me a little bit about it?

25   A.   Of course.  So during this event, while we hosted Riley

1    Gaines, we showed up to the event.  Everything went smoothly.  We

2    went in, got everything set up, and had no issues during this

3    time.  We met with Riley.  We went and did our ticketing to go and

4    verify that everything was okay with the event, making sure

5    everybody was coming in who needed to.  And everything went

6    smoothly.  We didn't have more than ten protestors at the event.

7    And the -- during this time, we met with ten officers that I could

8    see during this whole entire event, and that was before the event

9    started.  After the event's continuance, I did not see any.  And

10   there was only, I believe, four stationed inside.

11   Q.    Okay.  So did anything go wrong during the event?

12   A.    No.

13   Q.    So there was no violence?

14   A.    No.

15   Q.    No significant disruptions?

16   A.    Nope.

17   Q.    Could you give me an estimate of how many people attended the

18   event?

19   A.    I'd say about 200.

20   Q.    Okay.  Did you enjoy the event?

21   A.    I did.

22   Q.    Good.

23              MR. ISGUR:  Your Honor, I'd like to approach the

24   witness.

25              THE COURT:  You may.

1    MR. ISGUR:  Your Honor, I've handed the witness what's

2    marked as Plaintiffs' Exhibit 8.

3    Q.   (By Mr. Isgur)  Mr. Gonzales, could you tell the Court what

4    that document is?

5    A.   This is a finalized copy of our charges for the invoice of

6    security.

7    Q.   How much was the total charge?

8    A.   $5,384.75.

9    Q.   And do you recall when that invoice was sent to you?

10    A.   The following day after the event.

11    Q.   And do you recall who sent it to you?

12    A.   Timothy Stump.

13    MR. ISGUR:  Your Honor, I'd like to move to admit

14    Plaintiffs' Exhibit 8.

15    MS. WILLIAMS:  No objection, Your Honor.

16    THE COURT:  Plaintiffs' Exhibit 8 will be admitted into

17    evidence.

18    (Plaintiffs' Exhibit No. 8 admitted into evidence.)

19    Q.   (By Mr. Isgur)  Mr. Gonzales, I'd like to move you on.  Did

20    you host any speakers during the spring 2024 semester?

21    A.   No, we did not.

22    Q.   Why didn't you host any speakers?

23    A.   We didn't host any speakers due to the cost of our previous

24    event.  With security, we weren't gonna be able to afford it.  And

25    with limited funds, that didn't look like it was going to be

1    possible for us.

2    Q.    You said that, at the beginning of this, that you've been a

3    member of TP-UNM for about two years, right?

4    A.    Yes.

5    Q.    And in your experience, has TP-UNM in the past not hosted

6    speakers or --

7    A.    Not from my recollection.

8    Q.    So to your -- because you usually host one or two?

9    A.    We normally host one to two per semester, minimum one,

10    maximum two.

11    Q.    So the spring 2024 semester was unusual?

12    A.    Correct.

13    Q.    Are you interested in inviting speakers to come to UNM's

14    campus in the future?

15    A.    Yes, I am.

16    Q.    Are there any specific speakers you're interested in inviting

17    in the future?

18    A.    Yes.  So there is Ian Haworth.  There is also Riley Gaines

19    again, Brandon Tatum, and Tomi Lahren.  They have all expressed

20    interest in coming to campus.

21    Q.    And are you interested in booking any of them to come speak

22    on campus during the next semester?

23    A.    Yes, I am.

24    Q.    Is there anything preventing you from doing that?

25    A.    Yes.

1  Q.    Could you tell me what it is?

2  A.    Security fees.  Costs of going and hosting them just is too

3  high for us to go and personally come up with the money to go and

4  host them.

5  Q.    So to clarify your earlier statement, you've had individual

6  conversations with at least four different speakers?  Is that what

7  you said?

8         MS. WILLIAMS:  Objection.  Lack of foundation.

9  Misstates.

10         THE COURT:  Rephrase the question, if you would.

11 Q.    (By Mr. Isgur)  Have you had individual conversations with

12 the four speakers you mentioned earlier?

13 A.    Correct.

14 Q.    And in those conversations, did those speakers express an

15 interest in coming in the next semester?

16 A.    Yes, they did.

17 Q.    Did they express reservations about the high cost of security

18 fees?

19 A.    Yes, they have.

20 Q.    So is it ordinary -- when you host a speaker, does TP-UNM

21 usually cover in full the cost of security fees, or is there some

22 other method?

23 A.    Normally it comes out of our pocket.

24 Q.    How much money does TP-UNM have on hand?

25 A.    Currently, we have around $2,250.

1  Q.   And what's your -- what's an ordinary budget for a semester
2  for you?
3  A.   Ordinary budget would go and look like -- in between costs of
4  events and costs of meetings, supplies that aren't covered by
5  Turning Point corporate, it ends up that it costs us maybe $2,000
6  per semester, give or take.  But with events happening, it can
7  cost way over that.
8  Q.   So the amount of money you have on hand right now is $2,250,
9  and you normally spent about $2,000 a semester to keep the club
10 running.  So an invoice for $5,384.75 is not workable for you?
11 A.   Correct.
12        MR. ISGUR:  Your Honor, I'd like to approach the
13 witness.
14        THE COURT:  You may.
15        MR. ISGUR:  Your Honor, I've handed the witness what is
16 marked as Plaintiffs' Exhibit 9.
17 Q.   (By Mr. Isgur)  Mr. Gonzales, do you recognize that and could
18 you tell the Court what it is?
19 A.   Yes, I do recognize this and --
20 Q.   Yeah.
21 A.   This is a reservation for Drag Bingo with Roxxxy Andrews.
22 Q.   Did you attend that event?
23 A.   I did not.
24 Q.   Were you present nearby while the event was going on?
25 A.   Yes, I was.

1    Q.    What did you see when you were at the event?

2    A.    I saw a very large crowd, bigger than some of our events,

3    alongside a huge line out the doors.  And I only saw one police

4    cruiser in the front of the building with no other security

5    present that I could see.

6    Q.    Are you familiar with drag queens generally?

7    A.    Generally, yes.

8    Q.    Are you familiar at all with Roxxxy Andrews?

9    A.    Generally, yes.

10   Q.    Do you consider Roxxxy Andrews controversial?

11   A.    Yes, I do.

12   Q.    And drag shows in general controversial?

13   A.    Yes, I do.

14   Q.    Are you aware of events like that being protested on other

15   campuses?

16   A.    Yes, I am.

17   Q.    Or are you aware of violence breaking out as a result of

18   events like that?

19   A.    Yes, I am.

20   Q.    Did it strike you as odd that there was no security present

21   for that event?

22   A.    Yes, it did.

23   Q.    Are you aware of any security being charged by the University

24   for that event?

25   A.    I am unaware.  I'm not educated on that.

1    MR. ISGUR:  Your Honor, I'd like to move to admit
2    Exhibit 9 -- Plaintiffs' Exhibit 9.  My apologies.
3    MS. WILLIAMS:  Objection, Your Honor.  It does not
4    forward the case.  It's a calendar notice on a public website.  It
5    doesn't have anything to do with what the witness has testified
6    about.  Irrelevant.
7    MR. ISGUR:  Your Honor, it is relevant.  The calendar
8    invite, the announcement, indicates both the event is taking place
9    on UNM's campus and who is hosting the event.  It was in part
10   hosted by the Associated Students of the University of New Mexico.
11   I may be getting that acronym wrong, but it's hosted by a student
12   group on UNM's campus.
13   THE COURT:  Are those disputed issues?
14   MR. ISGUR:  I suspect they're not going to be disputed
15   about the event, but I'll --
16   MS. WILLIAMS:  Your Honor, the AS-UNM is not a chartered
17   student organization.  It's a different kind of organization and a
18   different kind of host, so this is not relevant.
19   THE COURT:  Well, again, given the fact that this is a
20   preliminary injunction hearing, I'm going to allow it.  I'll allow
21   defense to cover that on cross-examination with regard to what
22   that exhibit actually shows and doesn't show.  But I think the
23   Court is able to also look at it and determine the relevance of
24   that to the issues that we're talking about today.  So I'll admit
25   it for that purpose.

1              MR. ISGUR:  Thank you, Your Honor.

2              THE COURT:  This is Plaintiffs' Exhibit 9?

3              MR. ISGUR:  That is correct, Your Honor.

4    (Plaintiffs' Exhibit No. 9 admitted into evidence.)

5    Q.   (By Mr. Isgur)  Mr. Gonzales, are you familiar with an

6    organization known as Students for Life America?

7    A.   Yes, I am.

8    Q.   Is there a chapter of SFLA on UNM's campus?

9    A.   There was, yes.

10   Q.   Is there no longer a chapter?

11   A.   Not currently.

12   Q.   Do you have any idea why that is?

13   A.   Due to chartering issues.

14   Q.   Are you aware of an event that SFLA held featuring speaker

15   Kristan Hawkins?

16   A.   Yes, I am.

17   Q.   Are you aware of any security fees that were charged to SFLA

18   as a result of that event?

19   A.   Yes, I am.

20   Q.   Would it be -- what do you know about the security fees

21   charged to them?

22   A.   That they were above the security fees that were charged for

23   us.  I believe they were above $7,000.  And during that event,

24   they had more security than what we had.  Alongside that, they

25   paid that in full.

1          MR. ISGUR:  Your Honor, I'd like to approach the

2    witness.

3          THE COURT:  You may.

4          MR. ISGUR:  Your Honor, I've handed the witness what's

5    marked as Plaintiffs' Exhibit 10.

6    Q.   (By Mr. Isgur)  Mr. Gonzales, do you recognize this document?

7    A.   Yes, I do.

8    Q.   What is it?

9    A.   This is an outline of emails in between myself, Timothy

10   Stump, Kenna Fleig and also Ashley Glasgow.

11   Q.   And what is the email chain about, generally?

12   A.   Generally this is about our acknowledgement of payment for --

13   by LI for the security fees.

14   Q.   So in the first email in this chain sent on September 20th,

15   2023, by Commander Stump, Commander Stump reached out to you about

16   the security fees; is that correct?

17   A.   Yes, that's correct.

18   Q.   And you replied and asked him whether they wanted a deposit;

19   is that accurate?

20   A.   That is accurate.

21   Q.   And what did Commander Stump say in response to that?

22   A.   All right.  He replied:  Thank you for sending LI's response

23   reference the quote.  Because the event is being booked by your

24   student organization, please acknowledge -- please confirm

25   acknowledgement of the quote and provide assurance UNMPD will be

1  paid for the Police services provided as quoted.  Best, Tim.

2  Q.   So in the email prior to that, you had sent something to

3  Commander Stump.  What was it?

4  A.   On what page?

5  Q.   I'm on the second page of the exhibit and your email of

6  September 22nd, at 3:02 p.m.

7         MS. WILLIAMS:  Your Honor, this exhibit hasn't been

8  admitted.  We have no objection, but I think we need to make it

9  clear what's going on.

10         THE COURT:  Yes.

11         MR. ISGUR:  We'd like to -- I'd like to move to admit

12  Exhibit 10.  I apologize, Your Honor.

13         THE COURT:  Exhibit 10 will be admitted.  And if you can

14  provide me a copy.

15         MR. ISGUR:  Yes.

16  (Plaintiffs' Exhibit No. 10 admitted into evidence.)

17  Q.   (By Mr. Isgur)  So, Mr. Gonzales, on the second page of your

18  email, at 3:02 p.m., on September 22nd, you provided what to

19  Commander Stump?

20  A.   Our agreement from LI.

21  Q.   And what's your understanding of what that agreement said?

22  A.   That all services must be paid to, well, Lieutenant Stump and

23  UNM for everything that was previously quoted and a confirmation

24  that was needing to be given.

25  Q.   Sorry, Mr. Gonzales, maybe we can say this more simply.

1    A.    Okay.

2    Q.    What did LI agree to do, from your understanding?

3    A.    Pay the fees.

4    Q.    On your behalf?  So pay the University instead of having you

5    pay the University?

6    A.    Correct.

7    Q.    For the security fees you've been quoted?

8    A.    Correct.

9    Q.    And then, so as you stated a moment ago, Commander Stump

10    responded and said that you need to confirm acknowledgement of the

11    quote.  And then could you read Ms. Fleig's email back on

12    September 29th?

13    A.    On September 29th, Ms. Fleig's email said:  Yes, for sure.

14    We do acknowledge the quote for the $7,000 charge you gave us and

15    LI will be paying those charges on our behalf.

16    Q.    And would you read, please, Commander Stump's response to

17    that?

18    A.    Kenna, thank you for your quick response.  We will see you

19    Wednesday.  Best, Tim.

20    Q.    So Commander Stump agreed to let the event continue after

21    hearing from you via an agreement from LI that LI was going to pay

22    the fees?

23    A.    Correct.

24    Q.    And I'd like to direct you to the third page of this email

25    transcript, Lieutenant Stump's original email to you, in which --

1    sorry, not his original email.  My apologies.  It's on the second

2    page.  It's the email of September 20th at 1:49 p.m. from

3    Commander Stump, who I keep getting his title wrong.  And I do

4    apologize for that, Tim.

5         Lieutenant Stump or Commander Stump informed you that, in the

6    past, either TP-USA or the sponsor would wire payment after the

7    event.  Is that accurate?

8    A.   That's accurate.

9    Q.   So does it seem like an ordinary way of doing business to

10   you, for the University to handle events like this?

11        MS. WILLIAMS:  Objection.  Lack of foundation.  Calls

12   for speculation.

13        THE COURT:  Sustained.

14        MR. ISGUR:  Withdrawn.  Sorry.

15      Your Honor, may I confer briefly with co-counsel?

16        THE COURT:  You may.

17   (Counsel confer.)

18        MR. ISGUR:  Thank you, Your Honor.  No further questions

19   at this time.

20        THE COURT:  Thank you.

21      Ms. Williams?

22        MS. WILLIAMS:  Thank you.

23              CROSS-EXAMINATION BY MS. WILLIAMS

24   Q.   Good afternoon, Mr. Gonzales.  I'm Patty Williams.  I

25   represent the Defendants in this case that the Turning Point UNM

1    and Leadership Institute are suing.  You understand that?

2    A.    I understand.

3    Q.    Okay.  And you're currently a student at UNM?

4    A.    Correct.

5    Q.    And you expect to graduate in --

6    A.    August of 2025.

7    Q.    -- August of 2025?

8    A.    Yes.

9    Q.    All right.  So you're a -- going to be a senior?

10   A.    Correct.

11   Q.    All right.  Are you currently a member of Turning Point

12   UNM?

13   A.    Yes, I am.

14   Q.    And when did you join that organization?

15   A.    I joined Turning Point UNM about two years ago.

16   Q.    What month?

17   A.    I believe it would be -- would have been about April of 2022.

18   Q.    Right before the Riley Gaines event?

19   A.    No, April of 2022.

20   Q.    Okay.  Thank you.  Are you currently the co-president of

21   Turning Point UNM?

22   A.    Currently, yes.

23   Q.    Who is your co-president?

24   A.    Kenna Fleig.

25   Q.    Is she currently a student at UNM?

1    A.    No longer she is.

2    Q.    And so she can't hold a role in a chartered student

3    organization now, right?

4    A.    That is correct.

5    Q.    So she just graduated in the spring?

6    A.    Correct.

7    Q.    So you don't have a co-president right now?

8    A.    I actually do.  We just hosted elections for our organization

9    and I misstated who my new co-president was.  I was just --

10   thought you were mentioning relevant to the case.  Sorry.

11   Q.    And who is your current co-president?

12   A.    His name's Ryan.

13   Q.    Ryan?

14   A.    Ryan, yes.

15   Q.    What's Ryan's last name?

16   A.    I'm trying to think of his last name.  I'm sorry.  I am

17   unaware.

18   Q.    Where is Ms. Fleig now?

19   A.    Here in Albuquerque.  She's here.

20   Q.    And Turning Point UNM is a chartered student organization,

21   correct?

22   A.    Correct.

23   Q.    And it's not a corporation, is it?

24   A.    No, it's not.

25   Q.    Is it an unincorporated association of students?

1          MR. ISGUR:  Objection, Your Honor.  The witness

2    doesn't -- I don't think the witness even knows what an

3    unincorporated association is, and it calls for legal conclusions.

4          THE COURT:  Ms. Williams?

5          MS. WILLIAMS:  I'm asking his understanding of the

6    organization's structure of which he's been the president for a

7    couple of years.

8          THE COURT:  Why don't you rephrase your question.

9    Q.   (By Ms. Williams)  Do you know what the legal composition of

10   Turning Point UNM is?

11   A.   I do not.

12   Q.   Okay.  How does a student become a member of Turning Point

13   UNM?

14   A.   Attending meetings and filling out our contact list.  And

15   alongside going and attending meetings, we host general elections

16   that will go and concrete them into being a position on our board

17   or not.

18   Q.   Do you charge dues?

19   A.   No, we do not.

20   Q.   And you said that you have 22 members currently?

21   A.   Currently, yes.

22   Q.   And where did you get that list of members?  Is it whoever's

23   attended a meeting in the last year, or how do you decide that?

24   A.   It's consistent members who attend meetings, receive our

25   email list and also go and just attend most of our events.

1    Q.    And you said you have a little over $2,500 or so?

2    A.    2,250, but yes.

3    Q.    Where is that -- where is the source of that money?

4    A.    Donations.

5    Q.    Okay.  From members or from --

6    A.    From outside sources directly to our association's chapter.

7    Q.    And you testified earlier about Students for Life, correct?

8    A.    Correct.

9    Q.    Are you a member of that organization?

10   A.    I currently am not.

11   Q.    Have you ever been a member of Students for Life?

12   A.    Currently -- no, no, I have not.

13   Q.    Are you a member of any other chartered student organizations

14   at UNM?

15   A.    No, I'm not.

16   Q.    In your declaration and your testimony today, you said that

17   Students for Life is no longer a certified student organization,

18   correct?

19   A.    Correct.

20   Q.    Where do you get that information?

21           MR. ISGUR:  Objection, Your Honor.  Defendants' counsel

22   stipulated to the fact that Students for Life is no longer a

23   chartered student organization on UNM's campus.

24           MS. WILLIAMS:  I did not stipulate to that and it is a

25   certified chartered student organization, and that's why I'm

1  asking this witness that.

2           THE COURT:  I'll overrule the objection.  Go ahead and

3  restate your question, Ms. Williams.

4  Q.   (By Ms. Williams)  What's the source of your information to

5  make the statement under oath that Students for Life is not

6  currently a chartered student organization at UNM?

7  A.   From a prior president of the organization, their statement

8  led me to believe that, based off their -- them working with the

9  previous chapter that they were associated with, they stated that

10 they currently are not registered because of the fact that they

11 forgot to charter.

12 Q.   Who told you that?

13 A.   I'm not aware of her name, but I am in contact with her

14 through Turning Point.

15 Q.   Where did you have that conversation?

16 A.   Over Snapchat.

17 Q.   When did you have that conversation?

18 A.   About two weeks ago.

19 Q.   And you were informed over a Snapchat by a former president

20 of Students for Life that they had missed the deadline to charter

21 their organization?

22 A.   Correct.

23 Q.   Okay.  And what did you do to confirm that hearsay?

24 A.   Her statement and also based off of them going and previously

25 stating, that's the only way I could confirm it.

```
1   Q.   So you didn't confirm whether that statement was true or not,
2   correct?
3   A.   Not with the University, correct.
4   Q.   In your declaration, do you recall making a declaration in
5   this case that was attached to the preliminary injunction?
6   A.   Yes, I do.
7   Q.   You described something that you thought was a -- you
8   referred -- do you need it in front of you?
9   A.   It would be helpful.
10  Q.   Okay.
11          MS. WILLIAMS:  May I get that for him, Your Honor?
12          THE COURT:  You may.
13          MS. WILLIAMS:  Thank you.
14      May I approach the witness, Your Honor?
15          THE COURT:  You may.
16          THE WITNESS:  Thank you.
17  Q.   (By Ms. Williams)  I've handed you what was filed in this
18  case as the declaration of yourself.  Do you see that?
19  A.   Yes.
20  Q.   Have you had a chance to review it?
21  A.   Yes, I have.
22  Q.   Is it the declaration that you signed that was filed?
23  A.   Yes.
24  Q.   Thank you.  Could you take a look at declaration paragraph
25  11?
```

1    A.    Yes.

2    Q.    Can you read that for us?

3    A.    To the best of my knowledge, we are the only remaining

4    registered conservative student organization on UNM's campus.

5    Q.    What do you consider to be a conservative student

6    organization?

7    A.    An organization that exemplifies conservative values,

8    alongside going and hosting conservative speakers, and open for

9    political debate nearing more on the side of Second Amendment

10   rights, pro-life statements, and also political statements

11   against, like, capitalism, socialism.

12   Q.    What factors do you use to determine if you consider a group

13   to be a conservative student organization?

14   A.    Their declaration that they are conservative.

15   Q.    So the use of the word "conservative" is the defining factor

16   for you on whether an organization is a conservative student

17   organization?

18   A.    If they directly are stating that they align their values

19   with that, yes, I believe that that is a directly outlining

20   factor.

21   Q.    Do you consider Students for Life to be a conservative

22   student organization?

23   A.    Previously, I would have.

24   Q.    And you don't now?

25   A.    I still do.

1  Q.    Are you -- and you're not currently a member of that

2  association or have never been a member --

3  A.    No, I am not and I have never been.

4  Q.    Take a look at your declaration, paragraph 58.

5  A.    All right.

6  Q.    Could you read that?

7  A.    Yes.

8        I am aware of a security fee invoiced for $8,140 sent to UNM

9  chapter of Students for Life America last spring after they hosted

10 pro-life speaker Kristan Hawkins.

11 Q.    What is the basis of the statement that Students for Life was

12 invoiced $8,140 for the Kristan Hawkins event?

13 A.    Based off of speaking with the prior president of the

14 organization and also going and being aware of when they were a

15 registered CSO and my belief that they were charged this.

16 Q.    So the basis of your statement is hearsay from a former

17 president of the organization?

18 A.    Currently based off of what she stated and when she was

19 president, this event did take place.

20 Q.    Did you go to that event?

21 A.    I did not.

22 Q.    Did you ever see the invoice for that event?

23 A.    I did not.

24 Q.    Do you know if that invoice is paid?

25 A.    I believe it is.

1    Q.    But you don't know?

2    A.    I am not aware.

3    Q.    Take a look at your paragraph 59.  Maybe we've talked about

4    this.  The fact -- your belief that Students for Life is no longer

5    a chartered student organization at UNM is based on hearsay from

6    the former president, correct?

7    A.    That is correct.

8    Q.    Thank you.  Would you be surprised to learn that Students for

9    Life is currently a chartered student organization?

10   A.    I would be surprised and that's amazing.

11   Q.    Are you familiar with Federalist Society?

12   A.    I am not aware of them.

13   Q.    Do you know if the Federalist Society is a chartered student

14   organization at UNM?

15   A.    Currently, I am not aware.

16   Q.    Okay.  Do you work for Leadership Institute in any

17   capacity?

18   A.    I do not.

19   Q.    Have you been an intern for Leadership Institute or held a

20   position that entitled you to a stipend at Leadership Institute?

21   A.    I have not.

22   Q.    Are you receiving a scholarship from Leadership Institute?

23   A.    No, I'm not.

24   Q.    Have you applied for a scholarship at Leadership Institute?

25   A.    No, I have not.

1   Q.   Read paragraph 53 of your declaration.

2   A.   All right.  For example, the national organization of Turning

3   Point USA offers scholarships that I intend to apply for that I no

4   longer would be eligible for if our charter were revoked.

5   Q.   That's paragraph 53?  Let me take a look -- I may have

6   referred to --

7   A.   Sorry.  Paragraph 54, you stated?

8   Q.   53.  I'm sorry if I misspoke.

9   A.   Okay.  For example, the national organization of Turning

10  Point USA offers scholarships that I intend to apply for that I no

11  longer would be eligible for if our charter were revoked.

12  Q.   And have you applied for a scholarship with Turning Point

13  USA?

14  A.   Currently, no.

15  Q.   Do you know when the deadline to apply for a scholarship for

16  Turning Point USA is?

17  A.   There is not a deadline, but there -- you do have to host

18  events to go and receive the scholarships.

19  Q.   And the charter for Turning Point UNM has not been revoked,

20  right?

21  A.   Currently, no.

22  Q.   There's no proceeding to revoke the charter of Turning Point

23  UNM either?

24  A.   Not that I'm aware of.

25  Q.   And as co-president, you think you might know that?

1  A.    I believe so.

2  Q.    Okay.  Are you currently employed?

3  A.    Currently, no.

4  Q.    You're aware that Leadership Institute hires security guards

5  to accompany Ms. Gaines due to concerns about her safety at

6  university speaking events, correct?

7  A.    That is correct.

8  Q.    Do you know what Ms. Gaines' security detail is trained to do

9  if an event on a campus becomes unsafe?

10 A.    I am uneducated on that topic.

11 Q.    Excuse me?

12 A.    I'm uneducated on that topic.

13 Q.    You didn't talk with them about that when you were inviting

14 them to speak at UNM?

15 A.    Currently, no.  I did not want to distract them from their

16 job.

17 Q.    Did you talk to them about what their role was, when you

18 talked about testifying, that you didn't need security from UNM if

19 Ms. Gaines had her security?

20 A.    I did not speak to the officers, no.

21 Q.    Do you know what Ms. Gaines' security guards' obligations are

22 to the university community that Ms. Gaines is visiting?

23 A.    I currently am unaware.

24 Q.    Do you know if they're just concerned with protecting

25 Ms. Gaines, right?

1  A.   I believe that they're concerned about keeping Ms. Gaines
2  safe and keeping the event safe.
3  Q.   And how might they go about keeping the event safe, from your
4  perspective, since you don't know what they do?
5  A.   That is just my subjective opinion.  I'm sorry for the
6  misstatement.
7  Q.   You agree that the University has an obligation to keep
8  people safe while they're on campus, right?
9  A.   I agree.
10 Q.   You're aware of a public safety incident at UNM involving a
11 speaking event hosted by Turning Point UNM before the Riley Gaines
12 event, right?
13 A.   May I receive more info on that?
14 Q.   Sure.  Were you a member of Turning Point UNM during the Tomi
15 Lahren event?
16 A.   I was.
17 Q.   Did you go to that event?
18 A.   I did not attend that event.
19 Q.   Why not?
20 A.   Because of previous work obligations.
21 Q.   Are you aware that UNM imposed a security fee for the Tomi
22 Lahren event?
23 A.   I am aware.
24 Q.   Are you aware that that event became unsafe?
25 A.   I am aware.

```
 1   Q.   How did you become aware?
 2   A.   By prior -- well, first off, the news, and also seeing videos
 3   alongside our president who, at the time, stated, and also Tomi
 4   Lahren having to leave the event early.
 5   Q.   And do you know whether that event was open to the public or
 6   just UNM students?
 7   A.   I'm currently unaware, but -- yeah.
 8   Q.   Do you know the amount of the security fee that was charged
 9   in that event?
10   A.   I'm not aware of the current number.
11   Q.   Do you know if that was ever paid?
12   A.   I'm currently unaware.
13   Q.   Are you aware that UNM imposed a security fee for the Charlie
14   Kirk event that was hosted by Turning Point UNM?
15   A.   I'm unaware.
16   Q.   Did you attend that event?
17   A.   I did not.
18   Q.   Why not?
19   A.   Work obligations.
20   Q.   So you don't know the amount of the security fee?
21   A.   No, I do not.
22   Q.   And you don't know whether it was paid?
23   A.   I do not.
24   Q.   Are you aware of whether UNM imposed a security fee for the
25   Roxxxy Andrews event?
```

1    A.    I'm unaware.

2    Q.    Was that open to the public or just for UNM students?

3    A.    I'm unaware.

4    Q.    What's your understanding of what AS-UNM is?

5    A.    I don't have a great understanding.

6    Q.    Okay.  Do you know if Roxxxy Andrews' event sponsors paid a

7    security fee?

8    A.    I am unaware.

9    Q.    You don't know what that would have been, then?

10   A.    No.  Currently, no.

11   Q.    According to your declaration, at paragraphs 54 to 57, you

12   went to the Roxxxy Andrews event on November 2nd, 2023, and walked

13   around the perimeter, right?

14   A.    One second.  Let me pull that up.

15   Q.    Oh, I'm sorry.  Take your time and let me know when you're at

16   those paragraphs, Mr. Gonzales.

17   A.    What were the numbers?

18   Q.    54 to 57.

19   A.    54 to 57.  And may you restate your question?

20   Q.    You went to the Roxxxy Andrews event and walked around the

21   perimeter?

22   A.    I did walk around the perimeter, that is correct.

23   Q.    Do you know how many people attended that event?

24   A.    I am not aware of the exact number.

25   Q.    Do you know if it was open to the public or just to UNM

1    students?

2    A.    I currently am unaware.

3    Q.    Did you protest at that event?

4    A.    No, I did not.

5    Q.    Did you see any protestors at that event?

6    A.    I did not.

7    Q.    Do you know how much security was present other than the one

8    police car that you saw and referenced in your declaration?

9    A.    Currently, no.

10   Q.    You don't know how much security was inside the event?

11   A.    No.

12   Q.    Or stationed elsewhere on campus?

13   A.    Nope.

14   Q.    Do you know if Turning Point USA, the corporation that you're

15   affiliated with at UNM, covered security for the Charlie Kirk

16   event?

17   A.    I am unaware.

18   Q.    Okay.  So you don't know if that was paid or who paid that?

19   A.    I'm unaware.

20   Q.    Okay.  You mentioned in your direct testimony that you had

21   spoken to Tomi Lahren about attending an event at UNM?

22   A.    Yes.

23   Q.    When did that conversation happen?

24   A.    About five weeks ago, we were reached out to -- by Ian

25   Haworth about this event, about possibly hosting an event with

1   Tomi Lahren due to both them being interested in coming back to

2   the campus.

3   Q.   So that was long after the lawsuit was filed?

4   A.   I believe so.

5   Q.   When did you reach out to Riley Gaines to discuss her coming

6   back to UNM for a Turning Point UNM event?

7   A.   I did not reach out to any of these speakers, to go and just

8   clarify.  I've been reached out to, myself.  They've reached out

9   to me to go and possibly come back to campus.

10  Q.   Thank you for that clarification.  So Tomi Lahren, Riley

11  Gaines, and Ian Haworth's people reached out to Turning Point UNM

12  regarding revisiting the campus?

13  A.   Currently, yes.

14  Q.   When did Riley Gaines' campaign reach out to you?

15  A.   I'm unaware of an exact date, but it was right after the

16  event happened, they stated that they would be interested in

17  coming back.

18  Q.   After the event happened in the fall of '23?

19  A.   Yes, correct.

20  Q.   Have you had conversations with them since about having her

21  return to UNM?

22  A.   Not since with the legal implications right now.

23  Q.   Okay.  And did you now speak to Ian Haworth's people?

24  A.   About five weeks ago.

25  Q.   After the lawsuit was filed?

1    A.    I believe so.

2    Q.    After this preliminary injunction was filed?

3    A.    I believe so.

4    Q.    And what was the subject of that conversation?

5    A.    Them possibly coming to campus, and, furthermore, they stated

6    that it would be a possibility for us and they'd be interested in

7    it.    That was the consistency of it.

8    Q.    Did you discuss the security fees with the Haworth people?

9    A.    It was mentioned.  We do not have a reply currently to that

10   part of it.

11   Q.    Did you mention the security fee or discuss the security fee

12   with Tomi Lahren?

13   A.    It has been mentioned.  It has not been discussed further

14   than that.

15   Q.    When you say it's been mentioned, how is it mentioned?  Did

16   you email?  Did you Snapchat?  Did you talk to them on the phone?

17   A.    We emailed them based off of their interest.  They emailed

18   Turning Point USA, my head rep.  And further than that, we went

19   and had a conversation about them having interest.  And then we

20   mentioned that we would have to figure out a date due to we're

21   unaware if we would even be able to afford it based off of

22   security fees.

23   Q.    And you have an email to that effect?

24   A.    Something of that effect.

25   Q.    All right.  You referenced that you had knowledge of violence

1  during a drag queen event on campus.  Tell me about that.
2  A.   I did not reference that.
3  Q.   So you don't believe that you testified that you're aware
4  that there was violence during a drag queen event?
5  A.   On our campus?
6  Q.   Not on our campus.  On a campus.
7  A.   Oh, on a campus.  I am unaware of the exact name, but I've
8  heard of it happening on --
9  Q.   Do you know what the event was called?
10  A.   I do not.
11  Q.   Do you know what campus it was on?
12  A.   I do not.
13  Q.   Do you know when it might have happened?
14  A.   I do not.
15  Q.   What's the source of your information regarding your
16  testimony that there's been violence at a drag queen event on a
17  campus?
18  A.   Social media alongside news sources.
19  Q.   So hearsay?
20  A.   Hearsay.
21  Q.   Okay.  Turning Point UNM received a final invoice for
22  security.  Let's go over some of those.  You -- look at Exhibit 2.
23  Let me know when you have that and are able to testify about that,
24  Mr. Gonzales.
25  A.   May I clarify?  Exhibit 2, the 9/5 transcript meeting?

```
 1   Q.   No.  There's a folder in front of you, I think, that's marked
 2   Plaintiffs' Exhibit 2.
 3   A.   I just wanted to clarify.
 4   Q.   Oh, I'm looking at 3.  I apologize.  Thank you.  2 is the
 5   transcript.
 6   A.   Okay.
 7   Q.   Do you have that?
 8   A.   I do.
 9   Q.   What's the date on that document?
10   A.   Document...
11   Q.   The top right-hand corner.
12   A.   I'm trying to read that.  Thursday, August -- I'm not able --
13   I believe it says Thursday, August 31st of 2023.
14   Q.   Thanks.  Is this what was referred to in the transcripts as
15   the quote --
16   A.   Yes.
17   Q.   -- for security?
18   A.   Yes.
19   Q.   So this was a quote, the first quote that Lieutenant Stump
20   gave you?
21   A.   Currently, yes, yeah.
22   Q.   And this is not the amount that you were invoiced, correct?
23   A.   That's correct.
24   Q.   Let's take a look at Plaintiffs' Exhibit 6.  Let me know when
25   you're there.
```

1    A.    All righty.  I'm there.

2    Q.    Okay.  What's the date of Exhibit 6?

3    A.    On Exhibit 6, it says September 18th, 2023.

4    Q.    So some weeks after the original quote of 10,000 or so, you

5    got this adjusted quote?

6    A.    Adjusted quote based off of the building.

7    Q.    The building, you mean that the event was at Kiva?

8    A.    Yes.

9    Q.    Instead of at the SUB?

10   A.    Yes.

11   Q.    Do you know why it's cheaper to have an event at the Kiva

12   instead of the SUB?

13   A.    I'm unaware.

14   Q.    And you don't recall Lieutenant Stump telling you that?

15   A.    I'm unaware.  I don't believe I have that --

16   Q.    And what's the quote that you got on September 18th, 2023?

17   A.    $7,420.

18   Q.    And let's take a look at Plaintiffs' Exhibit 8.

19   A.    All righty.

20   Q.    What's the date on that invoice?

21   A.    The date is October 5th, 2023.

22   Q.    Is this the final invoice, the actual invoice, that UNM sent

23   to Turning Point UNM regarding the Riley Gaines event?

24   A.    Yes, as far as I'm aware.

25   Q.    And do you know if Turning Point UNM has paid this invoice?

1    A.    Turning Point UNM did not pay this invoice.  Leadership
2    Institute paid this invoice.
3    Q.    It's your understanding that Leadership Institute paid this
4    invoice?
5    A.    I'm unaware and I'm not able to go and speak on that topic.
6    Q.    But you saw the email earlier that Leadership Institute,
7    through Kenna, had agreed as a sponsor to pay this invoice, right?
8    A.    Yes.
9    Q.    And you don't know if that actually happened or not?
10   A.    Not 100 percent.
11   Q.    Okay.  If that invoice is not paid, do you know if Turning
12   Point UNM has plans to pay that invoice?
13   A.    I don't believe I'm educated to speak on that topic.
14   Q.    I didn't hear your answer.
15   A.    I don't believe I'm educated to speak on that topic.
16   Q.    As president of Turning Point UNM, you don't know whether the
17   invoice is paid or whether Turning Point UNM has plans to pay that
18   invoice?
19   A.    As far as I'm aware, I believe that the invoice was paid
20   since we did not receive any further notice from Timothy Stump or
21   anyone from the UNM staff.
22   Q.    And that's a good point.  You haven't heard from anyone at
23   UNM about a failure to pay the debt regarding the Riley Gaines
24   security fees, correct?
25   A.    As far as I'm aware, yes.

1    Q.    And they've never -- you've never -- Turning Point UNM has
2    never tendered an amount to UNM to pay any part of that invoice
3    that we looked at earlier?
4    A.    Currently, no.
5    Q.    And as far as you know, UNM has never contacted Turning Point
6    UNM regarding the unpaid security fee?
7    A.    That is correct.
8    Q.    And they haven't ever attempted to collect that fee from you
9    either?
10   A.    That is correct.
11   Q.    And Turning Point has not tried to schedule any outside
12   speaker events through the CSO process since the Riley Gaines
13   event, correct?
14   A.    That is correct.
15   Q.    Turning Point continues to schedule and hold regular meetings
16   at the Student Union Building, right?
17   A.    That's correct.
18   Q.    And you've had those meetings regularly since the Riley
19   Gaines event?
20   A.    That is correct.
21   Q.    And there hasn't been any problem with scheduling those
22   meetings?
23   A.    That is correct.
24   Q.    So Turning Point UNM has never been denied access to UNM
25   facilities after its failure to pay the security fees for the

1  Riley Gaines event?

2  A.   Not that I'm aware.

3  Q.   Look at your declaration.  There's two different paragraphs,

4  51 and 52, and I want to talk to you about that.  Are you ready?

5  A.   Yes, I'm ready.

6  Q.   What's the basis for your statement that Turning Point UNM

7  could lose its charter for failure to pay its debt?

8  A.   Based off of the UNM website for chartered organizations,

9  CSOs.

10 Q.   Tell me what you believe that says.

11 A.   I don't believe I can go and speak to the exact correctness

12 of it, but I -- from my knowledge, it states that if failure to

13 pay fees, events may not be fulfilled, alongside charters may be

14 lost.  It's something like that.  But I'm not able to speak to the

15 exact wording.

16 Q.   And you don't know of any organization that that failure to

17 pay a security fee has resulted in an organization losing its

18 charter?

19 A.   Currently, I do not know any organization that has lost their

20 charter that way.

21 Q.   And that has not ever been a threat to Turning Point UNM,

22 correct?

23 A.   I don't believe I'm educated to speak on that topic.  I'm not

24 aware if that's a threat or not.

25         MS. WILLIAMS:  May I have a minute, Your Honor?

1          THE COURT:  Yes.

2    (Counsel confer.)

3    Q.   (By Ms. Williams)  Have any of your speakers, to your

4    knowledge, for Turning Point UNM offered to pay any security fees

5    in the future?

6    A.   Currently, none that I'm aware of.

7    Q.   Have you discussed that possibility with the four speakers

8    that have reached out to you about speaking at UNM?

9    A.   Currently, no.

10   Q.   Okay.

11          MS. WILLIAMS:  That's all I have.  Thank you for your

12   attention.

13          THE COURT:  Thank you, Ms. Williams.

14       Redirect?

15          MR. ISGUR:  No questions on redirect, Your Honor.  We'd

16   ask that the witness be excused as he has, I believe, some school

17   obligations he would like to attend to, if possible.

18          MS. WILLIAMS:  No objection.

19          THE COURT:  We'll go ahead and excuse the witness.

20   Thank you very much for your testimony today.

21          THE WITNESS:  Thank you, Your Honor.

22          MR. ISGUR:  Your Honor, the Plaintiffs would like to

23   call Ms. Sarah Clark.

24          THE COURT:  You may do so.

25       Ms. Clark, if you'd come up to the witness stand and be

1    prepared to be sworn in.

2                LAW CLERK:  Do you solemnly swear or affirm that your

3    testimony in this matter will be the truth?

4                THE WITNESS:  Yes.

5                LAW CLERK:  You may be seated.

6                THE COURT:  You may proceed.

7                            SARAH CLARK

8                (being duly sworn, testified as follows:)

9                DIRECT EXAMINATION BY MR. ISGUR

10   Q.   Good afternoon.  Would you please state your name for the

11   record?

12   A.   My name is Sarah Clark, S-A-R-A-H, C-L-A-R-K.

13   Q.   And what is your occupation?

14   A.   I work for the Leadership Institute.  I'm the operations

15   manager and scheduler for the Riley Gaines Center at the

16   Leadership Institute.  I've worked for them for four years.

17   Previous roles include campus events coordinator and senior

18   regional field coordinator and regional field coordinator.

19   Q.   Could you briefly explain what that means you do?

20   A.   So my current position is the operations manager, so I run

21   anything having to do with the Riley Gaines Center, the

22   behind-the-scenes work, so booking travel, handling scheduling

23   obligations for her, paying bills when bills come in regarding

24   events, internal -- internal handling, so any reporting that we

25   have to do, I handle that.

1    Q.    And prior to your work with the Riley Gaines Center you said
2    that you work more generally with campus events?
3    A.    So my previous role of campus events coordinator, I ran our
4    speaker program, so it's a program where we bring conservative
5    speakers to college campuses across the nation.  And then I also
6    track the conservative events that happen nationwide on any
7    college campus that the Leadership Institute has connection to.
8    Q.    Are you familiar with the history of the Leadership
9    Institute?
10   A.    Yes.
11   Q.    Could you tell me a bit about it?
12   A.    We were founded in 1979 by Morton C. Blackwell.  He is our
13   current president.  He's the only president that we've had.  We
14   are primarily a training organization.  So we do political
15   trainings, the nuts and bolts of politics, if you will.  So we're
16   not gonna teach students what to think.  We operate under the
17   assumption, okay, you think the same things that we do.  Here's
18   how best to implement them, whether that is youth campaign
19   training, campaign management training, social media training.
20   Pretty much anything you can think of having to do with politics,
21   we likely have a training attached to it.
22   Q.    Are you familiar with the corporate structure of Leadership
23   Institute?
24   A.    Yes.
25   Q.    What is that corporate structure?

1  A.   We are a 501(c)(3) nonprofit organization.

2  Q.   How does Leadership Institute work to get its message out?

3  A.   Are we talking just like college campus or broadly?

4  Q.   On college campuses, yes.

5  A.   So on college campuses, we have a field staff that is

6  nationwide.  So we have over 20 regional field coordinators, over

7  20 field representatives.  And they go -- each are assigned to

8  specific states, and they go to those college campuses and those

9  states.  So, for example, I used to be the regional field

10  coordinator for Utah, Arizona, Colorado, Wyoming and Nevada.  And

11  it was my job to go to those college campuses, connect with

12  conservative organizations on those campuses, and offer them the

13  resources that the Leadership Institute has to offer.

14  Q.   Would you say that Leadership Institute's got -- about how

15  many speakers would you say Leadership Institute works with on a

16  regular basis?

17  A.   Our free speakers list has over 100 individuals who have

18  offered to donate their time to going out on college campuses and

19  speaking to our students.  The Leadership Institute will cover

20  travel and other expenses related to it in order to put them out

21  on those college campuses.  As far as paid speakers, we have

22  another list for select groups that have exhibited, like, that

23  they can handle a more expensive speaker.  So, for example, we

24  have speakers like Cabot Phillips, Ann Coulter and Riley Gaines,

25  who have an honorarium attached to them.

1   Q.   When you were in college, were you a member of any
2   conservative organizations?
3   A.   Yes.  I was a member of Turning Point USA at Utah Valley
4   University.  I briefly was the president of Students for Life at
5   Utah Valley University as well.
6   Q.   From your experience then and your knowledge working for
7   Leadership Institute, are the speakers in LI's book, speakers that
8   students on campuses -- conservative speakers on campuses would be
9   interested in inviting --
10         COURT REPORTER:  I'm sorry, can you repeat that
11   question?
12         MR. ISGUR:  Yeah.  Maybe I can simplify it.
13   Q.   (By Mr. Isgur)  From your experience as a TP-UNM -- or a
14   TP-USA affiliate and in your work with Leadership Institute, do
15   you expect that the speakers in your -- in LI's book are speakers
16   that conservative students on college campuses might be excited to
17   invite to campus?
18   A.   Absolutely.  Cabot Phillips works for Daily Wire.  That's a
19   very popular outlet among young conservatives.  Riley Gaines is
20   very popular amongst young conservatives.  Having traveled with
21   her across the country, I've seen the response that young people
22   have when they get to hear her speak, whether that's on college
23   campuses or at other conferences that we've been to.
24   Q.   Were you involved in planning the Riley Gaines event on UNM
25   campus in October 2023?

```
 1   A.   Yes.
 2   Q.   What was your involvement?
 3   A.   So my job was, one, to select the groups that we would go on
 4   tour to see.  I extend a contract to those students detailing the
 5   obligations and expectations that we have.  Leadership
 6   Institute -- the Riley Gaines Center at the Leadership Institute,
 7   our budget covers these events in their entirety.  So that covers
 8   Riley's speaking fee, her private security, any other expenses
 9   related to these events, so AV systems, room rentals, and then, on
10   occasion, campus security as well.
11   Q.   And what does Ms. Gaines go to college campuses to speak
12   about?
13   A.   She speaks about protecting women's spaces, particularly
14   women's sports against the gender ideology movement and the
15   inclusion of men in women's sports.
16   Q.   Do you think that's an important issue to young conservatives
17   these days?
18   A.   Absolutely.
19   Q.   Can you tell me about booking the October 4th event with the
20   University and your understanding of how that went?
21   A.   It was my understanding -- so the students reached out early
22   on saying that they were running into some issues with booking a
23   room.
24        MS. WILLIAMS:  Objection, Your Honor.  Lack of
25   foundation.
```

1          THE COURT:  I'm going to overrule it for now.  You may
2    proceed.
3          THE WITNESS:  They reached out early on to me and to our
4    field staff just letting us know that they were attempting to book
5    a room.  They wanted to book it in the SUB, and then they were --
6    they let me know early on that they were running into issues with
7    the cost of campus security.
8    Q.   (By Mr. Isgur)  How much was the cost of campus security?
9    A.   They let me know that it was initially -- the initial quote
10   was the $10,000.
11   Q.   In your experience booking events for Ms. Gaines, do schools
12   usually or often charge security fees?
13   A.   They do.  It is a requirement within their -- the student's
14   contract that they provide -- they get campus security.  But the
15   Leadership Institute does cover those costs.  Typically, you know,
16   two to four officers at each event.  Riley's security is only
17   responsible for Riley.  They would leave me behind in an
18   emergency.  They are only responsible for Riley.  Campus security
19   is there to protect the audience, and so when we -- when we
20   require this, we include that in what we cover for the students.
21   Q.   Could you estimate how many campus events you've done
22   involving Ms. Gaines?
23   A.   We have done 48 --
24   Q.   Okay.
25   A.   -- since 2023.

1  Q.   Okay.  Aside from the UNM event, do you recall the highest
2  security fee any school tried to charge LI?
3  A.   As far as exact numbers go, it ranged between 1,500 to 2,000.
4  Q.   And that's the highest?
5  A.   That is the highest.
6  Q.   What's a more ordinary number?
7  A.   Typically I'll get a bill for, like, 900, 800, less than
8  1,000.
9  Q.   So over $10,000 seemed very strange to you?
10  A.   That was very steep.
11  Q.   Does LI usually agree to pay -- so LI does not usually agree
12  to pay fees that are this high?
13  A.   No, that's unusual.
14  Q.   Why did you agree to pay the fee in this instance on behalf
15  of the UNM students?
16  A.   Riley's schedule is intense.  To put something on the
17  schedule requires three to four flights booked in advance, because
18  she is in the air most of the time.  I would say probably 350 days
19  out of the year she is in the air.  And so when we had been
20  planning this event, we had booked flights in advance, we had
21  booked hotels, we had booked security, all of that in advance.
22  And to cancel or move the event was going to be signifi- -- was
23  going to be very costly.  It costs around $25,000 to do a single
24  Riley Gaines event with all of the moving parts, including my
25  time, Riley's time, private security, other expenses related to

1    the events, AV requirements, my time, the regional field
2    coordinator's time, our field representative's time.  All of that
3    across the board is a very costly effort.  So to stop that, it
4    would have been more expensive than to just pay the fee.
5    Q.   So to restate what you just said a little bit, you --
6    Leadership Institute had already invested between 20- and $25,000
7    into hosting this event and booked Ms. Gaines and wasn't able to
8    reschedule her to do something else.  And then you were told that
9    you needed to agree to pay, at that point, the invoice, it was
10   $7,400, or else you'd have to cancel the event; is that correct?
11   A.   That is correct.
12           MR. ISGUR:  Your Honor, I'd like to approach the
13   witness.
14           THE COURT:  You may.
15           MR. ISGUR:  Your Honor, I've handed the witness what's
16   been marked as Plaintiffs' Exhibit 11.
17   Q.   (By Mr. Isgur)  Ms. Clark, do you recognize this document?
18   A.   Yes, I do.
19   Q.   What is it?
20   A.   It is the document that I sent to indicate that the Riley
21   Gaines Center would pay reasonable fees for the event.
22   Q.   And you did that so that the event could proceed?
23   A.   Yes.
24           MR. ISGUR:  Your Honor, I'd like to move to admit
25   Plaintiffs' Exhibit 11.

```
1              THE COURT:  Ms. Williams?

2              MS. WILLIAMS:  No objection, Your Honor.

3              THE COURT:  Plaintiffs' Exhibit 11 will be admitted.

4    (Plaintiffs' Exhibit No. 11 admitted into evidence.)

5    Q.   (By Mr. Isgur)  Did you communicate directly with UNM

6    officials about this agreement?

7    A.   No.

8    Q.   So how, then, did you make the arrangement to pay?

9    A.   I was dealing with mostly forwarded emails, so I could see

10   what was going on in, like, the email chains and understand where

11   these invoices were coming from.

12   Q.   Okay.  So who did you provide this agreement to?

13   A.   Kenna, I think.

14   Q.   Okay.

15   A.   Kenna or maybe Jonathan as well.

16   Q.   So you provided it to the --

17   A.   The chapter presidents.

18   Q.   -- the co-presidents of --

19   A.   Yes.

20   Q.   And what was your understanding about what they did with it?

21   A.   That they forwarded it directly to the campus police.

22   Q.   And following that, were you told that the event could

23   proceed?

24   A.   Yes.

25   Q.   I'd like to take you to the day of the event, if that's all
```

1    right.  Prior to the event taking place, where were you?

2    A.    So prior to the event, me and Riley's private security, we

3    typically do a walk-through with campus police everywhere we go.

4    They detail, like, where the event's going to be, exit plans,

5    et cetera.  So I was with our team to go over those procedures.

6    Q.    Okay.  And then directly prior to the event, where were you?

7    A.    I was with Riley in our vehicle, and then also walking around

8    the event and making sure that everything was going well, making

9    sure that check-in was going well, ensuring that all of our promo

10   materials are in the room, and just, you know, ensuring that the

11   event is running smoothly.

12   Q.    Did you speak to Commander Stump prior to the event taking

13   place?

14   A.    Yes.  He was there during the walk-through with our team

15   beforehand and then he was also there at the event.

16   Q.    Could you tell me about your conversation with him?

17   A.    He talked about the procedures of, like, the Kiva Building

18   and where he was going to have officers stationed.  He talked

19   about barricades and where those would be.  And then he talked

20   about the number of police officers, which was between 30 to 45,

21   if I'm remembering correctly.  And then he talked a lot about the

22   previous events that they had seen at UNM including Tomi Lahren

23   and Charlie Kirk and Kristan Hawkins.

24   Q.    Did he say anything specific to you about the Tomi Lahren

25   event?

```
 1   A.   Yes.  He seemed -- he had said that Tomi had exaggerated the
 2   story on Twitter saying that, you know, she hadn't been taken away
 3   in an unmarked vehicle, and that these speakers tend to embezzle
 4   what happened.
 5   Q.   I'm sorry, did you mean to say "embezzle"?
 6   A.   Yeah.  Not embezzle.  What's the word?
 7   Q.   Did you mean exaggerate?
 8   A.   Yeah, yeah, that's the one.
 9   Q.   Did you have any impression of how Commander Stump felt about
10   your event?
11   A.   I just got a sense of general annoyance.
12   Q.   Who do you think his annoyance was directed at?
13   A.   Conservative speakers.
14        MS. WILLIAMS:  Objection, Your Honor.  Calls for
15   speculation.
16        MR. ISGUR:  Your Honor, I'm asking about the witness'
17   impression from her conversation with -- it's calling for a
18   presence sense impression, not speculation.
19        THE COURT:  I'll overrule it.
20        THE WITNESS:  I just got a sense of general annoyance
21   towards just conservative speakers, and perhaps just annoyance
22   that these events bring controversy to the campus.
23   Q.   (By Mr. Isgur)  Did you take note of whether or not there
24   were any protests going on at the event?
25   A.   Yes.  There were about seven protestors behind the
```

1    barricades.  They had a couple signs.  They flipped me the bird.

2    Very -- not very scary.

3    Q.    Is that an ordinary experience?

4    A.    Yes.

5    Q.    A small number of non-violent protestors is normal?

6    A.    Yes.  It's unusual.  Typically we have a couple that bring

7    their signs and, you know, the typical F words and insults thrown

8    at me.  And then -- but then, like, we get some bigger ones here

9    and there.

10   Q.    Did you speak to Commander Stump about dismissing officers

11   early from the event given the protest response?

12   A.    Yes.  I had talked to him about that before the event with

13   our team.  I said, This seems excessive.  Are we going to -- like,

14   when can we dismiss officers?  Is that in the plan that, like, if

15   nothing happens, we dismiss these officers?  And he said yes.

16        At the event, we were about 15 to 20 minutes into the event,

17   and I had ensured that Riley had gotten on stage just fine and all

18   introductions and mics and all of that were working.  And so I

19   went out to see how our protestors were doing, and I walked up to

20   Commander Stump and I said, Can we please release more officers?

21   And he said, Yeah, sure.  I'm gonna do that now.

22   Q.    Was it your impression that he would have released those

23   officers if you hadn't asked him repeatedly?

24            MS. WILLIAMS:  Objection, Your Honor.  Calls for

25   speculation.

1    MR. ISGUR:  I'm again asking for her impression based on

2    how Commander Stump interacted with her.

3    THE COURT:  Well, if you're just asking her for her

4    impression, what's the relevance of that?

5    MR. ISGUR:  It's relevant because it goes to any kind of

6    viewpoint discrimination toward conservative speakers or

7    conservative organizations in general, which is one of the

8    centerpoints of the litigation.

9    THE COURT:  I'm going to allow you to ask the question

10   regarding her impressions on this, but I will tell you that I

11   don't see those impressions as being particularly relevant to the

12   issues that we have here.  But go ahead and ask her.

13   MR. ISGUR:  Thank you, Your Honor.

14   Q.   (By Mr. Isgur)  Do you think Lieutenant Stump would have

15   dismissed officers if you hadn't asked him to again?

16   A.   Maybe a few minutes later, but it was definitely prompted by

17   my appearance.

18   Q.   Okay.  After the event took place, did you see an invoice at

19   any point?

20   A.   Yeah.  I received a forwarded invoice on October 9th of '23.

21   Q.   And how much was that invoice for?

22   A.   $5,384.75.

23   Q.   Has Leadership Institute paid that invoice?

24   A.   No.

25   Q.   Does Leadership Institute have any future plans you're aware

1  of to send speakers to UNM?

2  A.   Not if this is the treatment and response that we're going to

3  receive by coming to UNM.

4  Q.   By that, do you mean the high security fees?

5  A.   Yes.

6  Q.   If you -- if your speakers were charged a more normal

7  security fee for attending UNM events, do you expect that

8  Leadership Institute would be interested in sending speakers back

9  to UNM?

10 A.   Of course.  We've had a stronghold.  We've had a great

11 relationship with these students, and we'd like that to continue.

12 I know that, like, we've sent staff members.  We sent a staff

13 member to the Tomi Lahren event referenced earlier.  I know we

14 have a great relationship with these students and we'd like that

15 to continue.

16 Q.   If the University of New Mexico decided to bring a lawsuit

17 against Leadership Institute to try and demand payment of the

18 fees, that would presumably not be something that is good for

19 Leadership Institute, right?

20 A.   No.

21        MS. WILLIAMS:  Objection, Your Honor.  Calls for

22 speculation.

23        THE COURT:  Sustained.

24 Q.   (By Mr. Isgur)  Are you concerned that UNM might bring legal

25 action against Leadership Institute?

```
1            MS. WILLIAMS:  Objection.  Relevance.
2            THE COURT:  I'll go ahead and overrule that and allow
3    her to answer with the same...
4            THE WITNESS:  Yes.
5    Q.   (By Mr. Isgur)  If the University of New Mexico took action
6    against the Turning Point chapter on its campus -- say they lost
7    their charter, for instance -- would that injure Leadership
8    Institute's ability to bring speakers onto UNM's campus?
9            MS. WILLIAMS:  Objection, Your Honor.  Calls for
10   speculation.  These are hypotheticals.
11           THE COURT:  I'll allow it.  Overruled.  You may answer.
12           THE WITNESS:  Yes.  In the past when, say, like a
13   regional field coordinator has failed to produce the proper
14   paperwork to cover a previous event, it has made really rocky
15   relationships with students and it inhibits our ability to
16   continue doing activism on those campuses.  And I don't blame them
17   because, you know, when we don't pay a bill, it's a problem.
18   Q.   (By Mr. Isgur)  For Leadership Institute to get its message
19   out on college campuses, do you need conservative student
20   groups?
21   A.   Absolutely.  Our campus program does not run without them.
22           MR. ISGUR:  May I confer with my co-counsel briefly,
23   Your Honor?
24           THE COURT:  You may.
25   (Counsel confer.)
```

1    MR. ISGUR:  Your Honor, no further questions at this
2    time.
3        THE COURT:  Thank you, Counsel.
4        MS. WILLIAMS:  Thank you, Your Honor.
5        THE COURT:  Ms. Williams, cross-examination?
6        MS. WILLIAMS:  May I approach the witness?  You don't
7    have a copy of your declaration, right, Ms. Clark?
8        THE WITNESS:  No.
9        MS. WILLIAMS:  Can I give her that?  I'll be referring
10   to it.
11       THE COURT:  You may.
12       MS. WILLIAMS:  Sorry, Your Honor.
13       THE COURT:  That's okay.
14                   CROSS-EXAMINATION BY MS. WILLIAMS
15   Q.   I'm unclear, Ms. Clark, are you employed by Leadership
16   Institute or the Riley Gaines Center?
17   A.   They are the same thing.  So Leadership Institute is the
18   broad organization, and the Riley Gaines Center at the Leadership
19   Institute is an individual department.
20   Q.   So you're employed by Leadership Institute?
21   A.   Yes.
22   Q.   Okay.  How many employees work for Leadership Institute?
23   A.   I think our last count was 180, 180.
24   Q.   Okay.  Does Leadership Institute employ Riley Gaines?
25   A.   Yes.

1  Q.    And you work closely with Ms. Gaines?

2  A.    Yes.

3  Q.    And how long have you worked closely with her?

4  A.    I have known Riley and been sending her on college campuses

5  since November of 2022.

6  Q.    And you scheduled Ms. Gaines' speaking events for that period

7  of time till now?

8  A.    I took more of an active role in it in July of 2023.  Before

9  that, we were just working on a contractual basis.  And then she

10  became an employee and I was assigned to work with her on her

11  schedule.

12  Q.    Okay.  And in the past, you were also the Leadership

13  Institute's regional field coordinator for Arizona, Colorado,

14  Nevada, Utah, and Wyoming, right?

15  A.    Yes.  If you have five fingers up, yes.

16  Q.    I have five fingers up.

17  A.    Yes.

18  Q.    And you were never the regional field coordinator for New

19  Mexico?

20  A.    No.

21  Q.    Who was?

22  A.    When I was working over it, it was our Texas regional field

23  coordinator, so that would have been Alexa Schwerha or Jonathan

24  Alexander -- no, I'm sorry, Christina Zavala.

25  Q.    Do you know if either of those people came to UNM campus?

1    A.    Yes.

2    Q.    And do you know when?

3    A.    Christina was at Tomi Lahren's event.

4    Q.    Okay.  Your bio on the Leadership Institute website states

5    that you manage over 100 student groups and work to grow

6    conservative and libertarian movement on college campuses.  Sound

7    right?

8    A.    That was my biography when I was a regional field

9    coordinator.

10    Q.    Do you know that's still up?

11    A.    I guess it is.

12    Q.    My question pings off of that.  What does your management of

13    student groups entail?

14    A.    So I don't manage student groups anymore.

15    Q.    What did it in entail?

16    A.    So when I was managing those student groups, we have a

17    database where we keep track of the activity that these groups are

18    doing on campus, and when they're falling into a period of, like,

19    attrition, we do what we can to make sure that those groups stay

20    alive and well.  So whether that is bringing a conservative

21    speaker to their campus, providing financial resources, providing

22    them with the political training the Leadership Institute is

23    famous for, activism kits.  Sometimes students really just need a

24    friend.  Many times I would text a student and reach out and say,

25    Hey, like, I see your group's kind of falling into inactivity.

1  What's going on?  And they would reach out and they're like, Well,
2  I just don't have anybody to table with.  So I would go and table
3  with them.
4  Q.    So in your role as a regional field coordinator, you got
5  reports from conservative student organizations?
6  A.    It's never that formal.  It was more like I check in.  I
7  monitor what's going on, whether that's through social media or my
8  conversations with them.
9  Q.    So did you check in with Turning Point UNM?
10  A.    I didn't, no, but Christina Zavala would have, yes.
11  Q.    And do you know the content of those conversations?
12  A.    In our database, we have what's called campus notes, and we
13  write down what those conversations entail.  Basically those are
14  our general updates, so we do that three to four times a semester.
15  And then at the end of each semester, we do a wrap-up note,
16  talking about what the group has done for the semester, goals that
17  we could institute for the next semester, et cetera.  And anybody
18  within the Leadership Institute can access these at any time.  So
19  I personally know that I have audited the Turning Point UNM's
20  chapter a few times, especially when I moved up into a more
21  administrative role and took more of a role in the auditing
22  efforts.
23  Q.    When was the last time that you audited the campus notes for
24  Turning Point UNM?
25  A.    It would have been April of -- no, May of 2023.

1  Q.   And do you recall what their organizational health was as far
2  as Leadership Institute's perspective would have been?
3  A.   If I'm remembering correctly -- and I don't have this in
4  front of me -- but I want to say they were moving into a new
5  presidency and that they had a history of hosting great events on
6  campus.  I also spoke to Christina Zavala who was the regional
7  field coordinator and asked her about the health of the group as
8  well, and that's what she reported to me as well.
9  Q.   Have you checked in since May of 2023?
10 A.   My role is no longer with the same administrative role
11 anymore.  I'm not campus events coordinator anymore, so it's not
12 appropriate for me to go in and -- I don't audit groups anymore.
13 Q.   And you don't look at the campus notes, like, in preparation
14 for this hearing today?
15 A.   I mean, I could, but --
16 Q.   You didn't?
17 A.   No.
18 Q.   Okay.  You said that you were a member of Students for Life
19 when you were a college student?
20 A.   Yes.
21 Q.   Do you know whether Students for Life is a chartered student
22 organization at UNM?
23 A.   I don't.
24 Q.   Okay.  Are you familiar with the Federalist Society?
25 A.   Yes.

1    Q.    Do you know if the Federalist Society is a chartered student
2    organization at UNM?
3    A.    I don't.
4    Q.    Do you consider the Federalist Society to be a conservative
5    student organization?
6    A.    Conservative legal organization, yes.
7    Q.    Do you consider Students for Life to be a conservative
8    student organization?
9    A.    Yes.
10   Q.    Okay.  You attended Utah Valley University, I think you said?
11   A.    Yes.
12   Q.    Did you earn a degree at Utah Valley?
13   A.    No, I didn't.
14   Q.    Your employer, Leadership Institute, is not a New Mexico
15   corporation, correct?
16   A.    No.
17   Q.    And they don't have offices or employees in New Mexico?
18   A.    I don't know, actually, if we have an employee, because
19   sometimes our regional field coordinators can live in the regions
20   that they have, as well as their field representatives.  I am not
21   familiar if we have a field representative in New Mexico because
22   their regions change.  So for all I know, we could have one right
23   now.
24   Q.    But you don't know?
25   A.    But I don't know.

1   Q.   You're not an employee of Turning Point USA --

2   A.   No.

3   Q.   -- correct?  And you're not a UNM student?

4   A.   No.

5   Q.   And you've never been a UNM student, right?

6   A.   No.

7   Q.   When did Leadership Institute sign a contract with Turning

8   Point UNM for the Riley Gaines event?

9   A.   It would have been at the end of July or early August.

10  Q.   Was that before the -- take a look at Exhibit 11.  Is it

11  still in front of you?

12  A.   Yeah.

13  Q.   Can you take a look at that email -- and it's dated

14  9/21/23?

15  A.   Yes.

16  Q.   Had you already committed to bring Riley Gaines to UNM --

17  A.   Yes.

18  Q.   -- before this?

19  A.   Yes.

20  Q.   Okay.  We'll talk about that document a little bit later.

21  But you think it was July?

22  A.   Yeah, it was -- they would have signed -- contracts go out in

23  July, and they're either signed at the end of July or beginning of

24  August depending on the student's abilities to start reserving

25  rooms.

1    Q.    And Turning Point UNM's obligations under your contract to
2    Leadership Institute were what?
3    A.    So it is a requirement that they get an on-campus room.    In
4    the era of COVID, a lot of groups started hosting off-campus.
5    This would diminish the attendance of, like, the student
6    community, and so we actually discourage off-campus events because
7    it creates an unnecessary burden on the campus community to attend
8    those events.    So, for example, if they're hosted at a church,
9    like, three miles away, a lot of students don't have cars and
10   can't get to those events.    Our focus is the student organization,
11   so we want students to attend these events.    That being said, so
12   that is a requirement in the contract that they need to get an
13   on-campus -- an on-campus location.    Preferably -- this isn't a
14   requirement, but it is preferable that they have two forms of
15   entry.
16   Q.    Egress and ingress into the room?
17   A.    Yes.
18   Q.    Two doors?
19   A.    Yes.
20   Q.    Thank you.
21   A.    Another requirement is to get campus security, and we state
22   clearly in this contract that the campus security needs to be in
23   contact with Riley's private security, which is Cold Harbor
24   Security, and such security -- Cold Harbor Security is not
25   responsible for the attendees of these events.    They're only

1   responsible for Riley.

2   Q.   Thanks for that clarification.

3        So since you've never been a UNM student, you've never been a

4   member of Turning Point at UNM, correct?

5   A.   No.

6   Q.   And you've never entered an agreement with UNM regarding an

7   event at UNM on behalf of Turning --

8   A.   UNM proper, no.  Turning Point UNM, yes.

9   Q.   Okay.  And did you enter that contract on behalf of

10  Leadership Institute, between Leadership Institute and Turning

11  Point UNM?

12  A.   Yes.

13  Q.   Thanks.

14  A.   Are we referring to Exhibit 11 as a contractual agreement

15  between me and UNM?

16  Q.   No.  Are you aware that you have to have a written contract

17  to contract with a State of New Mexico entity?

18  A.   No.

19  Q.   Okay.  As far as you know, no one from Leadership Institute

20  has ever entered into a contract with UNM regarding the Riley

21  Gaines event?

22  A.   No.

23  Q.   Okay.  Ms. Gaines has never been and was not a UNM student,

24  correct?

25  A.   No.

1  Q.  She swam for a different school?

2  A.  Yes, University of Kentucky.

3  Q.  Okay.  You're aware, since you've worked so closely with

4  Ms. Gaines, that Ms. Gaines told Newsweek that she feared for her

5  life after a university speaking event?

6  A.  Yes.  This was San Francisco State University, where she was

7  held for ransom for over three hours while over 50 protestors

8  protested outside demanding that she pay them $10 each in order to

9  get her safe passage home.  The San Francisco campus security were

10  so poor at their job that the San Francisco PD themselves -- so

11  not SFSU -- San Francisco PD themselves had to come in and break

12  up this riot.

13  Q.  Let's talk about that San Francisco State University event.

14  That was in April of 2023?

15  A.  Yes.

16  Q.  And Ms. Gaines, in interviews, claims she was assaulted and

17  held hostage for hours, as you've just described?

18  A.  Yes.  She was hit in the face.

19  Q.  Okay.  Were you there?

20  A.  No.

21  Q.  Okay.  You agree that Ms. Gaines' claims regarding her fears

22  for her safety at the San Francisco State University speaking

23  event was widely publicized?

24  A.  Yes.

25  Q.  And Ms. Gaines interviewed with Fox News and Newsweek and had

1  a huge social media presence regarding her fears for her safety at
2  university speaking events, right?
3  A.   Yes.
4  Q.   This publicized event happened before Ms. Gaines spoke at
5  UNM, correct?
6  A.   Yes.
7  Q.   Leadership Institute hired security guards -- and you've
8  referred to them a couple times.  Cold Harbor, is that the name of
9  the company?
10 A.   Yes.
11 Q.   -- to accompany Ms. Gaines due to concerns for her safety at
12 university speaking events?
13 A.   Yes.  We have hired the private security because following
14 San Francisco State, we can't trust that campus police will be
15 enough.
16 Q.   Okay.  What's Ms. Gaines' security detail trained to do if an
17 event on the campus becomes unsafe?
18 A.   Their job is to get her out of there.  So we basically have
19 taken what happened at San Francisco State and we say, okay, what
20 could be done differently?  Just get her out of there.  So that's
21 what their job is, is just to simply take her and get out.
22 Q.   And I think you've already testified that the security guard
23 obligation is to Ms. Gaines, no one else, including you?
24 A.   Correct.  Correct.  They would leave me behind.
25 Q.   And what's the security guard's obligation to the university

1    community that Ms. Gaines is --

2    A.   None.

3    Q.   None.  And they're just concerned with protecting

4    Ms. Gaines?

5    A.    That is their only job.  We talk with campus security and we

6    want to cooperate with campus security because that makes

7    everybody's lives easier.  But in terms of, like, if something

8    happens, like that is to the campus security who are responsible

9    for their campus community.

10   Q.    And I understand that the Cold Harbor folks are ex-military,

11   ex-Special Forces, ex-Green Berets?

12   A.    Yes.

13   Q.    And they travel with her to every university speaking

14   event?

15   A.    Yes.

16   Q.    And you agree that a university has an obligation to keep

17   people safe on campus?

18   A.    Sure.

19   Q.    Okay.  You came to the UNM campus prior to the Riley Gaines

20   event, correct?

21   A.    Yes.

22   Q.    And you were -- were you aware of the issues of the Tomi

23   Lahren event?

24   A.    Yes.

25   Q.    And tell me what you know about that.

A.    I know that they were hosting Tomi, and some protestors tried
to break down the doors and gain entry into the room that she was
in.  I had seen video from my coworker Christina, who was there,
of the protestors hitting the doors and attempting to gain entry.
Q.    So you're aware that an event at UNM that was hosted by
Turning Point UNM had turned unsafe?
A.    Yeah.
Q.    And that was something that was factored in, do you know, to
the security plan that was developed by UNM PD?
A.    I would assume, yes.
Q.    Were you aware of the Charlie Kirk event at UNM hosted by
Turning Point UNM?
A.    I know Charlie attended.  I don't know details.
Q.    You don't know the amount of any of the security fees charged
for these events?
A.    No.
Q.    And you don't know if they were paid?
A.    No.
Q.    You'd agree that Leadership Institute has no agreement with
UNM to pay Turning Point UNM's contractual obligations or debts to
UNM, correct?
A.    So my email indicates that we would pay them on their behalf.
Q.    Okay.  So you don't -- that's, like, a sponsorship, maybe?
A.    Yeah.
Q.    How would you describe it?

1   A.   I would say that it's included in the sponsorship that we do

2   for the campus events.

3   Q.   You said that you were worried that UNM could sue Leadership

4   Institute.  What cause of action were you referring to?

5   A.   I would say, like, they could come after us and say unpaid

6   dues, due to my email.

7   Q.   Okay.  When you went on the walk-through with Ms. Gaines'

8   security and Lieutenant Stump, he chastised you for recording

9   during that walk-through, didn't he?

10  A.   Maybe.  I don't recall.

11  Q.   He told you that he didn't want the security plan to be

12  recorded and put out because it compromised the safety of the

13  event?

14  A.   Okay.

15  Q.   You don't remember that?

16  A.   I don't remember.

17  Q.   Okay.  Exhibit 11, I can't tell who you sent that email to.

18  A.   I sent it -- I'm pretty sure I sent it to Jonathan.

19  Q.   So you didn't send it to UNM?

20  A.   No.

21  Q.   So you don't know if UNM ever got this?

22  A.   I think I've seen an email chain where they acknowledged that

23  they received it.

24  Q.   But they didn't get it from you or anyone else at Leadership

25  Institute?

1    A.    Not directly from me, no.

2    Q.    Did you ever get a response from UNM to that document?

3    A.    Not in writing, but, I mean, it was acknowledged that we

4    would be paying.  Like when we were in person with the police, I

5    said something to the effects of, We're paying this bill so can we

6    please be mindful of the amount of --

7    Q.    But you, in fact, didn't pay the bill?

8    A.    No.

9    Q.    Was it your impression that Lieutenant Stump was annoyed at

10   you when you were filming his security briefing?

11   A.    Yeah.  I mean, I think he was annoyed by us coming to campus.

12   Q.    Why do you say that as opposed to your behavior during the

13   walk-through?

14   A.    Because of how he had treated the students beforehand and how

15   he was treating me now that I was in person.

16   Q.    What's your impression or knowledge of how he treated the

17   students beforehand?

18   A.    I had listened to the recordings that the students had

19   submitted.

20   Q.    Before the Riley Gaines event?

21   A.    Yes.

22   Q.    Okay.  And those are the recordings that the Judge has --

23   A.    Correct.

24   Q.    -- and the recording transcripts that he has?

25   A.    Yes.

1  Q.   And it's your impression that he was -- treated the students
2  badly in those meetings?
3  A.   I think that he demonstrated annoyance that this event was
4  happening.
5  Q.   Okay.  You said something that had me curious.  You said that
6  the protestors at the event were flipping you off and yelling at
7  you.  How do they know who you are?
8  A.   I'm usually the person who goes and takes pictures of the
9  protestors during Riley events.
10  Q.   Do you wear a uniform or any gear that indicates that you're
11  part of Ms. Gaines' staff?
12  A.   Occasionally, I'll have a headpiece on.  That's not always
13  the case.  I might have had that on while we were -- yeah, we did
14  film at UNM, so I would have had the headset on communicating with
15  our studios team.  Again, it's pretty obvious when you walk up to
16  a protestor or up to a barricade and you've got your phone out
17  that you're probably not on their side.
18  Q.   And you deal with protestors regularly, right?
19  A.   Very often.
20  Q.   And you testified, I think, that there were less than ten
21  protestors at this event?
22  A.   Yes.
23  Q.   Did you count them?
24  A.   In photos that I have of those protestors, there's seven.
25  Q.   Did you count them at different times or take photos at

1    different times prior to the event and through the event?

2            MR. ISGUR:  Objection, Your Honor.  Relevance.  It

3    doesn't really matter if there were seven or ten protestors.

4            THE COURT:  I'll overrule the objection and let her

5    answer.

6            THE WITNESS:  Before the event?

7    Q.    (By Ms. Williams)  Did you take pictures before the event?

8    A.    No.

9    Q.    Did you take pictures during the event more than once?

10    A.    Yes, I think so.

11    Q.    Of the protestors?

12    A.    Yes.

13    Q.    Okay.  Did you count the protestors at the time?

14    A.    Yes.

15    Q.    And you only came up with seven?

16    A.    Uh-huh.

17    Q.    Okay.  Is that a yes?  We have the court reporter.

18    A.    Yes, that's a yes.  It's important that we include how many

19    protestors are present in my final reports following Riley events.

20    Q.    And Leadership Institute has never tendered any amount to UNM

21    for security fees for the Riley Gaines event?

22    A.    No.

23    Q.    Your email that you sent to Jonathan indicated that you would

24    pay a reasonable fee?

25    A.    Correct.

1    Q.    Did you know what that fee might be in your mind before you

2    sent that email?

3    A.    I work with hundreds of campuses, both, like, in my capacity

4    as the Riley Gaines Center operations manager and scheduler and my

5    previous role as campus events coordinator, and I've stated that a

6    typical campus security fee is between 1,500 to 2,000 on the

7    expensive side, less than 1,000 on the regular basis side.

8    Q.    Why didn't you say Leadership Institute will pay up to $2,000

9    on behalf of Turning Point UNM?

10    A.    Because I wanted to make sure that the students were covered.

11    Q.    That the students were what?

12    A.    Covered, that the costs were covered.

13    Q.    But you didn't make sure that the costs were covered, did

14    you?

15    A.    No, because we're in this lawsuit now.

16    Q.    Well, this lawsuit was filed months after the event and the

17    invoiced amount was sent to Turning Point UNM, correct?

18    A.    Yeah.

19    Q.    You had ample opportunity to pay that bill if Leadership

20    Institute wanted to, right?

21    A.    I think that it takes some time to get a legal case in order

22    and that was, hence, our delay.

23    Q.    So is it your testimony that the delay was you set UNM up by

24    not giving them a number so that you could sue them --

25              MR. ISGUR:  Objection, Your Honor.  Argumentative.

1        THE COURT:  Sustained.  Let's move on, Ms. Williams.  I

2   think you've made your point.

3   Q.   (By Ms. Williams)  And UNM has never contacted Leadership

4   Institute regarding Turning Point's unpaid security fee, have

5   they?

6   A.   No.

7   Q.   And they've never attempted to collect the unpaid security

8   fee from Leadership Institute, correct?

9   A.   No.

10        MS. WILLIAMS:  May I have a moment, Your Honor?

11        THE COURT:  You may.

12   (Counsel confer.)

13   Q.   (By Ms. Williams)  You're aware that the Riley Gaines event

14   at UNM was promoted to off-campus people, correct?

15   A.   Yes.

16   Q.   Were you in charge of that?

17   A.   I wasn't in charge of that -- of, like, reaching out to the

18   campus community, but we don't discourage reaching out beyond the

19   campus community.  We encourage that, you know, students reach out

20   to anybody who would like to hear Riley speak.

21   Q.   Did you design a social media plan for the Gaines event or

22   did Leadership Institute do that?

23   A.   We have a flier that the students are required to use.  We

24   craft that for them because it's in line with Riley's typical

25   tour.  And then they're allowed to post it as much as they want.

1  We do not give them a specific detailed plan of how many times
2  they're supposed to post.
3  Q.    Has Leadership Institute paid the security fees for any other
4  Turning Point UNM events, like the Charlie Kirk, the Ian Haworth,
5  or Tomi Lahren events?
6  A.    To my knowledge, I can't say if that exactly went to those
7  security fees.  We do offer grants to student organizations for
8  their speakers.  So for Tomi, I'm pretty sure we have given them
9  1,000 to 1,500 for that.  If that went to security, I don't know.
10 If that went to Tomi's honorarium, I also don't know that either.
11 Q.    You heard Mr. Gonzales say that Turning Point UNM gets
12 donations to fund their organization.  Does Leadership Institute
13 give Turning Point UNM donations?
14 A.    They are called activism grants or speaker grants.  So a
15 student has to fill out a form in order to get that money, and
16 they have to detail to us what those are.  So, for example, if
17 they're asking us to pay a speaker fee and they say, Okay, this
18 speaker's fee is $700, and we want another $300 for food,
19 something -- an LI policy is, is that we don't pay for food.  So
20 we would only pay the 700.  So if they have filled out a form
21 talking about, like, the security fee or the speaking fee or
22 whatnot, we don't -- we just write them based on the invoice that
23 they send us that they have filled out on the form.  I can't say
24 if that goes exactly to each individual bill following us cutting
25 the check.

1    Q.   And to your knowledge, has Leadership Institute paid an

2    activism grant to Turning Point UNM?

3    A.   I am not sure.

4            MS. WILLIAMS:  That's all I have, Your Honor.  Thank

5    you.

6            THE COURT:  Thank you, Ms. Williams.

7        Redirect?

8            MR. ISGUR:  No questions on redirect, Your Honor.

9            THE COURT:  Thank you.

10           MR. ISGUR:  We're happy to release the witness.

11           THE COURT:  May the witness be excused, Ms. Williams?

12           MS. WILLIAMS:  Yes, sir.

13           THE COURT:  All right.  Thank you very much for your

14   testimony.  You're excused, Ms. Clark.

15       Any other witnesses for the Plaintiff?

16           MR. ISGUR:  Not at this time, Your Honor, but at this

17   time, I would like to move for the admission of what's been marked

18   as Plaintiffs' Exhibit Nos. 12 through 28, which are a series of

19   invoices and emails provided to us in discovery by opposing

20   counsel on Saturday, last Saturday.

21           MS. WILLIAMS:  Your Honor, we'd object.  They had an

22   opportunity to get those in and discuss them with a witness and

23   they have not done so.  I think they're irrelevant to the issue

24   before this Court without foundation or testimony to support the

25   admission.

1    THE COURT:  Well, in motions for preliminary injunction,

2  we have people attaching exhibits to pleadings all the time.

3  They're not necessarily admitted, certainly something that I can

4  consider.

5    I won't admit them for purposes of the hearing.  If you have

6  a briefing that you're going to be filing and you want to attach

7  those, that's different.  But without hearing any testimony about

8  what those mean, they're really kind of useless to be admitted

9  here for this purpose.

10    What kind of invoices are there?

11    MR. ISGUR:  Your Honor, they're invoices of security

12  fees charged between the years 2019 and 2023, to a variety of

13  speakers, Ken Starr, Will Witt, Tomi Lahren, Ian Haworth, Ibram X.

14  Kendi, Charlie Kirk and Vice President Kamala Harris.  And then

15  there are a series of emails internal to UNM staff discussing

16  those events and security fee determinations related to them that

17  were all disclosed during discovery by opposing counsel.

18    THE COURT:  Ms. Williams, why wouldn't that be relevant

19  to my determination on the motion for preliminary injunction if

20  we're looking at determining whether the Plaintiffs have met the

21  factor of substantial likelihood of success on the merits, to look

22  at what UNM has charged others in the past?

23    MS. WILLIAMS:  Your Honor, they didn't introduce the

24  policy, which describes the factors that the security assessment

25  is based on and --

1          THE COURT:  Well, I have that in the record.  I have

2     that on the motion for preliminary injunction.

3          MS. WILLIAMS:  But there's no testimony about what

4     factors developed the fees that each event was --

5          THE COURT:  Well, again, this isn't the trial on the

6     merits.

7          MS. WILLIAMS:  I understand that.

8          THE COURT:  Ordinarily, we would have issues with a lot

9     of these exhibits being presented to the Court.  But we're in a

10    different posture right now.  The thing that I'm trying to

11    determine is whether or not there's an injunction that should be

12    issued here based on the constitutionality or unconstitutionality

13    of the policy.  So I'm not sure -- it sounds like what he wants to

14    present to the Court is relevant to the issues that I need to deal

15    with right now, so unless you tell me that those invoices are not

16    invoices...

17         MS. WILLIAMS:  They are invoices, Your Honor, but there

18    is no foundation for why they're comparable or fair comparators

19    under Section 1983 to this event.

20         MR. ISGUR:  Your Honor, if I may?

21         THE COURT:  Yes.

22         MR. ISGUR:  Several of those invoices are invoices that

23    opposing counsel referenced in her questioning of witnesses.  She

24    actually specifically asked both of the witnesses called today

25    about at least the Tomi Lahren invoice and I believe also the

1  Charlie Kirk invoice, whether they were aware of those invoices

2  and the amounts on them.  I think opposing counsel made it highly

3  relevant, the amounts on those invoices.

4          MS. WILLIAMS:  And, Your Honor, the fact that the

5  witnesses could not discuss those invoices does not make them

6  irrelevant because they could not.

7          THE COURT:  Well, but you're implying -- in the

8  questions that you were asking them, you are implying or you're

9  asking me to infer, then, that those fees might have been the same

10  or equivalent, or if they were different, there was a reason for

11  them.  Again, the issue before me right now is to determine

12  whether or not the Plaintiffs have met their burden on a motion

13  for preliminary injunction.  A lot of things I need to consider.

14  To the extent that UNM has provided those documents to the

15  Plaintiff, I don't see why I can't consider them on this.

16      Now, if you want -- once they provide them to me, if you want

17  to write something up and tell me why they're different, I'll be

18  glad to accept that.  But I'm going to be moving forward with this

19  pretty quickly.  So I'm going to go ahead and allow you to submit

20  those to the Court.  And, Ms. Williams, I will give you an

21  opportunity to respond if you think that there's a reason why

22  those fees are not -- are not -- do not play into any of the

23  issues that I am looking into, and I'll be glad to look at that as

24  well.

25      So for the purposes of the motion for preliminary injunction,

1  the Court is going to admit Plaintiffs' Exhibit 12 through Exhibit
2  28, and I will allow the Defendants to respond to those invoices
3  by motion, if they wish, and I'll ask that that motion be
4  presented to the Court within the next ten days.  You can respond
5  to that as well under the normal schedule.
6  (Plaintiffs' Exhibit Nos. 12, 13, 14, 15, 16, 17, 18, 19, 20, 21,
7  22, 23, 24, 25, 26, 27 and 28 admitted into evidence.)
8          MR. ISGUR:  Thank you, Your Honor.
9          THE COURT:  Again, I have a lot -- as I stated earlier,
10 I'm not going to be deciding any of the issues on preliminary
11 injunction until I decide the standing issues that have been
12 raised by the defense.  So along with these exhibits, this is all
13 something I'll be considering all at once.
14         MR. ISGUR:  Yes.  Thank you, Your Honor.
15     I would also like to direct the Court's attention to Document
16 22 in the record.  Mr. Boucek, could you -- and if I could go to
17 page 3 of Document 22.
18         THE COURT:  You're talking about Exhibit 22?
19         MR. ISGUR:  No.  Document 22 in the record, Your Honor.
20         THE COURT:  Oh, you mean in the --
21         MR. ISGUR:  Yes.  It should be up on your screen,
22 hopefully.
23         THE COURT:  Okay.
24         MR. ISGUR:  That's what I was trying to call up.
25         THE COURT:  What is this from?

1          MR. ISGUR:  This is the joint status report filed by the
2    parties in this case on May 1st, 2024.  In it, the parties
3    included a set of stipulations that the parties agreed to.  I'd
4    like to direct the Court's attention to Stipulation No. 21, which
5    states Students for Life America is no longer a chartered student
6    organization at UNM after the students did not renew their
7    charter.  This document was filed with both counsel's signatures.
8          THE COURT:  Let me see the last page of this.
9          MR. ISGUR:  I'm sorry?
10          THE COURT:  The last page of this document.  All right.
11          MR. ISGUR:  I would also direct the Court's attention to
12    the fact that this document stipulated to the authenticity of the
13    provided policies that opposing counsel referenced a moment ago.
14          THE COURT:  You're talking about the security fee policy
15    and the free speech policy?
16          MR. ISGUR:  Yes, Your Honor.  Both of those policies, as
17    well as the policy pertaining to the ability of the University to
18    take action against chartered student organizations that do not
19    pay their fees, which I believe is UNM policy 5250, stipulated to
20    at No. 27 in this document.
21          THE COURT:  All right.
22          MR. ISGUR:  And, Your Honor, I'd like a moment to confer
23    with my co-counsel.
24          MS. WILLIAMS:  Your Honor, may I make a clarification?
25          THE COURT:  Yes.

1          MS. WILLIAMS:  At the time of this, it's my
2  understanding that Students for Life had not met their charter
3  deadline, and they have since, or I didn't have the information
4  that they had renewed.  And Mr. Lindquist is here and can testify
5  to that.  He has personal knowledge.
6          THE COURT:  Well, at the time that this stipulation was
7  entered into, it looks like they were not a chartered student
8  organization.  I think that's the point that counsel's trying to
9  make.
10          MR. ISGUR:  Yes, Your Honor.  If I may?
11  (Counsel confer.)
12          MR. ISGUR:  Your Honor, we'd ask that you take judicial
13  notice that these events occurred within the District of New
14  Mexico.
15          THE COURT:  Yes.  That's obvious.
16          MR. ISGUR:  I believe that's all, Your Honor.
17          THE COURT:  Let me hear really briefly, I want to hear
18  some argument on what we just heard today, because you do have the
19  burden of showing that you're entitled to preliminary injunction
20  on this.  Are you ready to do that now?
21          MR. ISGUR:  Yes, Your Honor.  I do want to briefly
22  grab --
23          THE COURT:  Sure.
24          MR. ISGUR:  Your Honor, I'd ask for clarification of
25  whether the defense intends to put on proof after.

```
1              THE COURT:  You mean if they're calling witnesses?
2              MR. ISGUR:  Or if this is closing arguments, yes.
3              THE COURT:  Ms. Williams, are you going to be presenting
4    any witnesses today?
5              MS. WILLIAMS:  Well, Your Honor, I don't believe they've
6    met their burden, and I don't believe that I need to put on
7    witnesses.  But if you are going to reserve ruling, I can put on
8    some limited clarifying information.
9              THE COURT:  I think that would be wise, to put on some
10   witnesses.
11             MS. WILLIAMS:  So the first witness I'd like to call is
12   Mr. Lindquist.
13             THE COURT:  Ms. Williams, before we get to the witnesses
14   for the defense, we are going to take a five-minute break.  I'm
15   afraid the court reporter might throw something at me if we don't
16   do that.
17             MS. WILLIAMS:  Those court reporters can be mean.
18             THE COURT:  They can.  I'm not going to say anything
19   else.
20        Let's take a ten-minute break here.  We'll reconvene at 4:20.
21   (In recess at 4:09 p.m. until 4:27 p.m.)
22             THE COURT:  Ms. Williams?
23             MS. WILLIAMS:  Thank you, Your Honor.  We'd like to call
24   Ryan Lindquist for very short clarification of the record.
25             THE COURT:  Let's do that.
```

1     Sir, if you'll come up to the witness stand so you can be

2  sworn in.

3         LAW CLERK:  Do you solemnly swear or affirm that your

4  testimony in this matter will be the truth?

5         THE WITNESS:  I do.

6         THE COURT:  You may seated.

7                    RYAN LINDQUIST

8            (being duly sworn, testified as follows:)

9            DIRECT EXAMINATION BY MS. WILLIAMS

10  Q.   Mr. Lindquist, can you introduce yourself to the Court?

11  A.   Yes.  My name is Ryan Lindquist.  I'm the director of the

12  student activities center at the University of New Mexico.

13  Q.   How long have you held that position?

14  A.   I've held the director position for approximately eight years

15  now.

16  Q.   And what are your duties?

17  A.   I work to oversee the chartering process for student

18  organizations, work with fraternities and sororities, and work

19  with the two student governments.

20  Q.   You've heard some testimony, since you've been sued in this

21  case and were allowed to sit in, about the status of Students for

22  Life?

23  A.   Yes.

24  Q.   What's the current status of Students for Life?

25  A.   They are chartered.

1    Q.    Was there a time when there were not chartered?

2    A.    Yes.

3    Q.    And why was that?

4    A.    They missed the initial charter deadline.

5    Q.    There was no action taken by UNM to revoke their charter or

6    discipline them in any way?

7    A.    That is correct.

8    Q.    All right.  I also want to ask you, since it's part of your

9    job, has a chartered student organization ever had their charter

10   revoked at UNM?

11   A.    Yes.

12   Q.    What are the circumstances in which charter has been revoked

13   from a CSO at UNM?

14   A.    Usually the dean of students' office -- and probably not

15   usually.  Always the dean of students' office will notify our

16   office that there has been a disciplinary procedure against that

17   student organization requiring the revocation of their charter.

18   Q.    Has there ever been a charter revoked from a CSO for an

19   unpaid security fee bill?

20   A.    Not in my 23 years at the University in the office.

21   Q.    I want to ask you a few questions about the Riley Gaines

22   event.  Were you at that event?

23   A.    Yes, I was.

24   Q.    What were your duties in relation to that event?

25   A.    Prior to the event, I was setting up barricade, and then I

1    monitored the entrance to ensure that they did not go over

2    capacity with the event.

3    Q.    Okay.  And so to ensure that they didn't go over capacity,

4    what did you do?

5    A.    I sat at the front entrance and had a clicker and counted

6    people as they entered the event.

7    Q.    I don't want to, you know, test you on the exact number of

8    people, but how many people were at the event, ballpark?

9    A.    Ballpark, just under 200.

10   Q.    And do you recall what the request form indicated that

11   Turning Point UNM thought the attendance would be at that event?

12   A.    I was not privy to the request form information.

13   Q.    Okay.  Did you count protestors at that event?

14   A.    I did not specifically count them but I did observe two

15   groups of protestors.

16   Q.    And can you tell me your estimation of how many protestors

17   were in each group?

18   A.    Each group, I would say, had approximately 10 individuals in

19   them.

20   Q.    And no -- the event didn't become unsafe, correct?

21   A.    It did not appear to do so.

22   Q.    And what do you attribute the fact that the event was safe

23   to?

24   A.    Proper preparation for any threats that were posed.

25          MS. WILLIAMS:  That's all I have for Mr. Lindquist.

1    Thank you.

2            THE COURT:  Thank you, Ms. Williams.

3        Cross-examination?

4            MR. BOUCEK:  Yes, Your Honor.  One second.

5                CROSS-EXAMINATION BY MR. BOUCEK

6    Q.   Good afternoon, Mr. Lindquist.

7    A.   Hello.

8    Q.   My name's Braden Boucek.  I'll be asking you a few questions

9    today.  I'm representing the Plaintiffs in this case.

10   A.   Sure.

11   Q.   First off, how long did you say you'd been the director of

12   the student activity center?

13   A.   I've been the director of student activities for

14   approximately eight years.

15   Q.   How long?  I'm sorry?

16   A.   Eight years.

17   Q.   That's some time.

18   A.   Correct.

19   Q.   How often are speech events held on campus?

20   A.   Pretty regularly.

21   Q.   Can you give us some flesh on the bones of what you mean by

22   "regularly"?

23   A.   Between the months of August and May, and it's -- could

24   probably say two to three a week.

25   Q.   Two to three a week?

1    A.    Uh-huh.

2    Q.    These are speech events?

3    A.    It depends what your definition of a "speech event" is.

4    Q.    Well, don't you use the term "speech events" in your

5    emails?

6    A.    On occasion, uh-huh.

7    Q.    What do you mean when you use the phrase "speech events"?

8    A.    Events that could evoke a response.

9    Q.    Evoke a response from whom?

10   A.    Anybody.

11   Q.    Now, you're talking about people who are hearing a speaker

12   speak and might respond to that?

13   A.    That could be a part of it.

14   Q.    What else could be a part of it?

15   A.    Just could be a tabling event, somebody that's just trying to

16   distribute information on events.

17   Q.    That's a speech event, too?

18   A.    Yes.

19   Q.    Now, are there events that are non-speech events?

20   A.    Potentially, yes.

21   Q.    What are some examples of some events -- or some events that

22   are non-speech events?

23   A.    Athletics games.

24   Q.    And those are non-speech events, then?

25   A.    An athletics game?

1    Q.    Yes.

2    A.    I would think so.

3    Q.    Are you involved in any way in the non-speech events?

4    A.    On occasion.

5    Q.    And what is your level of involvement there?

6    A.    It just depends on who's organizing the event, or where it

7    is, or lots of different factors.

8    Q.    Are you familiar with policy 2230?

9    A.    If that's the security and police policy.

10    Q.    Yes.  Are you familiar with that?

11    A.    I believe so.  I'm somewhat familiar with it.

12    Q.    What is your role in it?

13    A.    What is my role in it?

14    Q.    What is your role in the assessment of a security fee?

15    A.    I do not assess security fees.

16    Q.    Do the police interact with you when they're making an

17    assessment of a security fee?

18    A.    Yes.

19    Q.    In what capacity?

20    A.    We will have discussions in regards to events and discuss the

21    amount of security needed for events that we work on.

22    Q.    And you testified earlier that you -- some of these speech

23    events you're assessing them for, I think you said, the

24    anticipated reaction or the effect?

25    A.    That could be a part of it.  It just depends.  The attendance

1    is the part that I look at.  So, once again, I don't have anything
2    to do with security fee.
3    Q.    So you don't have anything to do with whether or not there's
4    a risk of protestors who are going to show up there?
5    A.    My office does the outdoor space reservations, so if there is
6    a response to an event, we have to assist with outdoor space use.
7    Q.    Do you communicate with the police when you think there's
8    going to be a risk of a protestor appearing at a speaker event?
9    A.    Do I communicate with police?
10   Q.    Yes, that's what I mean.
11   A.    At my specific events?
12   Q.    For any registered speech event.
13   A.    For any registered speech event?  On occasion, I will.
14   Q.    What will you tell the police?
15   A.    Just to make sure that there's a notification that they know
16   there's an upcoming event.
17   Q.    And why is it important, in your mind, that the police
18   understand that?
19   A.    Campus needs to be safe, and there's a policy on campus
20   events and safety and security.
21   Q.    Is it important for the assessment of the security fee?
22   A.    Our campus events?
23   Q.    No.  Is the existence of protestors important for the
24   assessment of the security fee?
25   A.    I don't know.  I don't do the security fee assessment.

1   Q.   But you do let the police know whether or not you anticipate
2   protestors showing up, correct?
3   A.   Not necessarily, no.
4   Q.   Do you sometimes let the police know if you believe that
5   there are going to be protestors present?
6   A.   At an event that I have an awareness where protestors have
7   been at in the past, I will communicate with the police.
8   Q.   My question to you is:  Why are you communicating that to the
9   police?  For what reason?
10  A.   Because I'm an event logistics person on campus.
11  Q.   Why, as the event logistics person, do you think it's
12  important to relate that information to the police?
13  A.   So they have all the information they need.
14  Q.   And what are you thinking they're gonna do with that
15  information?
16  A.   Whatever they see fit.
17  Q.   But is it an important part of your job with the University
18  that you communicate that to the police so they can make an
19  assessment as they see fit, in your words?
20  A.   I don't think that's an important part of my job.
21  Q.   But it is part of your job?
22  A.   It's something I have done.
23  Q.   And you do do this on a regular basis, let the police know
24  your assessment of whether or not protestors will be there.  Isn't
25  that right?

1          MS. WILLIAMS:  Your Honor, this is far beyond the scope

2   of direct.

3          THE COURT:  It's getting there, so let's --

4          MR. BOUCEK:  If I may, Your Honor, he's also the

5   declarant as well, and so the scope of the declaration itself is

6   much broader than what he testified to on direct examination.

7          MS. WILLIAMS:  He could have called him in his

8   case-in-chief.  He's been available the whole time.  They asked me

9   to have him here and they did not call him.  This is not the time

10  to try and build their case.

11         THE COURT:  I'll allow the questions, but please try to

12  get to your point.

13         MR. BOUCEK:  Important point of clarification, just so

14  the Court knows.  It was at defense's behest that we have any

15  witnesses here.  We were content to proceed on declarations alone.

16  But when it was our understanding that they could not be admitted

17  without live witnesses, we were proceeding under that assumption.

18  Thus, we expect that before declarants can be admitted, that

19  person will be testifying and authenticating those declarations.

20  That's the gist of it.

21  Q.   (By Mr. Boucek)  So, Mr. Lindquist, you testified earlier

22  that Students for Life is now a chartered organization, correct?

23  A.   Correct.

24  Q.   And you also testified that they were not before, right?

25  They previously lost their charter?  Is that right?

1    A.    They did not lose their charter.  They did not charter by the

2    deadline.

3    Q.    So they were not a chartered student organization for a

4    period in time?  Is that right?

5    A.    Correct.

6    Q.    Are you aware of who Kristan Hawkins is?

7    A.    I am, a small amount.

8    Q.    And who is she?

9    A.    A speaker that was hosted by Students for Life.

10   Q.    And was that on or about April 24th, 2022 or 2023?

11   A.    Yes.

12   Q.    Was she invoiced?  Was the Students for Fair Life group

13   invoiced?

14   A.    I do not know.

15   Q.    Do you monitor invoices?  Do you have anything to do with

16   invoices?

17   A.    I do not.

18   Q.    So you have no knowledge as to whether or not there was an

19   invoice generated or paid in the Ms. Hawkins event?

20   A.    I do not.

21   Q.    Were you worried about her generating an unruly crowd?

22   A.    There are people that I send out that could, so I probably

23   did a -- an email to general population.

24   Q.    What was in that email?

25   A.    Probably notifying of upcoming free speech events that the

1  campus administrators should be aware of.

2  Q.   And what did you exactly tell them?

3  A.   Usually I give the details of the event -- time, date,

4  person, location -- and then a potential response.

5  Q.   Were you worried about the fact that she might have some

6  tendency to elicit a reaction out of a crowd?

7  A.   There -- I think I probably said that there was a potential

8  small reaction by a crowd.

9  Q.   And were you aware of the police communicating to Students

10 for Fair Life chapter that they will not tolerate any incitement

11 or antagonizing on the part of the crowd from the speaker?

12 A.   I do not know that.

13 Q.   Would you agree with me -- is it a regular thing for the

14 University to be warning students about incitement on the campus?

15 A.   I do not know.

16 Q.   Are you familiar with the legal standard for incitement?

17 A.   I am familiar, but I'm not an expert, so that's not a

18 judgment call I make.

19 Q.   Let me just wrap up quickly.  Have you given any advice to

20 anybody on the police about what qualifies as incitement from a

21 speaker?

22 A.   I have not.

23 Q.   Now, you said that, I think, on direct examination, that a

24 registered student group has never had their charter revoked.  Is

25 that right?

```
1    A.    That's incorrect.

2    Q.    What did you say?  I'm sorry.

3    A.    She asked me if a chartered student organization had had

4    their charter revoked, and I said yes.

5    Q.    Tell me more about -- which organizations have had their

6    charters revoked?

7    A.    Primarily during my time, the only groups I can think of are

8    fraternities.

9    Q.    Okay.  Any others that you can think of?

10   A.    Not that I can think of.

11   Q.    Has it ever been brought to your attention whether or not a

12   student -- a registered student group has failed to pay an

13   invoiced fee for security?

14   A.    That's not been brought to my attention.

15   Q.    So you have no knowledge as to whether or not that's ever

16   come up before?

17         MS. WILLIAMS:  Objection.

18   Q.    (By Mr. Boucek)  Do you have any knowledge as to whether or

19   not that's been brought up before?

20   A.    Could you repeat your question?  I don't understand where --

21   Q.    Are you aware of an incident where a registered student

22   organization has failed to pay an invoice for a security fee?

23   A.    This lawsuit.

24   Q.    Is that the only one?

25   A.    I have heard that Students for Life, in relation to this
```

1   lawsuit, had not paid as well.  Those are the only two that I am

2   aware of.

3   Q.   So you've heard that Student for Fair Life failed to pay an

4   invoice?

5   A.   As a part of this lawsuit, yes.

6   Q.   You only know about it because of the lawsuit?

7   A.   Correct.

8   Q.   You don't have independent knowledge?

9   A.   Yes.

10  Q.   So, essentially, the test case for what happens if a student

11  group doesn't pay a security fee is this case?  You have no other

12  basis of knowledge for comparison.  Is that right?

13  A.   To my knowledge, nobody has paid -- has been held responsible

14  for not paying an invoice.

15  Q.   Well, but the situation has never arisen before.  Do I

16  understand you correctly?

17  A.   To my knowledge, no.

18  Q.   All right.  Now, were you at the meeting on September 13th

19  with the students and Lieutenant Stump that was testified here

20  earlier?

21  A.   I was at one of the three meetings.  It was the last one.  I

22  don't remember the specific date.

23  Q.   And did you hear Mr. Gonzales testifying?

24       MS. WILLIAMS:  Your Honor, this is beyond the scope of

25  my direct.  We did not talk about any other meeting.  We talked

1    about two topics.

2              MR. BOUCEK:  Again, Your Honor, he put in a broad

3    declaration about his involvement here.  I'd ask for a little bit

4    of latitude.  We only got discovery from them on Saturday.

5              THE COURT:  You'll get some latitude, but try to get --

6              MR. BOUCEK:  I will.

7              THE COURT:  -- as quickly as possible.

8    Q.   (By Mr. Boucek)  And did you hear the recordings in

9    Mr. Gonzales's testimony about the conversation you were at?

10   A.   I've heard them before.

11   Q.   Did you recognize the speakers on that recording?

12   A.   I believe so.

13   Q.   Who were the individuals speaking?

14   A.   The meeting that I attended was Lieutenant Stump at the time,

15   myself, Jonathan, and I don't remember, actually, the third

16   person.

17   Q.   And --

18   A.   Fourth person, excuse me.

19   Q.   Sorry.  Did you hear Mr. Gonzales identify the speakers?

20   A.   Identify the speakers?

21   Q.   Yeah, who the speakers were on the transcript, Speaker 1,

22   Speaker 4, so on?

23   A.   I believe so, yeah.

24   Q.   Did he identify those speakers accurately?

25   A.   I don't know.  I don't have a copy of the transcript to match

1  up to the numbers.

2  Q.   Did you -- when he was testifying, did you think he was wrong

3  about anything he had said?

4  A.   As far as people attending?

5  Q.   And his identification of the voices, yes.

6  A.   I don't believe so.

7  Q.   Okay.  Now, you mentioned that you do monitor these speech

8  events.  I want to return to that just very briefly.  Do you know

9  which speakers you think may cause a campus disruption?

10 A.   I -- do I note which speakers may cause a campus disruption?

11 Yes.

12 Q.   Do you alert Lieutenant now Commander Stump when you think a

13 student -- a speaker may cause a disruption?

14 A.   Lieutenant Stump was, at the time, a part of a listserv

15 that -- an email that I send out typically on a biweekly basis,

16 yes.

17 Q.   Tell us about this listserv.  Who does it go out to and what

18 does it say?

19 A.   The listserv goes out to administrators on campus, and it

20 notifies individuals of upcoming events that could cause a

21 disturbance on campus, potentially.  May or may not.

22 Q.   I'd like to hand you a copy of Exhibit No. 27.  I think

23 there's one that's been admitted.

24      MR. BOUCEK:  Your Honor, with your permission, I'd

25 approach the witness.

1              THE COURT:  You may.

2    Q.    (By Mr. Boucek)  Do you recognize that?

3    A.    Yes, I do.

4    Q.    What is it?

5    A.    That's a free speech notification for upcoming speech events.

6    Q.    Who authored this?

7    A.    I did.

8    Q.    And is this typical of the listserv that you're referencing

9    earlier?

10   A.    Yes, uh-huh.

11   Q.    And to who -- to whom is this listserv for?

12   A.    This listserv is for administrators on campus.

13   Q.    And does it also include police officers, campus security,

14   like now Commander Stump?

15   A.    There are a few, yes.

16   Q.    And does this listserv include upcoming speech events with

17   your views on whether or not you expect there to be campus

18   disruption?

19   A.    I wouldn't say it's my views.  I would say it's my past

20   experience as an event manager.

21   Q.    But it's fair to say, then, that whatever your basis of

22   knowledge is, you are informing security that you expect there to

23   be some degree of probability of a campus disruption?

24   A.    I'm informing administrators that there could be a campus

25   disruption associated with an event hosted on campus.

1    Q.    To include the security officers such as then Lieutenant
2    Stump; is that right?
3    A.    There are a few police officers, yes.
4    Q.    Now, is there -- was there an event -- excuse me.
5          Have you seen videos with Kristan Hawkins and Isabel Brown?
6    Are you familiar with who those are?  Have you ever witnessed
7    videos of it?
8    A.    Kristan Hawkins, we talked about earlier.  I've not seen
9    videos with her.  And I don't know the other individual you talked
10   about.
11   Q.    Do you recall emailing on April 3rd, 2023, to say that she
12   was savvy in her videos?  Does that ring a bell?
13   A.    Does not ring a bell.
14   Q.    Now, did you have a listserv about upcoming speaker events
15   that concerned the Riley Gaines event that's the source of this
16   litigation?
17   A.    Not understanding what you're asking.
18   Q.    Sure.  We talked about that you sent out the listserv where
19   you're alerting about upcoming events and your assessment of
20   whether there's gonna be a disruption, right?
21   A.    This piece of evidence, yes.
22   Q.    That's Exhibit 27.
23   A.    Yes.
24   Q.    Did you conduct similar emails where you ever talked about
25   the upcoming Riley Gaines event?

1   A.    I believe, more than likely, there was probably a listserv

2   sent out with multiple events where Riley Gaines was one of them.

3   Q.    And how did you assess the risk of any disruption if she were

4   to speak on campus?

5   A.    I don't know, to tell you the truth.  I would have to see

6   that email.

7   Q.    Okay.  Let me hand you a copy of Exhibit 28.

8   A.    Sure.

9         MR. BOUCEK:  With the Court's permission, may I approach

10   the witness again?

11        THE COURT:  You may.

12   Q.   (By Mr. Boucek)  Take your time, review it.  Do you recognize

13   this item?

14   A.    Yes.

15   Q.    What is it?

16   A.    It's one of the upcoming speech event emails I sent out.

17   Q.    How do you recognize it?

18   A.    How do I recognize it?

19   Q.    Yes.

20   A.    I sent it.

21   Q.    Is this a true and accurate copy of an email that you sent

22   out on Thursday, September 28, 2023, at 3:14 p.m.?

23   A.    I believe so.

24   Q.    And did you discuss the upcoming Riley Gaines event?

25   A.    It is one of the events listed on this upcoming speech event

1  listserv.

2  Q.   And did you make an assessment of the likelihood of risk?

3  A.   Yes.  I said, Based on past experience with similar events,

4  we expect the possibility for campus disruption to be medium or

5  unknown.

6  Q.   And you shared that information with the people on this

7  listserv to include campus security, such as then Lieutenant

8  Stump; isn't that right?

9  A.   This email was sent to the campus listserv.

10 Q.   And that includes then Lieutenant Stump; is that right?

11 A.   Yes.

12 Q.   All right.  Now, you've heard reference to a drag queen bingo

13 event with a Roxxxy Andrews being featured.  Do you recall hearing

14 about that testimony?

15 A.   Yes.

16 Q.   Do you recall that event?

17 A.   Yes.

18 Q.   Were you concerned about protesters appearing at that event?

19 A.   Was I concerned about protestors attending that event?

20 Q.   Yes.  Were you concerned about disruption or protestors

21 attending that event?

22 A.   No.

23 Q.   So you would never have generated an email where you would

24 have told people that you were concerned about demonstrators

25 showing up at that event?

```
1   A.   Not necessarily.
2   Q.   Explain what you mean "not necessarily."  Is it possible that
3   you might have generated this email?
4   A.   That I would have generated an email about people showing up
5   to this event and potentially protesting at it?
6   Q.   Yes.
7   A.   Potentially.  Maybe I did.  I don't know.
8   Q.   Well, to the best of your knowledge and information today,
9   were you concerned, at the time, that protestors might show up to
10  protest the Roxxxy Andrews drag queen bingo event?
11  A.   With my experience with past events, no.
12  Q.   And why not?
13  A.   We had hosted Roxxxy Andrews the year before and had no
14  protestors.
15  Q.   And so, therefore, you assessed the -- would have assessed
16  that there would have been a low likelihood of campus disruption
17  if Roxxxy Andrews appeared again.  Do I understand your testimony?
18  A.   Potentially, uh-huh.
19  Q.   I'm going to direct you to what's been entered as Plaintiffs'
20  Exhibit 19.
21          MR. BOUCEK:  Your Honor, may I approach the witness one
22  more time?
23          THE COURT:  You may.
24  Q.   (By Mr. Boucek)  Take your time and once you familiarize
25  yourself with it, can you tell us what it is we are looking at?
```

1  A.    It's an email I sent to Timothy Stump, Dennis-Ray Armijo, and

2  Cheryl Wallace.

3  Q.    Is this a true and authentic copy of the email you sent on

4  September 19th, 2022, at 9:08 a.m.?

5  A.    Yes, that's September, so that was the previous Roxxxy.  That

6  was the first Roxxxy event.

7  Q.    And this was the one that you testified earlier had no

8  demonstrators appear at; is that right?

9  A.    No.  We were talking about the 2023 Roxxxy event.

10  Q.    I know, but I thought I understood you to say the reason why

11  you thought in 2023 there weren't going to be protestors is

12  because at the prior event, there were no protestors?

13  A.    Correct.

14  Q.    And this would be the event where there was no protestors?

15  A.    Correct.

16  Q.    Now, prior to the 2022 event, you were, however, concerned

17  that protestors would show up?

18  A.    That is correct.

19  Q.    And why were you concerned about that?

20  A.    Because we had just received hate mail in regards to the

21  University response to the Tomi Lahren event.

22  Q.    Now, what do you mean by hate mail?

23  A.    Threats, email threats in regards to this speaker coming to

24  campus, in regards to not doing anything in protecting Tomi

25  Lahren.

1  Q.    Now, you were concerned that the Roxxxy Andrews event in 2022

2  might be targeted as a, quote, "settle-the-score event."  Is that

3  right?

4  A.    Correct.

5  Q.    It, in fact, was not targeted as a settle-the-score event,

6  was it?

7  A.    No.

8  Q.    And, therefore, based on that, you concluded that when Roxxxy

9  Andrews returned in 2023, there was a low risk of campus

10  disruption; is that right?

11  A.    Based on my event management in the past, yes.

12  Q.    And had you assessed there to be a high likelihood of a

13  campus disruption, including protestors, you would have assessed

14  it more highly and let the police department know that you

15  expected there to be demonstrators; is that right?

16  A.    I have conversations with the police in regards to that, but,

17  yeah, I don't make the actual assessment.

18  Q.    No, I understand.  But you do pass along your assessment

19  about whether or not you think there will be demonstrators, right?

20  A.    If I am familiar, yes.

21  Q.    And you did not think there was a high degree of likelihood

22  of demonstrators appearing when Roxxxy Andrews appeared in 2023;

23  is that right?

24  A.    Correct.

25  Q.    And you would have shared that knowledge with the police; is

1    that right?

2    A.    Correct.

3    Q.    And, in fact, in 2023, you would have told them -- you did

4    not assess that there was a high degree of likelihood of

5    protesting at the Roxxxy Andrews event; is that right?

6    A.    Correct.

7    Q.    Now, you were also made aware of the fact that activists who

8    appeared at the Tomi Lahren event were incredibly disruptive.  We

9    heard a little bit of testimony about it, but tell us what you

10   know about the Tomi Lahren event.

11   A.    I was not present at the Tomi Lahren event.

12   Q.    Okay.  But you're aware of the concern about how

13   insufficiently that was staffed?

14   A.    I can't agree with that.

15   Q.    Well, tell me what you know about the fallout from the Tomi

16   Lahren event.  Was it considered to be disruptive?

17   A.    The Tomi Lahren event was -- there was a reaction.

18   Q.    Were there arrests made?

19   A.    I don't know.

20   Q.    Okay.  Well, I want to direct you to the last page of what

21   you're looking at, Exhibit 19.

22   A.    Sure.

23   Q.    And attached to your email that you sent out, you're quoting

24   a political commentator, and at the bottom you read:  The same

25   activist terrorizing Tomi Lahren.  Right?  Do you see that

1  paragraph?

2  A.    Uh-huh.

3  Q.    And can you read what the posting was that you attached to

4  your email?

5  A.    Yes.  So not my words:  Those same activists terrorizing and

6  the local police celebrated their actions with one posting, We

7  kicked Tomi Lahren out of the University of New Mexico campus, and

8  it took less than an hour of disruption.  It's our duty to shut

9  down white supremacist organizing every chance we get. The

10  individual ended the praise with, Fuck Tomi Lahren, fuck White

11  Supremacy.

12  Q.    Okay.  So you knew, at least at the time you generated this

13  email, the activist had appeared and disrupted this event?

14  A.    Yes.

15  Q.    Is there a reason why you couldn't testify to that earlier

16  unable --

17           COURT REPORTER:  I'm sorry, can you slow down?

18           MR. BOUCEK:  I apologize.  Chronic problem.

19  Q.    (By Mr. Boucek)  Is there a reason why you were unable to

20  testify about your knowledge about the Tomi Lahren event earlier?

21           MS. WILLIAMS:  Objection, Your Honor.  Misstates.  He

22  did not refuse to testify.

23           MR. BOUCEK:  If I may --

24           THE COURT:  I'm going to overrule.  Go ahead and get to

25  the --

1          THE WITNESS:  I was not at the event, so I did not

2    witness what happened.

3    Q.   (By Mr. Boucek)  But you were made aware, after the fact,

4    what happened?

5    A.   I heard people talking about it, yes.

6    Q.   And what did you hear them say?

7    A.   Just that there was people that tried to get into the event,

8    banging on doors, working to get into the event.

9    Q.   Were you concerned because of how much the Tomi Lahren event

10   was protested about future speakers brought in by TP-UNM?

11   A.   Was I worried?

12   Q.   Yes.

13   A.   I wouldn't say I was worried.

14   Q.   Were you concerned about the likelihood of protestors showing

15   up at future TP-UNM events?

16   A.   That's not my job to be concerned about it.

17   Q.   Well, it is your job to assess whether or not you think

18   campus disruption is likely; isn't that right?

19   A.   It's not my job to do so.  I don't make the security

20   assessment.

21   Q.   But you do do this, correct?

22   A.   I let people know on campus if there are potential

23   disruptions with events that are coming in that I'm aware of.

24   Q.   Okay.  And you don't know anything about whether the Kristan

25   Hawkins event ever was invoiced.  I think you testified to that

1    earlier.  I just want to make sure.

2    A.    Correct.  Other than this, than this trial.

3    Q.    Yeah.

4          Now, did you testify that you don't have anything to do with

5    invoices, you don't know what students are invoiced for, costs of

6    providing security?  Did I understand you correctly or am I wrong

7    about that?

8    A.    I don't invoice students, correct.

9    Q.    Do you ever see those invoices on the back end?

10   A.    Not often, no.  With my student organizations and my work on

11   campus, yes, I do.

12   Q.    Well, who are your student organizations?

13   A.    Who are my student organizations?

14   Q.    Yes.

15   A.    I work with -- I work with Mortar Board Honor Society.  I

16   work with a couple of other groups.  And then I don't work -- I

17   work with student government entities as well.

18   Q.    Are these just at the undergraduate university or with the

19   graduate schools?

20   A.    I work with GPSA, which is the graduate student government,

21   the undergraduate student government.

22   Q.    Is that a different registered student group?

23   A.    They're not registered student organizations.  They're

24   student government entities.

25   Q.    Okay.  Do you work with other registered student groups in

1    the graduate programs?

2    A.    Graduate programs?

3    Q.    Yes.

4    A.    What do you mean by work with other --

5    Q.    Well, I'm trying to understand.  You said "my groups."  I'm

6    trying to understand what you meant by "my groups."

7    A.    Sure.  Mortar Board Honor Society is primarily my student

8    organization that we work with.

9    Q.    Are you familiar with all the registered student

10   organizations?

11   A.    Yes.

12   Q.    And are there student organizations for the undergraduate

13   that are different than, say, the law school?

14   A.    Could you please clarify that one again?

15   Q.    Well, I'm just asking, are there student organizations at the

16   law school that are not student organizations for the

17   undergraduate university?

18         MS. WILLIAMS:  Your Honor, I'm going to object.

19   Mr. Lindquist can answer this question, but I was very mindful of

20   a very directed and tailored direct exam, covered three topics,

21   and we've gone far afield there.  I understand the leeway for a

22   preliminary injunction setting, but this is -- I object.

23         MR. BOUCEK:  This is really my last thing I want to ask

24   him.  And, again, the only reason why we're here is because we

25   insisted that the declarants testify to authenticate the

1  declarations.

2          THE COURT:  I understand he did submit a declaration,

3  but let's get to --

4          MS. WILLIAMS:  Your Honor, that is incorrect.  I said

5  that we couldn't do it on declarations because I wanted the

6  opportunity to cross-examine the declarants.  That's what I said.

7  And the declarants haven't even -- the declarations haven't even

8  come in.  So that's not what we agreed.

9          THE COURT:  The declarations are in the record and

10  I'm --

11          MS. WILLIAMS:  They're in the record, I understand.

12          THE COURT:  I'm going to consider all of them when I'm

13  determining this issue.

14      So to the extent you're asking him questions that go to his

15  declaration, I'll give you some leeway, but I do think that we

16  need to get to an end.

17          MR. BOUCEK:  I'm wrapping up, Your Honor.  I just want

18  to make sure.

19  Q.   (By Mr. Boucek)  Are there student organizations that are

20  just part of the undergraduate, or are there different student

21  organizations for, say, the law school?

22  A.   The question is confusing.  I'm sorry.  We have 340 chartered

23  student organizations on campus.

24  Q.   Do you know of any that are in the graduate school or are

25  they all just for the undergraduate?

1   A.   They all -- all student organizations are chartered through
2   our office.
3           MR. BOUCEK:  That's all my questions, Your Honor.
4           THE COURT:  Thank you.
5           MS. WILLIAMS:  I have two follow-up questions.
6           THE COURT:  Of course.
7                  REDIRECT EXAMINATION BY MS. WILLIAMS
8   Q.   Mr. Lindquist, Mr. Boucek asked you several questions about
9   your assessment of likelihood of risk for events that are held in
10  your purview?
11  A.   Yes.
12  Q.   What's your goal when analyzing likelihood of risk related to
13  an incident?
14  A.   The goal is to notify campus administrators if there's a
15  disruption on campus, so that they're aware of something that
16  could be coming up in not a normal activity on campus, a
17  University activity on campus.
18  Q.   And what is the effect of campus disruption on the University
19  community and your ability to do your job and keep students safe?
20  A.   When regular University business is disrupted, that impacts
21  basically the academic space or what other events are going on,
22  and if those events are regularly scheduled, regular business is
23  going on, we would, depending on where that location is, ask that
24  group to suspend their disruption.
25  Q.   Said simply, campus safety?

A.    Correct, yes.  Campus safety, yes, to notify people that
there could be activity on campus.

Q.    This hearing is to determine whether the Plaintiffs' request
that UNM halt the enforcement of the security fee policy, and the
collection of payment for security fees related to the Riley
Gaines event specifically, is going to be ordered by this Judge.
If the injunction is granted and UNM is forced to halt the
enforcement of the security fee policy, what would be the effect
on your ability to schedule student events?

A.    It would be pretty drastic.  Without the ability to schedule
events, campus life would come to a halt.

        MS. WILLIAMS:  All right.  Thank you.  That's all the
questions I have for Mr. Lindquist.

        THE COURT:  Thank you.  May this witness be excused?

        MR. BOUCEK:  Yes, Your Honor.

        THE COURT:  All right.  Mr. Lindquist, thank you for
your testimony.  You can go back down.

    Any further witnesses, Ms. Williams?

        MS. WILLIAMS:  No, Your Honor.

        THE COURT:  All right.  It looks like we've completed
the witness testimony, so let's get to the legal argument.  I
don't know who's going to be making that for the Plaintiffs.  I'll
give you -- we're running a little short on time and I do have the
briefs on the issue, so let's try to keep it to 10 or 15 minutes
each side and just hit the highlights.

1    And let's start off with the Plaintiffs' counsel by asking a
2    couple of questions.  It seems to me like you have a challenge, a
3    facial challenge, to the security fee policy.  You also have a
4    facial challenge to the free speech policy; is that correct?
5         MR. ISGUR:  Yes, Your Honor.
6         THE COURT:  With regard to the free speech policy -- I
7    know there's a lot with the security fee policy.  But with regard
8    to the free speech policy, tell me how it is that that policy is
9    unconstitutional under the way that you've argued it in your
10   briefs.
11        MR. ISGUR:  Your Honor, the free speech policy is
12   unconstitutional on its face because it doesn't provide any
13   guidance or real limitation on the ability of President Stokes to
14   enact speech policies.  And essentially without --
15        THE COURT:  Do they have to?
16        MR. ISGUR:  I'm sorry?
17        THE COURT:  Does it have to?  And I say that because it
18   seems to me that you're arguing, based on your briefs, that she
19   doesn't mention -- or that the policy doesn't mention making sure
20   that all policies are content-based neutral, for instance.  It
21   seems to me that's what you're arguing.  It doesn't say that, so
22   she has free reign.  That's how I saw the argument.  Because it
23   does say that all policies have to be viewpoint neutral and so
24   forth.  You're not arguing that that's the issue.  You're saying
25   that it gives her the discretion to pass regulations, rules,

1  policies, that might be content based or discriminate based on

2  content.  Is that right?

3        MR. BOUCEK:  Yes, Your Honor, that's correct.  And this

4  is partially tied into -- for one thing, it's tied into the

5  underlying security fee policy that we're challenging as vague and

6  over broad, the problem being that the free speech policy permits

7  that policy to have been passed in the first place is sort of an

8  underlying problem in the free speech policy, if that makes sense.

9        THE COURT:  Well, kind of, except you're making a facial

10  challenge.  So I'm looking at it plainly on its face, what does

11  the policy say?  It seems to me that the argument that you make,

12  at least in your briefs, I've never really seen that before, where

13  there's language, according to you, that's missing, and,

14  therefore, it gives her discretion to do something that's

15  unconstitutional.  For instance, the policy doesn't say -- the

16  free speech policy doesn't say anything about being race neutral

17  either, so does that mean that it discriminates on the basis of

18  race simply because it doesn't say that in there?  I just don't

19  know how far to take your argument.

20      The free speech policy, as far as I can see, is very short,

21  succinct, and it seems to me you're making this argument that it's

22  missing some language regarding content based regulations.  And

23  I'm not sure that I've ever seen a case like that before.  So tell

24  me more about -- because I just want to get to the security fee

25  policy challenge.  I think that one's probably your main argument.

1    But with regard to the free speech policy, what is it that is
2    facially unconstitutional?

3                MR. ISGUR:  Your Honor, I think you've correctly
4    outlined what we argue is facially unconstitutional with it, which
5    is that it appears to permit content based regulations that are in
6    violation of the First Amendment.  And to the extent the policy
7    would permit that, it is unconstitutional.

8        But I agree with you that the main thing we're here about
9    today is the security fee policy, and that's the major concern for
10   preliminary injunction.

11               THE COURT:  All right.  And I just wanted to raise that
12   because, I'll tell you now, I have serious questions about your
13   argument regarding the constitutionality of the free speech
14   policy.  But with regard to the security fee policy, that's a
15   little different, so let's hear that.

16       I want to point out I have, obviously, reviewed the security
17   fee policy.  There appears to be some factors outlined in the
18   policy.  You are making the argument that regardless of those
19   factors that are looked at, what is happening is it leaves
20   discretion in one official or officials from UNM to determine
21   based on things like the potential reaction to a particular
22   speaker.  It leaves it to their discretion, and that's what you
23   are alleging is unconstitutional and why it's vague and over
24   broad.

25               MR. ISGUR:  In part, Your Honor, yes.  So the policy is

1    vague and over broad not just for that reason, though.  The first

2    place the policy vests substantial discretion is in the preamble,

3    actually, when it says that the University officials may assess

4    security fees but provides no guidance whatsoever on when they may

5    and may not assess security fees.  That, in and of itself, is a

6    vagueness problem and a discretion problem under Forsyth County.

7         In addition though, Your Honor, the further problem is that

8    the factors outlined there don't link to any sort of objective

9    reality.  So the example used in our reply brief was the

10   University of California at Berkeley's policy, which clearly sets

11   out through a chart sizes of rooms, audience attendance numbers,

12   alcohol, et cetera, and then it gives a price.  So a student can

13   go look at a chart and they can see a price.  There's nothing like

14   that here.

15              THE COURT:  What's the price based on?

16              MR. ISGUR:  It's based on the size of the venue, the

17   duration of the event, exactly what venue, if I recall correctly,

18   whether alcohol is served may be factor.  But regardless, at the

19   end of the day, a student can look at it and they can get a price

20   or they can at least get close to knowing what price they'll be

21   charged.  There's nothing like that here.

22              THE COURT:  That's what I was going to ask you.  In your

23   mind, what does a constitutional policy look like as far as a

24   security fee policy?  If UNM was to say, for instance, that they

25   needed to know how many people were expected to attend, and based

1    on that, they would have an officer present for every 20 people,

2    and, therefore, they can give you more direction.  Would that be

3    more in line with a constitutional policy, in your view?

4         MR. ISGUR:  That sounds a lot closer, Your Honor, and

5    really we think that the UC Berkeley policy is a pretty good

6    guideline.  It's not perfect, by any means, but it's a very good

7    start and it makes clear that there shouldn't be any sort of

8    discrimination about content or the types of speakers at issue.

9         I would like to mention something opposing counsel, in

10   questioning a witness a moment ago, Mr. Lindquist, mentioned, the

11   breadth of the security fee policy.  We are entirely comfortable

12   with an injunction that only enjoins the policy as to speech

13   events, events with First Amendment protected activity.  There's

14   no First Amendment problem in applying the security fee policy to

15   basketball tournaments or to football games.  And from looking

16   through discovery, that's most of the use of the policy.  We don't

17   expect you to enjoin that.  We wouldn't want you to enjoin that.

18   That would go beyond the scope of what we're requesting.

19        THE COURT:  Let me ask you, since we're talking about

20   Mr. Lindquist, what is wrong with the University considering

21   factors, things that may, in their view, affect the safety of the

22   campus or the students who are on campus?  For instance, if there

23   is some knowledge from the University that the last time a

24   particular speaker went to the University to speak there was a

25   disruption, why can't they consider that?  I mean, why would they

1   have to -- I'm asking you truthfully, I want to hear what you want
2   to say.  Why would they have to turn a blind eye to that?  Is that
3   your argument, that they cannot even consider the fact that a
4   particular speaker might sort of create a hostile environment
5   based on the way that they're perceived in the public eye?

6          MR. ISGUR:  Your Honor, they can and should consider
7   that in determining how to effectively safeguard their campus.
8   Our problem isn't that they want to assign additional officers to
9   events like the Riley Gaines event.  We do think that the number
10  they assigned was particularly excessive.  Our problem is with the
11  fees charged in association with that.  If the University wants to
12  staff 33 officers at the Riley Gaines event and then charge for a
13  more nominal amount as would be normal for an event, that's fine.
14  The problem is in charging the speaker for it.

15         And the issue comes back just to Forsyth County where a
16  speaker is being charged a fee based not on what they are to do or
17  what they're there to get the crowd to do.  It's different if
18  you've got a Brandenburg situation, you've got incitement.  But
19  when they're being charged additional amounts due to someone else
20  coming on and hearing their speech and deciding to go after them
21  for that speech.  That's what's happening in all these cases with
22  the protestors and the disruptive behavior.  You end up with
23  heckler's veto situation, which we outlined --

24         THE COURT:  Slow down a bit.

25         MR. ISGUR:  I apologize.

1    You end up with a heckler's veto situation, like we outlined

2    in our opening brief, which the Tenth Circuit clearly said is

3    unconstitutional and the Supreme Court and other circuits

4    generally agree is unconstitutional.  That's the concern here.

5         Your Honor, I'd like to take a moment to walk through some of

6    the exhibited invoices that we introduced, as I think that that

7    actually really tells the story of what has happened with the

8    security fee policy.  It starts with Exhibit 12, which is the Ken

9    Starr invoice.  Ken Starr, of course, is a fairly controversial

10   speaker, and Ken Starr was charged $650 to come and speak.

11        THE COURT:  What year was that?

12        MR. BOUCEK:  That was -- so this is going to go in

13   chronological order.  That was January of 2019.

14        Following that, they had --

15        THE COURT:  Do you know what that was based on?  Do you

16   know whether or not, for instance, the fee was based on the fact

17   that they expected 50 people to attend as compared to 200 people

18   or --

19        MR. ISGUR:  I don't know the exact expectation for how

20   many people were supposed to be there, but the numbers get so out

21   of whack that it -- honestly, Your Honor, I don't know if it

22   matters whether it was 20 people, 50 people, or 100 people.

23        THE COURT:  Well, it does matter, because if we're

24   comparing apples to apples and we're saying -- you're making the

25   argument, look, they're charging organizations like TP this amount

1    of money and we've never seen that before -- I think that was the
2    testimony of one of the witnesses -- and then you're comparing it
3    to others and saying, look, they only charged so much for this
4    speaker, I think it matters the details of that.  I need to
5    know -- it seems to me like the Court would want to know how many
6    people were at that event.  Where did it take place?  What was --
7    you know, kind of more of the context of the situation than just
8    being able to say, well, they only charged 650 to Ken Starr and
9    they're trying to charge TP $5,000.  I think I need to have more
10   information to be able to compare those two, unless you're
11   thinking differently than I am.  I don't know, but --
12           MR. ISGUR:  Your Honor, I am thinking a little
13   differently than you are on it.  So if I can proceed through it, I
14   think it will become clear.
15       Will Witt, another conservative TP-UNM sponsored speaker
16   came, and that's Plaintiffs' Exhibit No. 13.  He came in April of
17   2019 and was charged $270 for two officers to provide security,
18   and Will Witt, as the invoice itself actually in Exhibit 13 notes,
19   is a controversial speaker who speaks from a conservative right
20   wing perspective.  So the University was aware of that and charged
21   $270 to come and speak.
22       Then there was COVID and nothing happened on campus for
23   awhile.  But then there's the Tomi Lahren invoice at Plaintiffs'
24   Exhibit 14.  Tomi Lahren came to campus and was charged 1,100 when
25   she came and spoke.  Following that -- so directly following the

1   Tomi Lahren incident, which concerned the University because of
2   the disruption that occurred, Ian Haworth comes to campus and Ian
3   Haworth is charged $6,502.50.  To the best of my knowledge, the
4   Ian Haworth event and the Tomi Lahren event aren't meaningfully
5   different in terms of attendees or expectation.  They occurred
6   fairly close in time to each other --

7           THE COURT:  Isn't the difference here, though, when
8   you're talking about cases like Forsyth County, that was based
9   on -- I believe it was the county manager or administrator's
10  discretion, and it appeared like he was just saying, I believe
11  this might be the kind of reaction we get.  Here, there's actual
12  evidence -- I mean, UNM has some information that a particular
13  speaker -- it seems to me like the 1,100 that they charged for
14  Lahren might not have been enough.  They didn't have enough
15  security there and they learned a lesson.
16      What's wrong -- isn't that a little different than the
17  situation we have in Forsyth?

18          MR. ISGUR:  No, Your Honor, I don't think it is.
19  Because there were two issues in Forsyth County.  So the first
20  issue in Forsyth County is the one you're pointing to, which is
21  the vagueness and over-breadth and the discretion that vests in
22  the enforcing official, which we do allege is present here.

23          THE COURT:  I think you presented some evidence of that,
24  but there's an additional sort of factor here, and that is that
25  there's actual prior instances where they've kind of learned that

1    they need a certain amount of officers there.  And I'm not sure

2    it's viewpoint related.  I think it's more just if you have

3    controversial speakers on either side, we're going to need

4    additional security.  What's wrong with UNM doing that?

5            MR. ISGUR:  First, Your Honor, that's not what they're

6    doing, as I think the very next exhibit will demonstrate in just a

7    second.  But the other problem with that is that if the discretion

8    is still vested largely in UNM officials like Commander Stump,

9    they get to sort of play with the numbers and come up with

10   whatever they think makes sense.  And I think that the invoices in

11   this case charged to Gaines actually make that pretty clear.  We

12   started off at $10,400, we somehow wound up at $5,300.  It

13   probably isn't a narrowly drawn definite policy if one official

14   can end up shifting it by 50 percent.

15           THE COURT:  But he shifted it -- correct me if I'm

16   wrong, and I'm sorry to interrupt your outline there, but we've

17   heard testimony that the 10,000 was basically a quote, basically

18   here's how much we could charge you based on the information that

19   we have.  And then as it actually occurred and they were letting

20   officers go from the event when it was clear there wasn't going to

21   be disruptions, then they got down -- the actual cost ended up

22   being 5,000.  So it wasn't like he was making things up before the

23   event even happened.  What we're hearing -- the testimony we're

24   hearing is he quoted it -- and I'm not saying that that process by

25   which he did that is correct or constitutional.  I'm not getting

1  there yet.  But I just don't see the argument that he was just

2  kind of making up numbers as he went along, because it seems like

3  it was based on what really happened as the event took place.  Or

4  am I wrong about that?

5          MR. ISGUR:  Your Honor, I'm not saying he made up

6  numbers as he went along, exactly, but he is using substantial

7  discretion to shift the amount of fees being charged.  We started

8  off at 10,000, and the students were told they needed to agree to

9  pay the fee or the event would be canceled.  The students

10 basically came back and negotiated him down to 7,400, if I recall

11 correctly, and then they were told they'd try and dismiss officers

12 as it went.  And then the final invoice went down to 5,300.  But

13 either way, the discretion to go from $10,000 to $7,000 to 5,400,

14 is a lot of discretion, and it's not clear how he's using that or

15 what the standards for it are, because, clearly, there's at least

16 one factor that isn't present anywhere in the policy 2230 that is

17 being used here, which is the potential for campus disruption, the

18 potential for hecklers, the potential for the heckler's veto, and

19 for that sort of thing to break up.  That's not listed in the

20 policy.

21      And opposing counsel has made, I think, a big point of

22 explaining that they do consider that because it's relevant to

23 campus safety, and it is, but it shouldn't be relevant to a

24 determination of security fees because that is a First Amendment

25 problem.

1    And, Your Honor, I'd like to move on to the 16th exhibit, the
2    next one.  So right after Ian Haworth comes and is charged $6,500,
3    Dr. Ibram X. Kendi comes to campus, who is --
4              THE COURT:  What number is this?
5              MR. ISGUR:  This is Plaintiffs' Exhibit 16, Your Honor.
6              THE COURT:  16, okay.
7              MR. ISGUR:  Dr. Ibram X. Kendi comes to campus.
8    Dr. Kendi is, I think, by virtually any definition a controversial
9    speaker, and he is charged for two hours of Commander Stump's time
10   at $58 an hour for $116.  That occurred three weeks after Ian
11   Haworth was on campus.
12        Three weeks later, after that, we have Exhibit 17, which is
13   the Charlie Kirk event where Charlie Kirk comes to campus and is,
14   again, charged $6,430.  So it isn't just that the fees sort of
15   vary widely or that the fees are only charged when there's a
16   controversial speaker who might cause disruption, but they're
17   being charged unevenly against liberal and conservative speakers
18   who are controversial.  There really isn't much dispute about
19   that.
20        It's also noteworthy that the Tomi Lahren goes off and is
21   immediately followed by the Ian Haworth and Charlie Kirk events
22   that are charged much higher numbers because those occurrences
23   demonstrate the University is considering the Tomi Lahren event
24   and, thus, the heckler's veto problem is going into the equation,
25   and that is always an unconstitutional speech restriction.

1          Your Honor, if I may, I'd like to turn to one more exhibit

2   I'd like to briefly discuss, which is Plaintiffs' Exhibit 25.

3   Plaintiffs' Exhibit 25 is an email from Timothy Stump to Louise

4   Maez, who it's our understanding handles invoicing and record

5   keeping.  It involves Commander Stump informing her that there

6   were two unpaid invoices out that he was aware of.  One of them is

7   the Kristan Hawkins speaking event and the other is the Riley

8   Gaines speaker event.  And then he indicates that he's provided

9   those to the Office of University Counsel who is handling both of

10  those.  So to the extent that opposing counsel attempts to say

11  that there's no litigation risk present here, it's rather odd to

12  provide unpaid invoices to the Office of University Counsel if

13  litigation or consequences or anything like that isn't a possible

14  consideration available.  And this did occur well before the

15  lawsuit happened.

16         Also of note, we haven't received the Kristan Hawkins

17  speaking event invoice for Students for Life America.  We're not

18  sure why we haven't.  We're in discussion with opposing counsel

19  about that.  But we think that that invoice, assuming we're

20  correct and that's about $8,000, does show the same trend of

21  charging conservative speakers very large amounts in security

22  fees.

23         Your Honor, I know you said you wanted me to keep this fairly

24  short, so we think the merits in this case are largely uncontested

25  on the facts.  We have a very high likelihood of success on the

1  merits against the security fee policy.  The threat of irreparable

2  harm is demonstrated by Mr. Gonzales and Ms. Clark and their

3  respective testimony.  And we will be briefing standing in full

4  later, but on those matters, we're comfortable.  And then the

5  third and fourth prongs merge and the Government -- opposing

6  counsel --

7          COURT REPORTER:  I'm sorry.

8          THE COURT:  You're mumbling a little bit.

9          MR. ISGUR:  I am.

10     Your Honor, what I mean to say is you should grant the motion

11  for preliminary injunction.  And unless you have further

12  questions, I'll --

13          THE COURT:  Not at this time.  I might come back to you

14  later.  I appreciate it.  Thank you.

15          MR. ISGUR:  Thank you, Your Honor.

16          THE COURT:  Ms. Williams, you have four minutes.

17          MS. WILLIAMS:  I can do this in four minutes.  They

18  didn't meet their burden.

19          THE COURT:  I'm just joking.  Go ahead.

20          MS. WILLIAMS:  Your Honor, there's four factors that

21  Plaintiffs had to prove to you today, and I know that you've

22  listened attentively and I appreciate your questions and to the

23  evidentiary foundation that you've heard today.

24     The factors I'd like to talk about, because there is an

25  absolute dearth of evidence on them, are there is not a single bit

1    of evidence that there is irreparable harm to either of these

2    Plaintiffs that can be remedied by not enforcing the security

3    policy until this -- in a preliminary injunction setting.

4         THE COURT:  I heard testimony today from Mr. Gonzales

5    that TP-UNM would like to be able to schedule speakers this fall,

6    but they're unable to do so because they wouldn't be able to

7    afford the kind of security fees that they've been charged in this

8    case.  So why doesn't that meet that standard?

9         MS. WILLIAMS:  Because that's completely speculative.

10   They have not set up a speaker.  They have not requested a

11   speaker.

12        THE COURT:  The law doesn't require that it be set in

13   stone.  The law just requires that even if it is -- even if it is

14   just them thinking they want to, to the extent that they've proven

15   that they're not able to because they won't be able to pay for it,

16   why would they have to wait?  The law actually says they don't

17   have to wait.  They don't have to wait and actually incur that

18   cost before they challenge something that they believe is

19   unconstitutional.  So I'm not seeing your argument that they

20   haven't met that prong.

21        MS. WILLIAMS:  Well, Your Honor, they have been able to

22   schedule whatever requested meetings that they have been wanting

23   to schedule other than these that they just started talking with

24   someone about five weeks ago after the national organizations

25   reached out to them.  And there is --

1          THE COURT:  Isn't that important?  The meetings and so

2    forth, that's one thing.  But to have speakers come and speak

3    publicly at the University on these issues, that's important to

4    them.  Obviously, that's important to them.  They wanted to do it.

5    From the evidence or the testimony I heard, they wanted to do it

6    in the spring of 2024 and weren't able to do it because they felt

7    they could not incur another fee.  So, again, it doesn't seem to

8    me like they have to go any further than that, at this stage, to

9    show that they have been injured, especially if I find that

10   there's a substantial likelihood of success that they're going to

11   prove that the policy is unconstitutional.

12         MS. WILLIAMS:  And that is the hardest prong, Your

13   Honor, because obviously you have to delve into the actual merits

14   with limited evidence that you've received this afternoon to

15   determine whether they're likely to succeed on the merits.

16         THE COURT:  Well, when I'm looking at that prong and I'm

17   looking at -- it's a facial challenge to the security fee policy.

18   I can see the factors that are supposed to be considered, but I

19   can also see the Plaintiffs' argument, how are those applied on a

20   case -- from one organization to another?  Because we see that

21   somehow it's applied very, very differently as we're moving along.

22   We don't have information about things like venue or location or

23   the number, but that's a lot of difference.  That's a huge

24   difference between a $6,000 security fee invoice and a 100 and

25   whatever it was fee for Mr. Stump's time.  So I'm concerned that

1    there's something awry here with regard to the policy.

2                 MS. WILLIAMS:  Well, Your Honor --

3                 THE COURT:  And let me just add this:  The evidence

4    that's been presented, both in the audio recording -- well, mostly

5    in the audio recording, is that there is a lot of discretion left

6    to a UNM official on what the fee should be.  And we've also heard

7    some evidence, even from the Defendants themselves, that it's

8    based partly on what they expect the reaction to be.  And that is

9    a concern because I don't see the difference between that and the

10   issue that the Supreme Court dealt with in Forsyth County.  I see

11   it very, very similar.  So tell me what is the distinguishing

12   features between this case and what went on in Forsyth County.  As

13   you know, the United States Supreme Court struck down that policy,

14   and so I need to know what the difference is.

15                MS. WILLIAMS:  I agree, and thank you for the question.

16   It was one of the things on my argument.

17        Forsyth County made it very clear that one official, one

18   county official, had complete control over the decision making.

19   The evidence that you've heard today, and looking at the exhibits

20   that Plaintiffs have presented -- we put no exhibits into evidence

21   today -- shows through the emails, through the risk analysis that

22   they went into, 27 and 28, that there is a multitude of input from

23   a multitude of departments at UNM, from the finance department,

24   Louise, the last person they referenced, from Mr. Lindquist,

25   student activities department, from the facilities department,

1    which you didn't hear from Ms. Wallace but you have her

2    declaration, and from the police department.  We have input on the

3    nine factors that are outlined in that policy.

4        And I will say the policy is -- the factors are not 100

5    percent exhaustive because we know from the law you can't make an

6    exhaustive list of requirements.  There are tests.  You can fit

7    different subcategories into a factor.  And I think that UNM's --

8    the evidence here is that UNM has tried through at least five

9    departments in this security risk analysis/security fee

10   determination, it's not discretionary from one official, which it

11   was in Forsyth.  It is a system-wide determination from interested

12   people -- I'm not going to call them stakeholders because they're

13   all UNM -- but facilities, activities, finance, police.  They all

14   have input that goes into the development of the security fee.

15   It's not absolute discretion that was struck down in Forsyth

16   County.

17             THE COURT:  Who, then, decides the fee at the end of the

18   day?

19             MS. WILLIAMS:  The person who compiles the

20   information -- and you saw he's put -- he's cc'd on emails and

21   stuff, is the lieutenant in charge of the risk assessment.

22             THE COURT:  Wasn't that Mr. Stump in this case?

23             MS. WILLIAMS:  Yes.  It was Lieutenant Stump at the

24   time, yes.

25             THE COURT:  Commander Stump now?

1          MS. WILLIAMS:  Commander Stump.

2          THE COURT:  That's what I mean.  I'm not sure <u>Forsyth</u> is

3    saying that it was unconstitutional because the discretion was all

4    in one person, period, all the way across as to what was -- what

5    kind of event this could be.  I think the issue was that there was

6    discretion as to the fee as it ran across organizations.  And I

7    see it very similar here.  Mr. Lindquist testified that even

8    though he has input, he has nothing to do with the fee.

9          MS. WILLIAMS:  Correct.

10         THE COURT:  Ultimately, who decides the fee?  That is

11   what lends itself to a dangerous situation, according to the

12   Supreme Court and the cases that I've been reading.  That's what

13   lends to the dangerous situation where you have one individual,

14   who might not have bad intentions.  Obviously, I don't think

15   Commander Stump has any bad intentions.  He's thinking about

16   safety.  He's thinking about things of this nature.  But the

17   problem is that it lends itself to say this speaker, this

18   organization, is going to be charged more than this organization

19   because their speakers tend to be more controversial.  That's the

20   problem the Supreme Court saw in <u>Forsyth</u> and some of the other

21   circuits -- a lot of the circuits have actually agreed.

22        You heard Plaintiffs' counsel state that there are examples

23   of policies out there that could be -- that are clearly

24   constitutional, where someone can just look -- an organization who

25   wants to bring a speaker can look at it and say, This is

1    approximately how much it's going to cost us.  Here, there is none

2    of that.  They have to go, have a meeting, talk about it, and then

3    even though there's input from a lot of different people, at the

4    end of the day, somebody has a discretion to say $10,000, $5,000,

5    $7,000, $100.  And that's the real issue that we're seeing.  And,

6    again, we're not talking about, you know, malice on the part of

7    anybody or bad intentions.  It's just the way the situation plays

8    out when you have these sort of broad policies.

9            MS. WILLIAMS:  And, Your Honor, I appreciate the

10   concern, but in an institutional setting, there's always gonna be

11   someone who has to sign the document, who's gonna be the guy who

12   goes out and contracts with the APD officers and the New Mexico

13   State Police to provide the security for the event.  And at UNM

14   that ends up to be Stump, after he considers all the input from

15   each of the institutional stakeholders, that then go into his

16   evaluation of the factors, with their input, and he has to say,

17   Tomi Lahren, six cops wasn't enough.  We need more cops out there.

18   And he has to use his experience in evaluating those factors and

19   the real life experience on the ground to determine how to keep

20   the event safe for the speaker, for the public, for the students,

21   for the facility.  Sometimes these facilities -- and Tomi Lahren,

22   huge amounts of property damage were done.  And that becomes his

23   problem if he doesn't have security.

24           THE COURT:  Completely -- I completely understand that.

25   I completely understand the --

1    MS. WILLIAMS:  So I don't know if we would --

2    THE COURT:  Well, the problem, though, is you get to the

3  point where you say something like -- now, if it was the Barbie

4  Movie, I wouldn't be concerned about that, but I'm concerned about

5  this.  That's where we get into this area where you're -- not

6  intentionally, maybe, but you're getting into a point where you

7  are making a decision or potentially making a decision based on

8  your view or on the content of that speaker's speech.  And that is

9  where the rubber hits the road.  How -- well, with regard to the

10  policies, how should those policies look?

11    And, again, what the Supreme Court has told us is those

12  policies have to be narrowly tailored, right?  They have to be

13  specific.  They have to give people who want to bring speakers

14  onto a public campus direction and an understanding of what

15  they're going to be charged and why.  And it seems to me the

16  Plaintiffs are making a pretty good argument, just based on the

17  face of the policy, that it is overly broad and possibly vague and

18  could lead to these situations that the Supreme Court has said

19  cannot -- the law cannot muster.

20    MS. WILLIAMS:  And that will ultimately be your

21  decision, but I do not think, when you look at the factors, when

22  you look at how the policy is enforced in practice, that it is not

23  facially unconstitutional, either of the policies under dispute,

24  the free speech one or the security policy one.

25    So I just don't think that they're going to have a likelihood

1  of success on the merits that the policy's facially

2  unconstitutional because there's nine factors that are considered

3  by the University to determine how to keep the campus secure and

4  safe.

5      And the security fee is based on the actual cost of security.

6  There's no money-making incentive in that discretion.  It's not --

7  it's not to Stump's benefit to, like, get a cop party going on

8  with 500 cops.

9      THE COURT:  And I don't think that that's the argument

10  that's being made, and I don't see it that way, and I certainly

11  don't see the Plaintiffs making that argument.  I think what

12  they're saying is, again, even if it's based on how many officers

13  are going to be on the scene, that determination, how many

14  officers need to be on the scene or at the event, is going to be

15  based on, in some ways, the viewpoint of the speaker or the

16  content of the speaker's speech, and that's where the problem

17  comes down.

18      MS. WILLIAMS:  And there's no evidence that the decision

19  was based on the content of the speaker's speech.

20      THE COURT:  No, no.  What I'm saying is that it lends to

21  ultimately being content based or viewpoint based discrimination,

22  not because that's what it was intended to be, but because of the

23  way the policy's set out, because it's so broad, because it's so

24  vague, and because there's discretion in somebody to decide what

25  that fee should be.  That's where the issue comes down to, in my

 1  view.  And I don't see that much difference between this case and
 2  Forsyth, to be honest with you.
 3          MS. WILLIAMS:  Okay.  Well, obviously, you get to
 4  decide.
 5          THE COURT:  I mean, I'm just -- I'm playing the devil's
 6  advocate here and I want to hear your best argument.
 7          MS. WILLIAMS:  I understand that and I appreciate that.
 8  But I think that it is distinguishable from Forsyth because we
 9  have the syndicated evaluation of the factors in the policy which
10  everyone can read and everyone can see and everyone can have input
11  based on real life data.
12      We know that the Tomi Lahren's event was understaffed, and
13  lesson learned in that case.  And the events that had higher
14  security and higher security fees, surprise, were safer events.
15  They did not result in an unsafe situation on campus or for the
16  speaker.  Each of those events was safe because the level of
17  security that was assessed allowed that event to be safe.  The
18  Plaintiffs all said there wasn't a problem at Riley Gaines, and I
19  will say that you can connect the dots that that's because there
20  was a huge security presence making sure the event was safe, that
21  people did not misbehave and did not act up because the correct
22  amount of security was there to meet the purpose of the policy and
23  to keep the event safe, so that the free speech element could be
24  manifested under the regents policy.
25          THE COURT:  I think you're probably right.  I think

1    you're probably right.  That's probably a fair inference.

2              MS. WILLIAMS:  Right.

3              THE COURT:  Is that those events were safe because there

4    were a sufficient amount of officers there.

5              MS. WILLIAMS:  And so --

6              THE COURT:  But ultimately what happens, Ms. Williams,

7    is you end up with this fee that's very high.  Organizations like

8    TP-UNM can't pay them or are concerned that they might not be able

9    to pay them, so they're not going to call their speakers anymore.

10   They're not going to bring speakers in.  And that's the real

11   concern here, is everyone should have that opportunity to speak

12   freely on that campus.  And TP is telling us that they can't

13   because of these fees.

14             MS. WILLIAMS:  Except they have paid the fees in the

15   past.  Higher fees, in fact.

16             THE COURT:  What does that mean?  What does that mean

17   with regard to them telling me now that they can't afford the fees

18   going forward?

19             MS. WILLIAMS:  I think that it means that they don't

20   want to afford the fees, but that's an inference from the

21   testimony that we heard.  And I think that it's now not about the

22   event but about the implications for these kinds of organizations

23   dealing with University settings in states that are more liberal

24   than not.

25             THE COURT:  Thank you, Ms. Williams.  I do have the

1    briefs, so I think I can --

2              MS. WILLIAMS:  And I appreciate that.  And so we think

3    that they failed on all four elements of the preliminary

4    injunction standard, and we have briefed that.  And I know that

5    you listened carefully to the evidence today, and I appreciate

6    that.

7              THE COURT:  Again, you will have an opportunity to

8    respond to the exhibits that were presented today.  The reason I

9    allowed them in is because it sounded like the Plaintiffs just

10   received that in discovery.  I wanted to give them a fair chance

11   to present those.  But you can also respond to those.

12       I will look at the briefs on the standing issues because I

13   agree with you that before I move forward with any decisions, I

14   have to first determine the standing of both LI and TP, and I'll

15   be doing that as well.

16             MS. WILLIAMS:  Thank you, Your Honor.  Appreciate it.

17   Do you have any other questions for me?

18             THE COURT:  I have a lot of questions for you,

19   Ms. Williams.

20             MS. WILLIAMS:  I am happy to stand here and answer

21   questions.

22             THE COURT:  But for now, I think we've run into -- we're

23   getting to the point --

24             MS. WILLIAMS:  The marshals are going to --

25             THE COURT:  Exactly.  The marshals are going to start

1   calling me soon.

2        Briefly, do you have anything you want to add before -- it is

3   your motion, so if you want to chime in on anything, I'd be glad

4   to hear it.  But we only have about, at the most, ten minutes left

5   here.

6              MR. ISGUR:  I have two of them.

7              THE COURT:  Okay.

8              MR. ISGUR:  Thank you, Your Honor.

9        First, Your Honor, as you point out, the fact that they

10  didn't host events, that TP-UNM did not host events in the spring,

11  is an extremely important fact for demonstrating the alleged

12  injury -- the alleged future injury is not speculative.  This is

13  going to keep happening.  They will not host events with these

14  security fee policies in place.  They are prevented from speaking.

15       Second, Your Honor, we made both a facial and an as-applied

16  challenge.

17             THE COURT:  Yes.

18             MR. ISGUR:  Thank you.

19       And, lastly, Your Honor, the key point of <u>Forsyth</u> that I

20  think may have been left out of the discussion is that vesting

21  large amounts of discretion in government officials is the harm

22  itself.  It isn't a question necessarily whether that discretion

23  is abused or whether it is used correctly.  The vesting of the

24  discretion itself to control speech is the injury that causes the

25  problem that the Supreme Court was addressing in <u>Forsyth County</u>.

1    So you're correct, we're not saying that anyone on UNM's side
2  did anything malevolent or is trying to suppress speech.  But
3  there is an enormous amount of discretion vested in them
4  collectively.  We agree with you that there's nothing in <u>Forsyth</u>
5  <u>County</u> to indicate that it matters whether it's 1, 5, 10 or 20
6  people.  You can abridge First Amendment rights by committee if
7  you want to.
8    I think that's all I have to add to the conversation unless
9  you have any questions, Your Honor.
10    THE COURT:  No.  I don't have any further questions.
11  Thank you for your arguments today.
12    MR. ISGUR:  Thank you very much for your time, Your
13  Honor.
14    THE COURT:  All right.  So I think everyone knows what's
15  next on my plate here.  I'll be waiting for the completion of the
16  briefing on the standing issues and any briefs that you want to
17  submit with regard to the additional exhibits.  Once I get all
18  that in front of me and am able to sort of digest it, I will try
19  to get a ruling out on the motion for preliminary injunction.
20    This case has been set for trial; is that correct?  When is
21  it set for trial?
22    MS. WILLIAMS:  June next year, I think, Your Honor.
23    THE COURT:  Well, if the parties get to the point where
24  they want to move that up -- I think that was set simply because
25  what we ordinarily do is we look at what the magistrate judge has

1  done in terms of their scheduling order, and we just add a series

2  of months after that.  But if the parties believe that they can

3  move forward quickly, more quickly, and they want a resolution,

4  I'll be glad to entertain that.  We have some availability near

5  the end of this year for a trial if that's what the parties want

6  to do.  I don't know how much more discovery you have to do.  But

7  you can always advise the magistrate judge that you want a quicker

8  trial or a sooner trial, and that word will get to me and I'll set

9  that.

10       All right.  Anything further from anyone?

11            MS. WILLIAMS:  No, thank you, Your Honor.

12            MR. ISGUR:  No, Your Honor.

13            THE COURT:  Thank you all for being here today.  Court

14  will be in recess.

15  (Court in recess at 5:45 p.m.)

16

17

18

19

20

21

22

23

24

25

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                      FOR THE DISTRICT OF NEW MEXICO

 3    _____
                                      )
 4    LEADERSHIP INSTITUTE and        )
      TURNING POINT USA at the        )
 5    UNIVERSITY OF NEW MEXICO,       )      No. 24-CV-00187-DHU-JMR
                Plaintiffs,           )
 6                                    )
                                      )
 7         vs.                        )
                                      )
 8    GARNETT STOKES, in her official )
      capacity as President of the    )
 9    University of New Mexico, et al.,)
                Defendants.           )
10    _____)
```

11                   CERTIFICATE OF OFFICIAL COURT REPORTER

12          I, CARMELA V. McALISTER, CRR, RPR, CMRS, New Mexico CCR #306,

13    Federal Official Realtime Court Reporter, in and for the United

14    States District Court for the District of New Mexico, do hereby

15    certify that pursuant to Section 753, Title 28, United States

16    Code, that the foregoing is a true and correct transcript of the

17    stenographically reported proceedings held in the above-entitled

18    matter on July 11, 2024, and that the transcript page format is in

19    conformance with the regulations of the Judicial Conference of the

20    United States.

21

22

23

24

25

1    Dated this 22nd day of July 2024.

2

3

4
_____
5    CARMELA V. MCALISTER, CRR, RPR, CMRS, NM CCR #306
United States Court Reporter
6    333 Lomas Blvd., NW
Albuquerque, New Mexico  87102
7    Phone:  505-348-2094
Email: carmela_mcalister@nmd.uscourts.gov
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25